UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| EDNA SELAN EPSTEIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 6:14-cv-01606-MGL |
| Plaintiff, | ) ) | __CLASS ACTION__ |
| vs. | ) ) ) | **SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL** |
| WORLD ACCEPTANCE CORPORATION, *et al.*, | ) ) ) | **SECURITIES LAWS** |
| Defendants. | ) ) ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ...................................................................1

II.    JURISDICTION AND VENUE ................................................................6

III.   PARTIES ...................................................................................................7

    A.    Plaintiff ............................................................................................7

    B.    Defendants ........................................................................................7

IV.   SUBSTANTIVE ALLEGATIONS ..........................................................11

    A.    Confidential Witnesses ..................................................................11

    B.    Background of the Company ...........................................................15

    C.    World Acceptance Built a $1 Billion Empire Preying on Individuals with No Place to Turn ...............................................................................16

        1.    The Company Targeted Those Who Were Economically Disadvantaged, and Even America's Service Members ...........................16

        2.    A Payday Lender Dressed in "Installment" Clothing ...............................19

        3.    Employees Ignored Written Policies to Meet Loan Quotas.....................21

        4.    The Company Flouted State Usury Laws Using Bogus Insurance Products.............................................................................................26

        5.    World Acceptance Kept Hold of Its Customers Until They Either Defaulted or "Died on the Books" ............................................................31

            a.    Employees Pressed for Renewals During Every Visit and Phone Call.....................................................................................32

            b.    "Pay-to-Renew" Practices Avoided Delinquencies ......................35

        6.    The Company's Reported Loan Growth Was Misleading Due to Faulty Accounting.............................................................................38

    D.    Defendants Knew of or Recklessly Disregarded World Acceptance's Deceptive Lending and Renewal Practices..........................................41

        1.    The Departure of Three Individual Defendants During the Class Period Supports a Strong Inference of Scienter .........................................42

**Page**

       2.      Defendants Admitted to Closely Monitoring and Evaluating the Operations, Underwriting and Accounting Underlying the Company's Illicit Practices ............................................................................................44

       3.      Defendants' Scienter Is Further Evidenced by the Magnitude and Duration of the Fraud Involving World Acceptance's Core Operation.....47

       4.      Defendants Knew of the Company's Illicit Practices from Media Scrutiny During the Class Period...............................................................48

  E.     World Acceptance's Predatory Practices Eventually Caught the Eye of the Bureau ..................................................................................................................48

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....50

  A.     Third Quarter 2013 Results.....................................................................................50

  B.     Fourth Quarter and Full Year 2013 Results...........................................................57

  C.     First Quarter 2014 Results ......................................................................................68

  D.     Second Quarter 2014 Results..................................................................................78

  E.     Third Quarter 2014 Results.....................................................................................85

VI.   DEFENDANTS MINIMIZE THE FINANCIAL IMPACT OF THEIR FRAUDULENT PRACTICES ..........................................................................................92

  A.     Fourth Quarter and Full Year 2014 Results...........................................................92

  B.     First Quarter 2015 Results ....................................................................................100

  C.     Second Quarter 2015 Results................................................................................104

  D.     Third Quarter 2015 Results...................................................................................110

  E.     Fourth Quarter and Full Year 2015 Results.........................................................114

  F.     First Quarter 2016 Results ....................................................................................121

VII.  THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES .....125

VIII. LOSS CAUSATION.......................................................................................................136

  A.     July 3, 2013 Disclosure ........................................................................................138

**Page**

      B.     July 25, 2013 Disclosure ....................................................................140

      C.     November 4, 2013 Disclosure..........................................................143

      D.     March 13, 2014 Disclosure ..............................................................145

      E.     April 29, 2014 Disclosure ................................................................148

      F.     September 5, 2014 Disclosure .........................................................150

      G.     June 2, 2015 Disclosure ...................................................................152

      H.     August 10, 2015 Disclosure ............................................................154

IX.     PRESUMPTION OF RELIANCE...................................................................158

X.      NO SAFE HARBOR ......................................................................................160

XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS.......................................161

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND
      RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS ...163

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
      AGAINST THE INDIVIDUAL DEFENDANTS ..........................................167

PRAYER FOR RELIEF .............................................................................................168

JURY TRIAL DEMANDED......................................................................................169

By and through its undersigned counsel, Lead Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Plaintiff") alleges the following against Defendants World Acceptance Corporation ("World Acceptance," "WRLD," or the "Company"), A. Alexander McLean, III ("McLean"), John L. Calmes, Jr. ("Calmes"), Kelly M. Malson ("Malson"), and Mark Roland ("Roland") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by World Acceptance and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning World Acceptance, the other Defendants, and related non-parties; (e) consultation with experts; and (f) interviews with factual sources, including individuals formerly employed by World Acceptance and other industry participants.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action against World Acceptance and certain of its current and former officers for violations of the federal securities laws. Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of itself and all persons or entities who purchased or acquired shares of World Acceptance (the "Class") between January 30, 2013 and August 10, 2015, inclusive (the "Class Period"). Plaintiff alleges that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by misrepresenting and concealing information

regarding the Company's illicit lending and renewal practices and inflated loan growth.  As a result of this fraud, as more fully described below, shareholders suffered millions of dollars in losses.

2.      World Acceptance is a small loan consumer finance business that specializes in sub- "subprime" lending.  The Company offers short- and medium-term installment loans (*i.e*., ranging from four to 42 months), marketing those loans and related credit insurance ancillary products and services in more than 1,331 branch offices in 15 states as well as Mexico as of June 30, 2015.

3.      World Acceptance targets its products to customers with credit scores as low as 400 – well below the floor for "subprime" credit scores.  In essence, the Company preys on consumers who have no other place to turn for financial help.  While World Acceptance provides these consumers with financing, it comes at a steep price.  The Company's loans typically carry exorbitant interest rates, reaching as high as ***199%***, which are set near or at the maximum allowable limit under applicable law.

4.      Moreover, during the Class Period, World Acceptance routinely boosted its ***effective*** interest rates through two devious, but extremely profitable practices.  First, the Company bilked its customers into purchasing worthless credit insurance products that only benefitted ***the Company***, but were paid for by the borrowers.  Indeed, former Company employees confirm that World Acceptance deceived unsuspecting consumers into purchasing added insurance products that they rarely needed, but profited World Acceptance, which received commissions and interest on the premiums for the life of the loans.

5.      Second, the Company locked its borrowers into an endless cycle of debt by constantly manipulating them into refinancing their loans, even before they had paid back a significant portion of their outstanding balance.  Indeed, former employees were instructed to ignore underwriting standards and instead aggressively pushed borrowers to renew their loans whenever possible, even if

the borrowers' accounts showed as little as one dollar in equity.  Even if customers were behind on their payments, World Acceptance employees happily renewed ***delinquent*** loans just to avoid having to place those loans in default.  By continually rolling over its customers' loans, the Company was able to avoid defaults, churn its reported loan portfolio, and lock in additional interest income by extending the loans further and further into the future.  Such renewals comprised as much as 75% of the Company's loan portfolio during the Class Period.

6.     Through this practice, Defendants were able to create the perception of significant loan growth, which as Defendants stated, was their "number-one priority."  However, as Defendants later revealed, they were improperly accounting for many of those renewals in violation of Generally Accepted Accounting Principles ("GAAP").  Indeed, while World Acceptance was accounting for small-dollar loan renewals as new loans, such renewals should actually have been accounted for as "modifications."  Through this accounting machination, Defendants improperly inflated their loan growth and loan volume to the market, which closely followed these key metrics in assessing World Acceptance stock.

7.     The truth about Defendants' illicit lending practices and improper accounting began to emerge on July 3, 2013, when Defendants announced that World Acceptance filed a Form NT 10-K/A with the SEC disclosing that the Company was unable to file a completed Form 10-K for the fiscal year ended March 31, 2013, "because of unexpected delays" relating to the need for an "additional review and analysis" of the Company's allowance for loan losses.  Further, as a result of "management's ongoing assessment" of those issues, the Company also announced that it was "***possible*** that the Company's amended Form 10-K [would] report a material weakness in its internal control over financial reporting relating to its process for determining its allowance for loan losses." (emphasis added).  In response to this shocking news, the Company's stock price fell ***more than***

**12%**, on unusually heavy trading volume, from a close of $88.71 on July 3, 2013, to a close of $78.20 on July 5, 2013 (the very next trading day), with continued drops in the days following the announcement, resulting in substantial losses to investors.

8.    The truth continued to emerge on July 25, 2013 when Defendants held a conference call with analysts to discuss the Company's first quarter 2014 financial results and recently-filed amended fiscal 2013 Form 10-K,[1] in which they admitted that there had been a "material weakness" in World Acceptance's accounting treatment of small-dollar loan renewals.  Defendants explained that such small-dollar renewals, which comprised between 15% and 25% of the Company's entire loan renewal portfolio, were improperly being recorded as "renewals" instead of "modifications," in violation of GAAP, and that remedial actions would be required.  Defendants downplayed numerous analyst inquiries, falsely reassuring investors that the "material weakness" would **not** "have a significant impact on the overall operations of the company" moving forward.  As a result of July 25, 2013 revelations, World Acceptance's share price dipped **4.3%**, on heavy trading volume, causing millions in investor losses.  This stock drop would have been even greater; however, had Defendants not continued to mislead the market.

9.    Less than two months later, on September 10, 2013, the Company announced that its Chief Financial Officer and Senior Vice President, Defendant Malson, would retire from her positions upon appointment of her successor.  Then, on November 4, 2013, the Company announced that Chief Operating Officer and President, Defendant Roland, had resigned effective November 1, 2013 for "personal reasons."  On the heels of Malson's earlier resignation, the timing of this announcement was unusual and suspicious and further signaled to the market the existence of

---

[1]    The Company's fiscal year ends March 31, so fiscal 2014 began on April 1, 2013 and ended March 31, 2014.

undisclosed problems at the Company causing the price of WRLD's stock to fall **_over 12%_**, on abnormally high trading volume.

10.     The truth regarding Defendants' fraudulent scheme continued to be revealed on March 13, 2014, when Defendants unexpectedly announced that the Company was the subject of a federal investigation by the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") regarding potential "unlawful acts or practices in connection with the marketing, offering, or extension of credit in violation of" federal consumer financial laws such as the Consumer Financial Protection Act and the Truth in Lending Act.  As a result of this revelation, WRLD's stock price plummeted **_nearly 20%_**, on trading volume **_over 22 times greater_** than the previous trading day, from a close of $97.32 on March 12, 2014, to a close of $78.25 on March 13, 2014, causing millions in investor losses.  Despite being the subject of investigation by the CFPB, Defendants continued to buoy World Acceptance's stock price with false assurances as to the propriety of its marketing and lending.

11.     Then, on April 29, 2014, Defendants announced first quarter 2015 earnings and revealed that they had changed their corporate policy to no longer "encourage" small-dollar renewals.  As a result of this correction, World Acceptance posted its lowest quarterly loan growth in **_at least nine years_**.  Through this disclosure, Defendants implicitly acknowledged that through their prior practices, they had manipulated consumers who had barely repaid their loan balances into renewals to artificially boost World Acceptance's loan volume and growth.  Moreover, Defendants' announcement revealed that contrary to their initial assurances, the previously disclosed "material weakness" had, in fact, materially impacted the Company's operations in that, during the Class Period, reported loan volume and loan growth figures had been artificially inflated as a result of World Acceptance's faulty accounting methods for small-dollar renewals.  The market was stunned

by this revelation, causing the Company's stock price to tumble ***nearly 10%***, on abnormally heavy trading volume, from a close of $80.50 on April 28, 2014, to a close of $72.60 on April 30, 2014, resulting in millions in investor losses.

12.    On September 5, 2014, Defendants revealed that KPMG LLP ("KPMG") had resigned as the Company's independent auditor.  KPMG's unexpected resignation caused the price of World Acceptance stock to drop ***nearly 7.5%***, on unusually high trading volume.

13.    Then, on June 2, 2015, Defendant McLean unexpectedly announced his "retirement" as CEO and Chairman of the Board, effective September 30, 2015.  The timing of this announcement was once again unusual and suspicious and further signaled to the market the existence of undisclosed problems at the Company, as well as the import and impact of its previously announced practices, causing World Acceptance's stock to fall ***over 5%***, from a close of $80.51 on June 1, 2015, to a close of $75.89 on June 2, 2015.

14.    Finally, on August 10, 2015, just two months after the resignation of the Company's CEO, Defendants announced that on August 7, 2015, the Company received a Notice of Opportunity to Respond and Advice ("NORA") letter from the CFPB notifying World Acceptance that after a year-long investigation, the "CFPB's Enforcement Office is considering recommending that the CFPB take legal action against the Company."  The Company's stock price plummeted ***more than 34%***, on trading volume ***over 13 times greater*** than the previous trading day, falling from a close of $51.80 on August 10, 2015, to a close of $34.00 on August 11, 2015, causing additional losses to investors.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC,

17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b).  Many of the false and misleading statements and omissions were made in or issued from this District.  World Acceptance's principal executive offices are located at 108 Frederick Street, Greenville, South Carolina 29607, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

17.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

18.    Plaintiff was appointed to serve as Lead Plaintiff in this action by Order of this Court dated July 22, 2014. Dkt. No. 47.  Plaintiff purchased World Acceptance common stock at artificially inflated prices during the Class Period and suffered an economic loss when true facts about the Company's illicit lending practices and inflated loan growth were disclosed, and the stock price resultantly declined.  A true and correct copy of Lead Plaintiff's certification is attached hereto as **Exhibit A**.

### B.    Defendants

19.    Defendant World Acceptance is a South Carolina corporation with principal executive offices located in Greenville, South Carolina.  World Acceptance operates a small-loan consumer finance business in 15 states and Mexico.

20.     Defendant McLean was World Acceptance's Chairman and Chief Executive Officer ("CEO") until his departure on September 30, 2015.  He served as CEO starting in March 2006 and as Chairman of the Board starting in August 2007.  Defendant McLean started with the Company in June 1989 as a Vice President and, rose through the ranks as a Senior Vice President, Chief Financial Officer ("CFO"), Principal Accounting Officer, and Executive Vice President.

21.     Defendant Calmes currently serves as World Acceptance's Vice President, CFO, and Treasurer.  He has held these positions since December 2013.

22.     Defendant Malson was World Acceptance's Senior Vice President, CFO, and Treasurer from May 2006 until her departure from the Company in December 2013.  Malson previously was employed with KPMG, the Company's independent auditor that resigned in September 2014.

23.     Defendant Roland was World Acceptance's President and Chief Operating Officer ("COO") until his resignation from the Company in November 2013.  He had been with the Company since at least 1996.

24.     Defendants McLean, Calmes, Malson, and Roland are collectively referred to herein as the "Individual Defendants."

25.     During and prior to the Class Period, the Individual Defendants, as senior executive officers of World Acceptance, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning World Acceptance's lending and accounting practices, as discussed in detail below.  Because of their positions with World Acceptance, the Individual Defendants had access to non-public information about World Acceptance's business, finances, products, markets, and present and future business

prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of World Acceptance's business.

27.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with World Acceptance, each of the Individual Defendants had access to the adverse undisclosed information about World Acceptance's business prospects, financial condition, and performance as particularized herein, and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about World Acceptance and its business issued or adopted by the Company materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to, and did, control the content of the various SEC filings, press

releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

29.     Each of the above officers of World Acceptance, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein. These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

30.     As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to World Acceptance's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of World Acceptance's securities would be

based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of World Acceptance's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's business prospects and the intrinsic value of World Acceptance common stock, causing Plaintiff and other members of the Class to purchase World Acceptance common stock at artificially inflated prices.

32.     Defendants are liable for: (i) making false and misleading statements; and/or (ii) failing to disclose adverse facts known to them about World Acceptance. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of World Acceptance common stock was a success, as it: (i) deceived the investing public regarding the Company's business prospects; (ii) artificially inflated the price of World Acceptance common stock; and (iii) caused Plaintiff and other members of the Class to purchase World Acceptance common stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Confidential Witnesses

33.     Plaintiff's allegations herein concerning Defendants' materially false and misleading statements and omissions and Defendants' scienter are based upon, in part, interviews with numerous witnesses, including former employees of World Acceptance and other industry participants. These witnesses provided information regarding the various methods employed by

Defendants in furtherance of their scheme to defraud World Acceptance's shareholders. These witnesses[2] included:

(a)      The former Plainview Assistant Manager, who worked for the Company at a branch office in Plainview, Texas from August 2009 until August 2013. He began as a Customer Service Representative and was promoted to Assistant Manager roughly a year later, in mid-2010. As an Assistant Manager, this former employee typically was one of three employees in the Plainview, Texas branch office and handled many aspects of running the office, including collections, approving or re-opening loans when the Branch Manager was unavailable, and preparing taxes for customers as part of the Company's tax preparation service. He initially reported to Plainview Branch Manager 1, then, upon that person's departure from the Company in December 2009, to Plainview Branch Manager 2.

(b)      The former Texas Branch Manager, who worked for the Company at various Texas locations from June 2007 to June 2014. He started with World Acceptance as an Assistant Manager in the Paris, Texas branch office. Approximately three years later, in 2010, he was promoted to a Branch Manager overseeing two branch offices located in Rockwell, Texas and Terrell, Texas.

(c)      The former Belton Branch Manager, who worked for the Company at two Missouri locations from June 2009 to January 2014. He began at the Grandview, Missouri branch office in June 2009 as an Assistant Manager and was promoted to Branch Manager of the Belton, Missouri branch office in February 2013, where he remained until his departure from the Company in January 2014. As Branch Manager, this former employee opened new loans, renewed loans, prepared daily reports on branch numbers (including delinquencies and loan volume), assisted with

---

[2]    All confidential witnesses are identified in the masculine to protect their identities.

tax preparation services, and generally promoted the business. He reported to the Missouri District Supervisor, who, in turn, reported to the Missouri Vice President of Operations.

(d)      The former South Carolina Customer Service Representative, who worked at the Company's Ridgeland, South Carolina branch office. His first stint at the Ridgeland office ended in June 2013, then he returned to the same office from February 2014 until July 2014. He reported to the Ridgeland branch office's Assistant and Branch Managers. His job responsibilities included opening new loans and loan collections.

(e)      The former Valdosta Branch Manager, who began with the Company in 2011 as an Assistant Manager of the Moultrie, Georgia branch office and was promoted to Branch Manager of the Valdosta, Georgia office in August or September 2012. He remained with the Company at that location until November 2013. As Branch Manager, his job responsibilities included opening new loans, loan renewals, and loan collections. This former employee reported to the Georgia District Supervisor.

(f)      The former Marietta Assistant Manager, who worked at various branch offices in Georgia during two periods of employment with the Company: January 2004 through October 2007, and August 2008 to April 2013. He spent much of the latter period serving as Assistant Manager of the Marietta, Georgia branch office and reported to the Branch Manager there. This former employee's job responsibilities included opening new loans, renewing loans, collections, tax preparation services, "chasing" delinquent customers in the field, and court appearances when necessary.

(g)      The former Western Division Manager and Underwriter, who worked for the Company from October 2010 to September 2013 in Whitesboro, Texas. He was hired to assist a Senior Vice President in opening the Company's Western Division Office and to create policies and

procedures for the approval of Class 5 loans in the Western Division.  His job responsibilities also included reviewing and approving or denying larger Class 5 loans that had been submitted for approval from branch offices in the Western Division.

(h)      The former Abbeville Assistant Manager, who worked for the Company from February 2013 to May 2013 at the Abbeville, South Carolina branch office.  He reported to the Abbeville Branch Manager and was responsible for loan openings, renewals, and collections at his branch office.  This former employee resigned after only a few months on the job because he was "disgusted" with the way the Company was run and felt like a "loan shark."

(i)      The former Beaver Dam Assistant Manager, who worked for the Company from April 2012 to October 2013 at the Beaver Dam, Wisconsin branch office.  He reported to the Beaver Dam Branch Manager and, as Assistant Manager, assisted in opening and renewing loans, preparing daily reports, and performing collections by calling delinquent borrowers and visiting their residences and workplaces.

(j)      The former Yorkville Assistant Manager, who worked for the Company from March 2012 to November 2013 at the Yorkville, Illinois branch office.  He reported to the Yorkville Branch Manager, and, as Assistant Manager, primarily opened and renewed loans and performed collections.

(k)      The former Louisiana Branch Manager, who worked for the Company from October 2008 to May 2013 at two branch offices in Louisiana.  Initially, he was the Branch Manager of an office in West Monroe until 2011.  He then opened a new branch office in Farmerville and served as Branch Manager there until leaving the Company in May 2013.  This former employee's responsibilities included supervising staff, approving loans, helping Assistant Managers with collections, and generally working on other day-to-day aspects of running the office.  He reported to

the Louisiana District Supervisor, who, in turn, reported to the Louisiana Vice President.  The

Louisiana Vice President reported to the Vice President for the Southern Region.

(l)    The former Tulsa Assistant Manager, who worked for the Company from

March 2013 to July 2013 at two branch offices in Tulsa, Oklahoma.  Initially he worked at the

Colonial Finance branch office and reported to the Tulsa Colonial Finance Branch Manager.  In May

or June 2013, he transferred to the Midwestern Loans branch, where he remained until leaving the

Company in July 2013 for another employment opportunity.

**B.    Background of the Company**

34.    World Acceptance, headquartered in Greenville, South Carolina, operates a small-

loan consumer finance business with branch offices in 15 states as well as in Mexico.[3]  The

Company offers short-term loans, medium-term larger loans, and related credit insurance and

ancillary products and services to individual consumers, including tax return preparation services in

the U.S. Commercial banks and credit unions typically make loans of more than $5,000 with

maturities greater than one year.  By contrast, small-loan consumer finance companies like World

Acceptance generally extend loans of up to $1,500 with maturities of one year or less.  The

standardized installment loans World Acceptance offers generally fall between $300 and $4,000 in

value, payable in fully amortizing monthly installments with terms ranging from four to 42 months.

In fiscal 2014, the Company's average originated gross loan size and term were $1,330 and 13

months, respectively.

35.    World Acceptance concentrates its U.S. business in the South and Midwest.  As of

March 31, 2014, the Company operated 1,271 branch offices scattered throughout Alabama,

---

[3]    Background information provided herein derives from the Company's 2014 Form 10-K, filed
with the SEC on June 12, 2014 for fiscal year 2014.  As detailed above, the Company's fiscal year
ends on March 31 of that year, so fiscal 2014 began on April 1, 2013 and ended March 31, 2014.

Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, New Mexico, Oklahoma, South Carolina, Texas, Tennessee, Wisconsin, in addition to Mexico. Depending on the state and location, branch offices may operate under any of the following business names: World Acceptance Corporation, World Finance, World Finance Corporation, Amicable Finance Company, Capitol Loans, Colonial Finance Company, Freeman Finance Company, General Credit Company, Local Loans Company, Midwestern Financial, Midwestern Loans Inc., Peoples Finance Company, and Personal Credit Plan. Of the Company's 4,700 employees, about 3,650 are located in the U.S. in 2014.

36.     World Acceptance has rapidly expanded over the past 10 years, more than doubling its branch office count from 579 at the close of fiscal 2005 to 1,279 at the close of fiscal 2014. The Company opened 69 new offices during fiscal 2014 and opened another 69 in fiscal 2015. Fiscal 2014 revenues were split between the U.S. and Mexico approximately 92% and 8%, respectively. The split for fiscal 2013 was 93% and 7%.

37.     By the close of fiscal 2014, World Acceptance boasted a loan portfolio in excess of 956,000 loans valued at more than $1.1 billion. The Company had increased its gross loans receivable at a 10.6% annual compounded rate over the last five years, from $671.2 million in March 2009 to $1.1 billion in March 2014. Revenues surpassed $617 million in fiscal 2014, a nearly 6% jump year-over-year compared to fiscal 2013. Net income likewise increased from roughly $104 million in fiscal 2013 to $106.6 million in fiscal 2014.

### C.     World Acceptance Built a $1 Billion Empire Preying on Individuals with No Place to Turn

#### 1.     The Company Targeted Those Who Were Economically Disadvantaged, and Even America's Service Members

38.     World Acceptance specializes in sub "subprime" lending. FICO credit scores range between 300 and 850; generally, the higher the credit score, the lower the risk to lenders. Scores

above 620 are generally considered acceptable, with scores above 680 and 740 considered "good" and "excellent," respectively.  "Subprime" credit scores fall between 550 and 620.  According to FICO statistics, about 7% of consumers have credit scores below 550, which is considered "poor" and will generally result in a rejection of credit.  However, where nearly every other lender says "no," World Acceptance says "yes."

39.    The typical World Acceptance customer has nowhere to turn for financial help other than short-term lenders such as World Acceptance.  The Company generally serves individuals with limited access to other sources of credit from commercial banks, credit unions, credit card lenders, or other consumer finance businesses.  Its customers by and large are low income consumers with bad credit, little educational background, and very limited financial resources.  In particular, the Company preyed on individuals of modest financial means or who were facing desperate situations, including those who had lost their jobs or were between jobs, and the elderly and disabled who lived on fixed incomes such as retirement, social security, or disability benefits.  If their car needed unexpected repairs, or if sudden medical expenses overwhelmed their budgets, borrowers turned to World Acceptance for immediate assistance.  And, as described in detail below, they did so at a steep price.

40.    The Company's branch offices often are strategically located in small towns, rural settings, areas generally devoid of major industry, or near military bases.  World Acceptance typically leases small store fronts in local strip malls, staffed with just a few employees – perhaps a Customer Service Representative, an Assistant Manager, and a Branch Manager – in a minimalist office setting.  Oftentimes World Acceptance opens its branch offices right across the street from, or even directly next door to, a competing installment or payday lender.  With the same target audience,

these lenders thrive on repeat customers bouncing between different competitors to take out as many loans as possible.

41.     This is particularly true given that many of the Company's customers have no other access to consumer credit by way of traditional bank loans or credit card accounts.   World Acceptance freely issues loans to sub-"subprime" borrowers – those with credit scores falling below 550 – who are otherwise rejected by most other lenders.

42.     The Company also targets the men and women serving in the U.S. military.  Clusters of World Acceptance branch offices can be readily found in the areas immediately surrounding military bases in the states in which the Company operates.  For example, Fort Hood, one of the largest U.S. Army bases in the country, is located in Killeen, Texas.  World Acceptance has three separate branch offices in Killeen proper and another five offices in neighboring towns Harker Heights, Gatesville, Copperas Cove, and Temple, all within approximately 20 miles of Killeen.

43.     Fort Jackson is another major U.S. Army installation, located in Columbia, South Carolina.  World Acceptance operates eight branch offices in and around Columbia.  U.S. Army base Fort Campbell is located on the Kentucky-Tennessee border, and the Company has five branch offices within 12 miles of the base.  Additionally, there are four branch offices in Columbus, Georgia within eight miles of U.S. Army base Fort Benning.

44.     Service members and their families are prime targets for World Acceptance for a number of reasons.  First, they typically are young and financially inexperienced.  An estimated 43% of service members are 25-years old or younger, and they generally are high school graduates who may or may not have started college.  Second, service members tend to start families earlier in life, which only adds to their financial pressures.

45.     Third, loans to service members are relatively safe bets thanks to the institution of the U.S. military.  As compared to civilians, collecting from service members is often much easier because of the military's direct deposit payment system and the threat of embarrassment among the soldier's chain of command.  When applying for loans, service members are often forced to provide contact information for their commanding officers, who could be contacted should the borrower fall behind on his or her loan.  World Acceptance would commonly use this tactic during its collections efforts.

46.     Finally, the Company zeroes in on military service members because many of its competitors *cannot*.  The Military Lending Act passed in 2007 was designed to protect service members from predatory lenders charging exorbitantly high interest rates for short-term loans.  But the narrowly focused law capped interest rates at 36% for only two types of loans offered to service members: payday loans and auto-title loans.  As a result, installment lenders such as World Acceptance – which are not subject to the same restrictions – have swooped in to fill the lending void created by the Military Lending Act.  Recent surveys have shown that high-cost loans are still widespread among U.S. military service members, and the Department of Defense has acknowledged that the Military Lending Act has already proven inadequate.  In a recent report to Congress, the Defense Department indicated that it is now working on new, "more comprehensive" rules.  Meanwhile, the Company's branch offices surrounding military complexes continue to thrive.

### 2.     A Payday Lender Dressed in "Installment" Clothing

47.     Given the foregoing, it is hardly surprising that World Acceptance is careful to distinguish itself as a "small loan" or "installment" lender rather than a "payday" lender.  But in practice, little differentiates the two business models save for one important aspect: regulation.

48.     Payday lenders and installment lenders both offer relatively short-term loans at particularly high interest rates, often reaching into the triple digits on an annualized basis.  Payday

loans tend to have much shorter terms than installment loans, often only two weeks. According to the Bureau, most payday loans are for several hundred dollars and have finance charges of $15 to $20 per $100 borrowed. Considering that most payday loans have only two-week terms, these finance charges equate to an astonishingly high annual percentage rate ranging from 391% to 521%.

49.     World Acceptance's loans, on the other hand, generally have terms no shorter than four months. By setting these boundaries and maintaining a comfortable distance from typical payday lending terms, the Company has sought to avoid the negative connotations – and applicable federal and state regulations – associated with the payday lending industry.

50.     The Consumer Financial Protection Bureau was created in 2010 with the adoption of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Among other things, it writes rules, supervises companies, and enforces federal consumer financial protection laws; it also restricts unfair, deceptive, and abusive financial practices. The Bureau consolidates most federal consumer financial protection authority in one place.

51.     Historically, banks, thrifts, and credit unions have been subject to supervision by various federal regulators. Nonbank companies providing consumer financial products and services, however, escaped federal oversight prior to the Dodd-Frank Act and its creation of the Bureau. Under the Dodd-Frank Act, the Bureau was granted immediate nonbank supervisory powers over companies of all sizes in the mortgage, payday lending, and private student lending markets in particular. But for all other markets, including the consumer installment loan market in which World Acceptance operates, the Bureau may only supervise so-called "larger participants," which first needed to be defined through a rule.

52.     Thus, among the Bureau's first orders of business was an examination of the ***payday*** lending industry. On January 19, 2012, it published a manual of payday loan examination

procedures and convened its first-ever field hearing to gather information and input on the payday lending market. The examination procedures manual, entitled "Short-Term, Small-Dollar Lending Procedures," is essentially a field guide for Bureau examiners to use to ensure payday lenders are following federal consumer financial laws. It describes the types of information that examiners will gather to evaluate payday lenders' policies and procedures, to assess whether lenders are in compliance with federal consumer financial laws, and to identify risks to consumers throughout the lending process. Establishment of the Bureau marked the first time a federal agency could supervise not only bank payday lenders but also nonbank payday lenders.

53. For the majority of the Class Period, World Acceptance carefully avoided the Bureau's prying eyes as the agency's focus trained on payday lenders in particular. But in reality, the Company's predatory lending practices were no different, and certainly no better, than those used by payday lenders to prey upon the same low income clientele that World Acceptance targeted.

### 3. Employees Ignored Written Policies to Meet Loan Quotas

54. According to the Company, its borrowers submit to immediate background, employment, and credit checks for loan approval, which typically occurs while they wait in the office. Though most new customers also provide an itemized listing of their personal property that will serve as collateral to secure the loan (popular offerings include household electronics, video game consoles, and lawnmowers), World Acceptance generally does ***not*** perfect its security interest in that collateral. Accordingly, the Company typically extends credit with little more assurance than its customers' promises to repay.

55. In evaluating potential customers, World Acceptance claims to examine the applicants' discretionary income, length of current employment and/or sources of income, duration of residence, and prior credit experience. Employees supposedly verify applicants' sources of income and credit histories through telephone checks with employers, other employment references

and a variety of credit services.  Loans are then issued based on the customer's discretionary income and other factors.

56.     However, numerous former Company insiders tell a much simpler tale to obtain loans from World Acceptance.  According to the former Plainview Assistant Manager, World Acceptance offered loans to "anybody, as long as they had a home and a job."  This included customers with credit scores **below** 400, as long as those customers pledged five items of collateral for the loan. Shortly before the start of the Class Period, the Company changed its policy such that borrowers now needed a credit score above 400 – a dividing line still far below the 550 "subprime" threshold, however.

57.     The former South Carolina Customer Service Representative recalled that it was very easy to get a loan from World Acceptance: "everyone who applied got one," even if they had a prior loan with the Company and had missed payments on that loan.  The former Marietta Assistant Manager would only review three things when opening a loan for a customer: the borrower's income, automobile payment, and rent or mortgage payment.  If the borrower had any income left over after accounting for just those two expenses, the former Marietta Assistant Manager would open the loan regardless of whatever additional expenses may be incurred such as utilities, insurance, or groceries.  The former Texas Branch Manager corroborated that, even for borrowers on fixed monthly incomes from social security or disability benefits, loans were regularly approved without regard for typical monthly expenses like utilities and groceries.

58.     When the former Marietta Assistant Manager first started to work at World Acceptance, he was told by his manager to "look for reasons to give the loan."  Instead of searching for reasons to reject borrowers, he was to find ways to get the borrowers qualified.  Likewise, the former Texas Branch Manager was told by his superior that everyone who applied for a loan from

World Acceptance should be approved for "something" because "everyone qualifies" for a starter loan, which were typically around $100 in value.

59.    Likewise, the former Louisiana Branch Manager was encouraged by his superiors to make smaller loans – for example around $240 – "all day long."  In fact, he was specifically told by the Louisiana Vice President that he would never get in trouble for making loans, and the Vice President for the Southern Region encouraged him to open as many loans as possible.  According to this former employee, even customers subsisting only on unemployment benefits were eligible to open a loan so long as they could provide a copy of an unemployment check.

60.    Written policies and procedures were regularly ignored by branch office personnel, often at the direction of their superiors.  The former South Carolina Customer Service Representative recalled that "nothing was done by the books" in his branch, a sentiment echoed by other former insiders.  The Beaver Dam Branch Manager would issue loans to customers with insufficient collateral or who had only been at their job for one week.  In some cases, the former Beaver Dam Assistant Manager would deny a loan for a customer, only to see that customer had returned and been approved by the Beaver Dam Branch Manager because the customer knew it was easier to qualify with the Beaver Dam Branch Manager since that person was willing to manipulate and/or disregard the borrower's application information.

61.    During the former Belton Branch Manager's tenure at World Acceptance's Belton, Missouri branch office, the Missouri District Supervisor generally was not concerned with enforcing the Company's written policies and procedures related to loan openings, renewals, and collections.  When discussing these policies and procedures with the Missouri District Supervisor, the former Belton Branch Manager took cues from the Missouri District Supervisor's body language and voice tones – as if the Missouri District Supervisor were giving a "wink and nod" – that the Missouri

District Supervisor obviously did not expect the rules to be followed if it impeded the ability to make loans.  In other words, there was an implied understanding between the Missouri District Supervisor and his Branch Managers that the Branch Managers should do whatever was needed to reach their monthly quotas.  Likewise, in order to increase the Abbeville, South Carolina branch's "numbers," the former Abbeville Assistant Manager saw his office make loans to borrowers who clearly could not repay the loan.

62.     The Missouri District Supervisor specifically instructed the former Belton Branch Manager not to volunteer information to borrowers, and if the borrower were to ask any questions, he should "sugar coat" the information when answering.  The Missouri District Supervisor discouraged the former Belton Branch Manager from going over loan contracts in detail with borrowers or itemizing the components of borrowers' payments (such as which portion of the payments covered interest or fees).  Moreover, the Missouri District Supervisor also discouraged explanations to borrowers that they would pay less over time if they paid off their loan sooner, that renewing a loan was the same as opening a new loan, and that loan renewals would add significant cost and expense in addition to protracting borrowers' indebtedness.  The Missouri District Supervisor even warned the former Belton Branch Manager that the Missouri Vice President of Operations – to whom the Missouri District Supervisor reported – would be upset if ever hearing the former Belton Branch Manager explaining these details to World Acceptance's customers.

63.     The tactics employed by the Missouri District Supervisor were not unusual among World Acceptance's leadership ranks.  The former Valdosta Branch Manager described similar patterns of pressure from the Georgia District Supervisor.  When corporate headquarters distributed new policies on such matters as collections practices or insurance premiums, the Georgia District Supervisor often instructed him to disregard those new policies.  In fact, the Georgia District

Supervisor would actually threaten to fire the former Valdosta Branch Manager if he did not do things the way the Georgia District Supervisor wanted them to be done. For example, the Georgia District Supervisor instructed this former employee to automatically include insurance premiums on all loans and to tell borrowers the insurance products were mandatory, even though that was not the case.

64.    According to the former Valdosta Branch Manager, the Georgia District Supervisor's motivation in having him disregard the Company's stated policies was to simply close more loans, renew more loans, and/or sell more insurance products to customers.

65.    Personnel training at the branch office level was as inadequate as compliance. The former Texas Branch Manager recalled high turnover in the branch offices, with poor training following new hires. According to him, "no one" was trained correctly, and it was common for 18-year-old Assistant Managers with just a couple of months' experience to ascend to Branch Manager positions if the prior manager left the Company. This happened regularly because it was "easier and cheaper" for World Acceptance to simply "promote up" rather than look outside the Company.

66.    Compliance and personnel training problems at World Acceptance were exacerbated by a corporate culture of looking the other way. The former Western Division Underwriter and Manager described branch employees as "robots" who would do whatever they were told by their managers, regardless of whether that action was right or wrong. Myriad examples below illustrate this point. Whether in the Company's home state of South Carolina or in Texas, branch office employees openly disobeyed corporate mandates regarding loan originations, insurance premiums, loan renewals, and collections practices. They simply did what was needed to be done to snooker

potential customers, who invariably were "desperate" for money as described by the former Plainview Assistant Manager.

### 4. The Company Flouted State Usury Laws Using Bogus Insurance Products

67.    By its own admission, World Acceptance makes a business of issuing loans to customers at or close to the ***maximum*** interest rates allowed under applicable state law.  As of March 31, 2014, over 46% of the Company's loan portfolio carried annual percentage rates between 21% and 50%.  Plus, more than half of the portfolio carried far higher rates:

| Annual Percentage Rate Charged | Percentage of Loan Portfolio |
|---|---|
| 51% to 80% | 21.3% |
| 81% to 90% | 16.8% |
| 91% to 100% | 5.8% |
| 101% to 150% | 4.9% |
| 151% to 199% | 4.8% |

68.    Nonetheless, where state laws limit the interest rates World Acceptance would otherwise charge its customers, the Company responds with *de facto* rate hikes: expensive but mostly useless insurance products added to the base loan.  The fees and premiums earned on these insurance products serve to artificially inflate the effective interest rates on World Acceptance's loans while steering clear of state mandates.  In many (if not most) circumstances, customers paying for the insurance have little to no understanding of what the insurance actually provides and why they are paying for it.  This is because World Acceptance purposefully obfuscates the true costs and benefits associated with the insurance.

69.     Where state law permits, the Company markets and sells a variety of insurance products in connection with its loans, including credit life, credit accident and health, credit property, and unemployment insurance.  Significantly, each of these insurance products inures to ***World Acceptance's*** benefit, not the borrower's, yet the borrower pays the premiums.  For example, should the borrower die before repaying his or her loan, the credit life insurance provides for payment in full of the borrower's credit obligation ***to World Acceptance***.  Should the borrower become disabled from illness or injury, the credit accident and health insurance provides for repayment ***to World Acceptance*** of all loan installments that come due during the borrower's period of income interruption.  Should the personal property pledged as security by the borrower become damaged or destroyed by a covered event, the credit property insurance insures payment of the borrower's credit obligation ***to World Acceptance***.  Finally, should the borrower become involuntarily unemployed, the unemployment insurance provides for repayment ***to World Acceptance*** of all loan installments that come due during the borrower's period of involuntary unemployment.

70.     Most importantly, the Company also profits from the insurance policies ***on the front-end*** in two distinct ways: (1) it receives a commission from the insurer on whatever policies it sells to borrowers; and (2) the insurance premiums are typically financed as part of the loans, meaning World Acceptance earns interest on them for the life of the loan.  While federal rules actually prohibit the financing of credit insurance premiums as part of a mortgage, no such prohibition exists for the installment loans World Acceptance offers.

71.     Moreover, thanks to loopholes in the Truth in Lending Act, installment lenders like World Acceptance may lawfully exclude these insurance premiums when calculating a loan's annual percentage rate so long as the insurance products are voluntary or the borrower can select the insurer.  Thus, when factoring in the various insurance premiums often tacked on to World Acceptance's

loans, their *effective* annual percentage rates far exceed those stated by the Company and allowed under state law.

72.     It comes as little surprise, therefore, that World Acceptance branch offices pushed the insurance products as a matter of course to help boost Company profits.   In 2011, one of World Acceptance's favored insurers, Life of the South (a subsidiary of Fortegra Financial Corp.), raked in $20 million in premiums for credit accident and health insurance policies in Georgia alone.   While only 14% of that sum went toward paying actual claims, a whopping 56% went right back into the pockets of lenders such as World Acceptance.

73.     As indicated above, the former Valdosta Branch Manager was specifically instructed by his superior, the Georgia District Supervisor, to automatically include insurance premiums on all loans and to tell borrowers these insurance policies were mandatory, even though that was not the case.  According to the Company's fiscal 2014 Form 10-K, it offers credit life, credit accident and health, and credit property insurance for loans originated in Georgia.  If a customer asked about the insurance premiums or tried to opt out of the policies, the former Valdosta Branch Manager was told by the Georgia District Supervisor that it was his "job to make sure" the customers believed that they needed all of the insurance on the loans.  He was to indicate that the insurance was "required" in order for the customer to receive the loan.

74.     When a new law was passed in 2013 requiring borrowers to complete an "opt in" form for the insurance, the Georgia District Supervisor instructed the former Valdosta Branch Manager not to explain the form to customers.  Instead, he was to just tell customers to sign the form to "sneak" the insurance "under their noses."  The Georgia District Supervisor further explained that World Acceptance retains a significant portion of the proceeds from the insurance premiums, so this was a valuable line of business for the Company.  It was the former Valdosta Branch Manager's

understanding that World Acceptance kept 90% of the premiums for the credit life insurance it sold there.

75.     The former Marietta Assistant Manager was instructed by his manager to add accidental death or dismemberment insurance to every loan he made, even though such insurance was not mandatory.  Also, when a customer pledged his or her automobile as collateral, World Acceptance sold automobile insurance with "crazy fees" despite the fact that the borrower could simply ask his or her own insurance company to list World Acceptance as a payee.  According to the former Marietta Assistant Manager, the Company "made money all over the place" because of these types of fees.  He recalled that, for the most part, borrowers were not told that the insurance products were optional in the first place or that they could choose their own insurance provider if the insurance was mandatory.

76.     During his tenure with the Company, the former South Carolina Customer Service Representative operated under the assumption that certain types of insurance such as credit life insurance were mandatory while others, like unemployment insurance, were voluntary.  According to the Company's fiscal 2014 Form 10-K, it offers credit life, credit accident and health, credit property, and unemployment insurance for loans originated in South Carolina.  If a potential borrower had a bad reputation within the community or simply "looked" as though he or she might be unable to repay the loan, the former South Carolina Customer Service Representative was instructed by his manager to add unemployment insurance to the borrower's account without letting the borrower know.  In the event a customer asked about the insurance premiums, according to this former employee, there were "no straightforward answers."  It was obvious to the former South Carolina Customer Service Representative that the majority of his customers did not understand the insurance premiums.

77.     The former Abbeville Assistant Manager recounted the same thing occurring at his branch office in Abbeville, South Carolina.  He was instructed to tell borrowers that the insurance premiums were required to open the loans, even though he understood that the insurance was really optional.  Employees in the Abbeville branch office would "rush" through the loan paperwork, and it was clear the borrowers did not understand the loan terms.  According to the former Abbeville Assistant Manager, they looked like a "deer in the headlights."

78.     World Acceptance employed these same deceptive practices in Texas, where the Company offers credit life, credit accident and health, credit property, and unemployment insurance for loans originated there.  The former Texas Branch Manager recalled borrowers being told that they had to obtain insurance through World Acceptance when he first began working for the Company in 2007.  More recently, he was told that borrowers should not directly be told that insurance policies were "mandatory," but that Branch Managers should "word it" like the insurance premiums were, indeed, mandatory.  Further, borrowers should not be told that they had another option unless they asked.

79.     The same was true at World Acceptance's Plainview, Texas branch office.  The former Plainview Assistant Manager understood that credit life and unemployment insurance policies were regularly added to larger loans without the customers' knowledge.  His Branch Manager did not tell borrowers about the insurance premiums that were included with the loans being issued.  Despite the fact that the insurance was optional, this was seldom, if ever, communicated to the borrowers in Plainview.  Once they reviewed the paperwork, customers often got upset because the insurance premiums had been "taken off" the top from the proceeds of the loans, and they had not been informed ahead of time of the premiums or the amount of their cost.

80.     In a related tactic, World Acceptance also added roadside assistance programs to borrowers' loans without their approval.  Much like the insurance premiums, the roadside assistance fees would be wrapped into the loans.  When the former Beaver Dam Assistant Manager first started, he was told to simply offer the roadside assistance program to customers.  However, in early 2013, the Beaver Dam Branch Manager learned that other branch offices were automatically including the roadside assistance fees in the loans they issued.  Accordingly, the Beaver Dam Branch Manager instructed the former Beaver Dam Assistant Manager to do the same, and to tell customers that the roadside assistance was simply part of the loan.  Even if the customers indicated they did not want the program, the former Beaver Dam Assistant Manager was told to "force" it on them and include the program in the loan regardless.

81.     In sum, throughout the Class Period, World Acceptance made a routine of tacking onto its loans generally worthless insurance products that only benefitted the Company but were paid by unsuspecting borrowers.  As a matter of practice, the Company's employees made every effort to hide the added insurance costs, and when customers were wise enough to ask, employees purposefully misdirected and offered little in the way of explanation.  The premiums for these insurance products went straight to World Acceptance's bottom line and offered the Company an attractive money-making alternative where state law prohibited World Acceptance from charging the sky-high interest rates it would otherwise charge.

###     5.    World Acceptance Kept Hold of Its Customers Until They Either Defaulted or "Died on the Books"

82.     In addition to pushing its multitude of worthless insurance products, the Company also thrived on keeping its customers firmly within the World Acceptance ecosystem.  Loan renewals were pushed down customers' throats so World Acceptance could keep hold of them long after their initial loan terms.  This not only churned the Company's loan portfolio, artificially

inflating reported loan growth, as described below, but also minimized delinquencies and ensured World Acceptance a longer revenue stream from each renewed borrower. The Missouri District Supervisor once told the former Belton Branch Manager that customers were never able to leave World Acceptance because the Company has only two types of customers: those who default and those who "die on the books."

83.    Indeed, in fiscal 2014, approximately 84% of the Company's loans were generated from within, either through refinancings of outstanding loans or through originations of new loans to previous customers. Over 73% of World Acceptance's loan originations in fiscal 2014 were renewals of existing loans. That number topped 75% for each of fiscal 2013 and fiscal 2012.

### a.    Employees Pressed for Renewals During Every Visit and Phone Call

84.    The former Belton Branch Manager confirmed that Branch Managers were expected to "push" renewals on customers whenever they had funds available. This often occurred after only two or three payments on the original loan, once the borrower had begun paying down the loan principal. Even if the available funds amounted to just a few dollars, employees were expected to recommend renewal. In fact, according to the former Belton Branch Manager, if a customer had only $5 available, Branch Managers were allowed to tell customers that they could withdraw the $5 and pay another $20 out of pocket to renew their loans.

85.    The Missouri District Supervisor explained to the former Belton Branch Manager as follows: according to the "Law of 72," the most money was made on the loans during the first three months of the loan.[4] This, he explained, was why Branch Managers were expected to continuously renew customers' loans.

---

[4]    The "Law of 72," or "Rule of 72," is a common shorthand for calculating the amount of time it takes to double one's investment. Investopedia defines the "Rule of 72" as "a simplified way to determine how long an investment will take to double, given a fixed annual rate of interest. By

86.     Moreover, to further tease out profits on renewals, World Acceptance utilized an accounting tool known as the "Rule of 78s," which accelerates the payment of interest while pushing back the repayment of principal on the Company's loans.  According to Investopedia, "[t]he Rule of 78[s] weights earlier payments with more interest than later ones.  If the loan is not terminated or prepaid early, the total interest paid between simple interest and the Rule of 78[s] will be equal.  However, because the Rule of 78[s] weights the earlier payments with more interest than a simple interest method, paying off a loan early will result in the borrower paying more interest overall."

87.     During his tenure at the Belton, Missouri branch office, the former Belton Branch Manager was reprimanded by the Missouri District Supervisor for not pushing renewals enough.  And when the Missouri Vice President of Operations visited the Belton branch, he too made sure that the former Belton Branch Manager was telling all customers with available funds that they could renew their loans.  In fact, this former employee recalled that on one particular instance when the Missouri Vice President of Operations was visiting, the former Belton Branch Manager had failed to offer a renewal to a customer with available funds, so the Missouri Vice President of Operations stepped in and asked the customer himself.

88.     The former Belton Branch Manager also recalled a loan renewal policy change in August or September 2013, which required customers to have at least $25 available in their account before they could renew.  But, not surprisingly, this policy change was not always followed at his branch office because it was one of the policies the Missouri District Supervisor implied the former Belton Branch Manager need not follow.

---

dividing 72 by the annual rate of return, investors can get a rough estimate of how many years it will take for the initial investment to duplicate itself."  *See* "What is the 'Rule of 72'?," available at http://www.investopedia.com/ask/answers/04/040104.asp (last visited August 6, 2014).

89.    In Illinois, the former Yorkville Assistant Manager recalled the branch policy at his office was that loans could be renewed whenever money was available in the customer's account. This was usually available within three or four payments, but since most of those payments went toward interest, the available principal amount was sometimes very small.  In fact, the former Yorkville Assistant Manager recalled that a loan could be renewed even if only $2 was available.

90.    In Wisconsin, the Beaver Dam Assistant Manager reported that borrowers typically could renew after they had $29 available in their account, which usually took one or two payments. This former employee even recalled the Beaver Dam Branch Manager once paying $8 out of the manager's own pocket to renew a customer's loan.  The Beaver Dam Branch Manager then instructed the former Beaver Dam Assistant Manager to ask the customer for the $8 back when the customer returned to the office.

91.    In Louisiana, customers could renew whenever money was available in their account for paying off part of the loan principal, according to the former Louisiana Branch Manager. Moreover, once the customer had renewed his or her loan twice, he or she was then eligible to "raise" the loan balance to a higher amount as soon as funds were available in the account again.

92.    In Georgia, the Georgia District Supervisor emphatically told the former Valdosta Branch Manager that "you have to renew the loan" if a customer was eligible to renew.  According to this former employee, a customer was generally eligible after two payments, or occasionally three payments if a larger loan had been issued.  Moreover, even when a customer was not yet eligible, the former Valdosta Branch Manager was told to rebate a portion of the insurance premiums that already had been paid, which would lower the account balance to make the customer eligible to renew.

93.    Meanwhile, in Texas, the former Texas Branch Manager was told that, as soon as a borrower made a payment, branch employees were expected to immediately inform that customer

that he or she had money in his or her account that was available to withdraw. If the borrower chose to make the withdrawal, it was processed as a loan renewal without the terms of that renewal explained to the borrower. According to the former Texas Branch Manager, the vast majority of the borrowers did not understand all of the paperwork they were signing; he was simply told by his supervisors to get the borrowers "in and out" and to just get them renewed. In the former Texas Branch Manager's view, loan renewals were World Acceptance's "biggest money makers."

94.     The former Plainview Assistant Manager recognized that loan renewals were "not worth it" for the customers because they paid much more in the long run than the nominal cash they received up front by renewing. But the customers would renew their loans anyway in order to get even minimal money from their accounts.

95.     The former Abbeville Assistant Manager observed that borrowers were pushed especially hard for renewals around the holiday seasons because they typically needed more money around those times. Shockingly, as a means of pressuring borrowers to renew, the Abbeville Branch Manager would even taunt them about not being able to buy holiday presents for their grandchildren.

### b.     "Pay-to-Renew" Practices Avoided Delinquencies

96.     Renewals also were utilized to avoid delinquencies. The former Plainview Assistant Manager recalled a loan renewal policy change sometime in 2011 or 2012 that customers were not supposed to be eligible for renewal unless they had made two or more payments. The only requirement for those two payments was that they had to be consecutive within the last two months, even if the customer had missed payments in previous months. This policy change was spurred by a "pay-to-renew" practice popular at some branch offices to help borrowers who were behind on their loans.

97.     Using "pay-to-renew," borrowers could renew their loans and receive any available funds immediately, which could then be used to pay down their debt to bring the loans current, albeit

with the result of increasing their overall debt burden.  Borrowers were often able to put down very little additional money to bring their loans current, or they might even receive funds back into their own pockets.  Plus, conveniently for World Acceptance, this had the added benefit of (i) avoiding placing the borrowers' loans into default, and (ii) keeping the borrowers on the hook for an even longer period of time.

98.    But regardless of the policy change, the former Plainview Assistant Manager observed long-term employees such as Plainview Branch Manager 2 willingly to do renewals even when two or more consecutive payments had ***not*** been made.  As long as at least "a dollar" was available in the account, Plainview Branch Manager 2 would process the renewal.

99.    In South Carolina, the Abbeville Branch Manager would pressure delinquent borrowers whenever possible to renew their loans so that the loans could be removed from the branch's list of delinquencies, according to the former Abbeville Assistant Manager.  Further, the former Plainview Assistant Manager witnessed many other types of "pay-to-renew" tactics.  Branch personnel would call borrowers who were delinquent and ask them to renew their loan in order to make it current.  If the delinquent borrower was unable to come into the branch office before the end of the month, the former Plainview Assistant Manager observed Plainview Branch Manager 2 allow a family member of the borrower to come into the office to sign for the borrower.

100.    World Acceptance employees even resorted to forgery as a means to secure renewals or forewent consumer signatures altogether.  For example, the former Plainview Assistant Manager recalled that sometimes Plainview Branch Manager 2 would even forge a borrower's signature, if necessary.  Forgery was also common at the Colonial Finance branch office in Tulsa, Oklahoma.  The former Tulsa Assistant Manager recalled his branch office being internally investigated around April 2013 because of fraudulent loan practices by the Tulsa Colonial Finance Branch Manager and

another Assistant Manager.  The former Tulsa Assistant Manager explained that the Tulsa Colonial Finance Branch Manager had been improperly renewing loans by forging borrowers' signatures in order to withdraw funds from the accounts and make payments to keep the loans current.  The Tulsa Colonial Finance Branch Manager would even keep any remaining funds.  The Tulsa Colonial Finance Branch Manager would create checks from World Acceptance payable to the borrower for up to $800 or $1,000, then forge the borrower's signature to cash the checks.  The Tulsa Colonial Finance Branch Manager also paid the other Assistant Manager "hush money" to keep this conduct from being exposed.  After reviewing paperwork following the internal investigation, the former Tulsa Assistant Manager estimated there were at least 20 fraudulent loans.

101.    The former Western Division Underwriter and Manager confirmed similar "pay-to-renew" practices at World Acceptance's branch offices in his division.  He knew of loan renewals without the borrowers' signatures in order to prevent the loans from becoming delinquent.  He even knew of offices allowing borrowers to take out new loans in order to repay their old loans.

102.    World Acceptance also encouraged customers to renew their loans by promising that the renewals would help the borrowers' credit scores, as the Company reported to all three leading credit bureaus.  Plus, the pitch went, renewing loans in succession would make borrowers eligible to receive still larger loans from World Acceptance.  This was confirmed by the former Louisiana Branch Manager.  The Company would thus dangle multiple carrots in front of its customers, and branch office employees were trained to make borrowers think the renewals were beneficial to them.  It was not uncommon for borrowers' loan files to grow inches thick after dozens of renewals.

103.    The endless cycle of debt World Acceptance's borrowers locked themselves into was exactly what the Company wanted.  It provided a continuous revenue stream and allowed the Company to grow during the Class Period.  On top of these unscrupulous loan generation practices,

Defendants improperly accounted for their renewals to boost loan growth and volume, which they touted as their "number-one priority."

### 6. The Company's Reported Loan Growth Was Misleading Due to Faulty Accounting

104.    As detailed above, World Acceptance required its employees to push loan renewals at every opportunity, as each renewal was profitable for the Company in a variety of ways. Additionally, each renewal represented a new loan to be recorded on World Acceptance's books, which allowed the Company's reported loan volume and loan growth – key metrics in evaluating the health of the Company – to climb to new heights during the first half of the Class Period. Additionally, by continuously renewing small-dollar loans, the Company was able to stave off delinquencies and inflate the Company's interest and fee income.

105.    But World Acceptance's recording of its loan refinancings often failed to comply with GAAP.  Pursuant to GAAP, the Company was to account for those refinancings as either "renewals" or "modifications" depending on the amount of principal paid down on the original loan. The line of demarcation was 10%.

106.    If the customer had paid down at least 10% of the original loan's value, the refinancing was properly accounted for as a "renewal," which allowed for the extinguishment of the original debt and the simultaneous creation of a new loan to be recorded on World Acceptance's book.  However, if the customer refinanced having paid down less than 10% of the original loan's principal value, this was to be accounted for as merely a "modification" to that original loan.  The debt would ***not*** be extinguished and, for purposes of the Company's loan portfolio and reported loan growth, ***no new loan*** would be recorded.

107.    To be clear, at the time of the refinancing, the customer need not walk out of the branch office with proceeds of at least 10% of the original loan in his or her pocket.  Any or all of

those proceeds may be used toward the new loan.  From the standpoint of World Acceptance and its branch office employees, the important distinction was whether that customer *already had available funds* totaling at least 10% of the original loan value.  If the customer's available funds were anything less than 10%, the refinancing must be accounted for as a "modification," and World Acceptance may no longer claim that refinancing as a new loan for purposes of reporting its loan volume and loan growth for that quarter.

108.    As Defendants began to reveal on July 25, 2013, the Company was not properly differentiating between loans based on this 10% line of demarcation and admitted that there had been a "material weakness" in the accounting treatment of small-dollar loan renewals.  However, Defendants also downplayed the significance and falsely reassured investors that the "material weakness" would not "have a significant impact on the overall operations of the company" moving forward.

109.    Defendants provided more clarity on the "material weakness" and the 10% line of demarcation in the April 29, 2014 revelation.  According to Defendant McLean on the Company's earnings call that day, "[W]e were not properly accounting for those loans with proceeds of less than 10%."  In other words, World Acceptance had been recording all refinancings as "renewals" when, in reality, some should have been classified as mere "modifications."  This violated GAAP and artificially inflated the Company's reported loan volume and loan growth because the Company was wrongfully extinguishing debt and immediately replacing it with new debt, when the original debt should never have been extinguished in the first place.

110.    According to Defendants, World Acceptance solved this problem by (a) properly differentiating between "renewals" and "modifications" for accounting purposes, and (b) no longer encouraging refinancings that will only result in "modifications."  Truthfully, the Company has no

incentive to push customers to "modify" their existing loans because such refinancing: (i) will **not** result in a new loan being issued; (ii) will therefore **not** earn the Company the additional fees and charges associated with the opening of a new loan; and (iii) will **not** otherwise bolster the Company's reported loan volume and loan growth figures for that quarter.

111.    To this end, the Company revealed in its "Summary of Quarterly Results," filed with the SEC on Form 8-K on April 29, 2014, that it had "made some changes during the quarter that ensured customers were not encouraged to refinance existing loans where the proceeds from the transaction were less than 10%."  During the earnings call that day, Defendant McLean elaborated on those "changes":

> On our receipt statements and other type of paper that is given to the customer, the amount of money that's available to that customer in the event that they would like to refinance a loan to show them what they would get back under that transaction, this has been there for quite some time, and it shows up on the screen so that our finance personnel can tell them if they would like to renew it at any point in time, that this was the amount of money they'd get back if they had the same transaction. **We decided to suppress that information until such time as that amount that they could get back exceeded that 10% threshold.**

112.    Regarding loan volume, Defendant McLean went on to reveal, "Now, we anticipated that this would have an impact on volume, and as it turned out, it had a fairly substantial impact on the volume in the fourth quarter."  That substantial impact was decidedly negative.  According to the Company's Form 8-K filing that day, the changes that had gone into effect at the beginning of the quarter had "**resulted in a decrease in our loan volume** and had an impact on our balances outstanding and overall yields.  As a result, gross loans outstanding amounted to $1.11 billion at March 31, 2014, a 4.2% increase over the $1.07 billion outstanding at March 31, 2013," which was the lowest quarterly loan growth on record **in nine years**, since fiscal 2005.  In fact, during those nine years, quarterly loan growth reached as high as 23.3% and consistently remained well above 10%.  Defendant McLean further admitted that the percentage of originations that was small-dollar

renewals "***dropped down to the 7% or 8% range from the 20% range that we announced last year.***"

113.    Analysts immediately took note of the effects of World Acceptance's changes.  In its April 29, 2014 report, Sidoti & Company, LLC highlighted how "[s]lower loan growth and a decline in portfolio yield are concerning."  The report continued:

> WRLD's 4Q:F14 loan growth was just 4.2% year-over-year, which is the lowest quarterly growth we have on record through F2005. While we think there are some negative cyclical factors hampering loan growth, the 8-k sheds some light on this topic. . . . [M]anagement noted that they made some system changes in 4Q:F14 that made sure customers were not encouraged to refinance loans where the proceeds were less than 10% of the loans being financed. When loan refinancing fall[s] below this threshold it is considered a loan modification and the amortization of the loan does not start over once again (a negative for WRLD).

114.    A May 1, 2014 report from Sterne, Agee & Leach Inc. likewise warned, "WRLD implemented the planned change in renewal policy limiting renewals on transactions, where the net proceeds to the borrower must exceed 10%, in February.  The effect of this was already apparent: turnover rates were declined from 3x to 2.5x on a year-over-year basis, and we expect this rule to reduce the amount of fee income the company can collect."

### D.    Defendants Knew of or Recklessly Disregarded World Acceptance's Deceptive Lending and Renewal Practices

115.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; and knowingly or severely recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

116.    Indeed, according to the Company's fiscal 2014 and 2015 Forms 10-K, "Senior management receives daily delinquency, loan volume, charge-off, and other statistical reports consolidated by state and has access to these daily reports for each branch office."  The Individual

Defendants, by virtue of their receipt of information reflecting the true facts regarding World Acceptance and its core business practices, their control over and/or receipt of World Acceptance's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning the Company's lending practices and loan growth, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or severely recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing fraud as described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and/or severe recklessness and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

117.     In addition to the numerous allegations throughout the Complaint, demonstrating the Individual Defendants' scienter, for the reasons further detailed herein, each of the Individual Defendants had knowledge of or recklessly disregarded that the public statements and documents the Company issued or disseminated were materially false and misleading. Defendants McLean, Malson, and Calmes also undertook the affirmative obligation to obtain knowledge in order to ensure that the Company's disclosures to the market were truthful by executing SOX certifications (*see, e.g.*, ¶¶158-159).

> **1.     The Departure of Three Individual Defendants During the Class Period Supports a Strong Inference of Scienter**

118.     Scienter is further substantiated by the successive resignations of three of the Individual Defendants Roland, McLean, and Malson during the Class Period. Specifically, on September 10, 2013, approximately six-weeks after World Acceptance announced a material weakness in its internal control over financial reporting, the Company revealed that its CFO and Senior Vice President, Defendant Malson, would depart from her positions upon appointment of her

successor.  Defendant Malson continued to serve in her position as CFO until December 2, 2013, when her successor was appointed, and departed the Company effective February 3, 2014.  Notably, Defendant Malson previously worked at KPMG, the Company's independent auditor that unexpectedly resigned on September 5, 2014.

119.    Not long after, on November 4, 2013, the Company announced that Defendant Roland, the Company's President and COO, had resigned effective November 1, 2013 purportedly for "personal reasons."   Roland's resignation occurred just as the Company was evaluating its business practices in the wake of its discovery of a "material weakness," and prior to the April 29, 2014 announcement of a forced change in Company practices, that would ultimately have a significant, negative impact on the Company's financials.

120.    Then on June 2, 2015, Defendant McLean unexpectedly announced his "retirement," as CEO and Chairman of the Board, just weeks before the CFPB sent the Company a NORA letter notifying it that the CFPB's Enforcement Office was considering recommending that the CFPB take legal action.

121.    These successive executive resignations, which occurred against the backdrop of the identification of a material weakness in the Company's internal control over financial reporting, a systematic change in the way that Company accounted for its small-dollar loan renewals, Defendant's admission that it had directly solicited borrowers to renew small dollar loans with less than 10% paid down, KMPG's resignation as the Company's independent auditor, and the Company's announcement that the CFPB had filed a CID against it and, subsequently, issued it a NORA letter, were highly suspicious and further evidence Defendants' recklessness and conscious misconduct.

### 2. Defendants Admitted to Closely Monitoring and Evaluating the Operations, Underwriting and Accounting Underlying the Company's Illicit Practices

122.    Defendants' scienter is also apparent from their own admissions, throughout the Class Period, that they closely monitored and evaluated the operations, underwriting and accounting underlying their illicit lending practices.  These admissions support Defendants' knowledge or reckless disregard that their public statements regarding such illicit lending practices were false and misleading.

123.    For example, during the Company's April 25, 2013 earnings call with analysts, Defendant McLean stressed Defendants' focus on loan growth, stating that "***this Management team has got to be focused on getting back to near historical type [loan balance] growth levels***. . . . it's our challenge to try to do that, so that our shareholders benefit as best as we can offer."

124.    The following quarter, during the Company's earnings call on July 25, 2013, an analyst asked Defendant McLean whether assessing the impact of the Company's "material weakness" on loan renewals would require the Company to invest in any new accounting software systems.  Defendant McLean admitted that "***[w]e have the systems, we have the data, and we just need to determine operationally what is the best way to approach this and from the impact on accounting and so forth.  I mean, this situation is well under control***."

125.    During the Company's October 24, 2013 earnings call, an analyst asked: "You mentioned some of the changes in underwriting for small balance loan renewals based on the audit, kind of the auditing change you went through last year.  Is there any of the delinquency changes and the charge-off change . . . potentially related to that or is it really just the customer credit trends?"  Defendant McLean responded:

> I mean you bring up a good point, so let's address it now because it will probably be answered anyway. Currently, as a result of the material weakness that was identified during last year surrounding the less than 10% loans, ***we have implemented***

*procedures to monitor that much more closely*.  And we have actually taken into consideration the impact from an accounting standpoint of the way we should defer those fees and so forth.

But generally speaking, we are not the ones that initiate a renewal type transaction or refinancing.  Generally, that's the customer who may need that $25 or $35 or so forth, and so we have not at this point eliminated those type of loans.  *We are monitoring them and looking at those very closely*.  *We are doing some things systematically to improve our monitoring over those, and so it may have a slight impact on our volume.*  But I do not necessarily believe that it's a direct major contributing factor towards the increased losses.

126.    The following quarter, on the Company's January 28, 2014 earnings call, an analyst asked Defendants about their loan volumes with respect to new and recurring customers.  Defendant McLean responded that Defendants remained "very conscious of our growth rates" and "all aspects" of the Company's collections, underwriting and operational business:

If you remember for the first six months through September of the year, our new customer, brand-new customer loans, were down -- in the US were down about 7.7%.  During the third fiscal quarter, those new customer loans were down about 3.3%.  While they are still down this is a trend that we certainly think is an improvement.

Also our growth in the US was between 5% and 6% and our growth in Mexico was about 30%. So we still see somewhat weak demand in the US but hopefully things are improving a little bit.  But I don't know what kind of conclusions to draw from that.  *We are certainly very conscious of our growth rates and operations evaluating all aspects of our collections, underwriting and all parts of our operational business.*

127.    During the same earnings call, an analyst asked, "[b]ut you had a material weakness in [allowance for loan losses], I guess, starting last year.  And so what have you changed?  Have you changed the assumptions at all based on the material – I mean, I guess I was thinking the material weakness said you're not doing a sufficient job of measuring this."  Defendant McLean responded in part that "*we have since put procedures into place to monitor these loans and to make sure that they are properly accounted for*."

128.     During the Company's July 22, 2014 conference call with analysts, an analyst asked Defendants about the decrease in loan renewals across the Company and "[h]ow much of that is related to the small dollar renewal changes that you all made . . . ."  Defendant McLean responded, *"[w]e started these initiatives back when this problem was identified a year ago, but then we made some formal system changes at the beginning of the calendar year*."  McLean further admitted that the Company was "*no longer soliciting directly*" these type of loans from its customers.

129.     Then, during the Company's October 22, 2014 quarterly conference call with analysts, an analyst asked whether Defendants had "any sense that the changes you all are implementing mean that you're closer to a trough? Did you have any sort of outlook on when things could actually begin to rebuild, or whether we continue to see a drifting in growth from here?" Defendant McLean further confirmed his knowledge of the deceleration in loan renewals and his involvement in monitoring the changes, stating, "*I believe the impact of the changes we had surrounding the less-than-10% renewables will be lessened over the next couple of months because of the implementation date of that back in February.*"  Defendant McLean continued, "I believe our renewal activity . . . we've done some things to encourage renewals, but our renewal volume is actually down on a year-to-year basis."  February 2013, however, was more than four months prior to Defendants' disclosure of the "material weakness" and supports that the identification of the "problem" was actually prior to that date.

130.     Also, on October 22, 2014, during the Company's quarterly conference call, Defendant McLean further confirmed the timing of Defendants' knowledge by once again stating that the "*biggest change that we made to our systems took place in February of last year*" as a result of its improper accounting of less-than-10% loans. Defendant McLean further stated that the Company was "*just not marketing [loans to customers with less than 10%] like we previously did*."

131.    Finally, during the Company's April 30, 2015 conference call with analysts, Defendant McLean once again admitted that the Company's practices had included soliciting its customers for low-dollar renewals.  For example, he stated "*when we actually stopped soliciting for those low-dollar renewals, we anticipated it would take us a year before we saw that level off*."

### 3.    Defendants' Scienter Is Further Evidenced by the Magnitude and Duration of the Fraud Involving World Acceptance's Core Operation

132.    Prior to and during the Class Period, loan renewals were a core operation of the Company and a key driver of the Company's revenue.  Indeed, according to the Company, in fiscal 2014, 73% of World Acceptance's loan originations were renewals of existing loans.  The percentage was even higher, over 75%, in fiscal 2013.  Moreover, throughout the Class Period, the Individual Defendants repeatedly touted the Company's loan growth, which was a metric of great import to the market.  *See, e.g.*, ¶¶144, 162, 191, 215, 232.  For example, during the Company's earnings call on April 29, 2014, Defendant McLean said, "*As you know, we stated our number-one priority and our number-one concern is loan growth and loan volume in the US.*"  As the most senior executive officers of World Acceptance, the Individual Defendants knew, or at a minimum were severely reckless in not knowing, of facts critical to this core operation of the Company on which they repeatedly made statements.

133.    The sheer magnitude and duration of World Acceptance's fraud supports that Defendants knew or should have known that the statements they issued regarding the Company's core operation of issuing and renewing loans were false and misleading.  As recounted by a dozen former insiders, the Company's deceptive, illicit lending practices were pervasive throughout the country.  Former district and regional personnel from South Carolina, Georgia, Louisiana, Texas, Oklahoma, Missouri, Illinois, and Wisconsin relayed similar, corroborating accounts of World Acceptance employees actively misleading customers to the Company's gain.

### 4. Defendants Knew of the Company's Illicit Practices from Media Scrutiny During the Class Period

134. Moreover, Defendants knew or should have known of the Company's illicit practices from significant media scrutiny during the Class Period. Indeed, on May 13, 2013, *Pro Publica* issued an article entitled "The 182 Percent Loan: How Installment Lenders Put Borrowers in a World of Hurt," challenging numerous of the Company's business practices.

135. On July 25, 2013, however, Defendant McLean downplayed this article, characterizing it as painting a picture that was "inflammatory and highly-distorted." He accused *Pro Publica* of having "predetermined conclusions" and attributed the allegations in the article "to several disgruntled former customers and two or three disgruntled former employees, several of which have been terminated for improper behavior." Defendants' efforts in responding to inquiries into the Company's practices evidence that they were keenly aware throughout the Class Period of the Company's illicit lending and renewal practices that manipulated and deceived its customer base.

### E. World Acceptance's Predatory Practices Eventually Caught the Eye of the Bureau

136. As a result of Defendants' unscrupulous lending practices, the federal government soon came knocking. On March 12, 2014, the Bureau served World Acceptance with a Civil Investigative Demand ("CID") related to the Company's lending practices, which the Company publicly disclosed via Form 8-K filed with the SEC. According to the Company's filing, the Bureau's demand states that "[t]he purpose of [its] investigation is to determine whether finance companies or other unnamed persons have been or are engaging in unlawful acts or practices in connection with the marketing, offering, or extension of credit in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act, 12 U.S.C. §§5531, 5536, the Truth in Lending Act, 15 U.S.C. §§1601, et seq., Regulation Z, 12 C.F.R. pt. 1026, or any other Federal consumer financial

law" and "also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest."

137.    The Company revealed that the Bureau's demand contained "broad requests for production of documents, answers to interrogatories and written reports related to loans made by the Company and numerous other aspects of the Company's business."  World Acceptance informed investors that it had evaluated the Bureau's investigative demand and was in the process of providing the information requested.  The Company further noted, however, that it "believes its marketing and lending practices are lawful."

138.    Following the Company's disclosure of the investigation, Sterne, Agee & Leach Inc. published a report on March 13, 2014 identifying the "[t]wo areas of likely focus" in its view: "1) rollovers and renewals, and 2) the sale of credit-related insurance products."  Sidoti & Company, LLC also pinpointed the Company's "marketing of credit insurance products" as a likely concern in its March 13, 2014 report.

139.    On March 14, 2014, Sterne, Agee & Leach Inc. published a follow-up report expressing greater concern over the Bureau's investigation.  Lowering the Company's stock price target by $30 "to reflect the uncertainty surrounding" its regulatory issues, Sterne, Agee was not merely concerned about "the loss of any ancillary product" but instead predicted a likely outcome requiring World Acceptance to make "some change in business practices that lowers revenue, increases cost, or both."

140.    On August 7, 2015, after more than a year of investigation by the CFPB, World Acceptance revealed that it received a NORA letter notifying World Acceptance that the "CFPB's Enforcement Office is considering recommending that the CFPB take legal action against the Company."  According to the letter, the "CFPB's Enforcement Office expects to allege that the

Company violated the Consumer Financial Protection Act of 2010, 12 U.S.C. §5536." The NORA letter further confirms that World Acceptance was engaged in unscrupulous lending practices contradicting statements made by the Defendants throughout the Class Period. *See, e.g.*, ¶¶179, 238, 262, 323.

141.    Following the disclosure of the NORA letter and impending CFPB legal action, on August 10, 2015, Macquarie Research published a report reiterating its "Underperform" rating and "lowering [its] target price to WRLD's F1Q16 tangible book of $38." The report further stated, "[a]t the very least, a significant fine; at worst, the business model could be untenable by a CFPB action."

142.    On August 11, 2015, Sterne Agee CRT published a report reducing its price target from $55 to $37 to "reflect the acceleration of the CID between WRLD and the CFPB." The Sterne Agee CRT report also identified that it believes the CFPB is looking at the Company's "sales practices" surrounding, its "sale of credit insurance products in conjunction with its loans" and "the whole process of loan renewals."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Third Quarter 2013 Results

143.    The Class Period begins on January 30, 2013 when Defendants announced the Company's third quarter 2013 financial results. As was regular throughout the Class Period, on that date, World Acceptance filed with the SEC a Form 8-K attaching both a press release and a "Summary of Quarterly Results" in advance of Defendants' conference call with analysts to discuss the Company's financial results.

144.    World Acceptance's press release touted the Company's 48th consecutive year-over-year quarterly increase in diluted earnings per share, with revenues increased to $149.6 million in the third quarter 2013 due to loan growth. "The primary driver for the growth in revenue was an 11.3%

increase in average net loans and the associated growth in interest and fees. Gross loans outstanding increased 11.0% to $1.2 billion at December 31, 2012, up from $1.1 billion at December 31, 2011. Interest and fees rose 11.3% to $130.3 million in the third quarter of fiscal 2013 compared to $117.1 million in the third quarter of fiscal 2012."

145.    Under "Selected Consolidated Statistics," the press release listed loan volume of $865,507,000 and $2,379,209,000 for the three months and nine months ended December 31, 2012, respectively. This was an increase from $816,093,000 and $2,222,189,000 for the three months and nine months ended December 31, 2011, respectively.

146.    In its "Summary of Quarterly Results," the Company proclaimed, "We are generally pleased with the financial results for the third quarter of fiscal 2013 as many of the positive trends that we have experienced during the last several years have continued into the current fiscal quarter and year. Demand for our loan products has remained strong and we have continued to experience improvement in our loan loss ratios."

147.    The Summary continued:

As everyone is aware, the third fiscal quarter is one of the busiest lending periods of the year for the Company, primarily due to the holiday season. During the quarter we closed $865.5 million in gross loan volume, which was a 13.8% increase over the amount loaned during the second fiscal quarter and an 6.1% increase over the same quarter of the prior fiscal year. As a result, gross loans outstanding grew to $1.2 billion at December 31, 2012, an 11.0% increase over the $1.1 billion outstanding at December 31, 2011 and a 21.7% increase since the beginning of the fiscal year. Nine of our 13 states and Mexico had year over year growth of at least 9.0%.

148.    The Company also noted, "Total revenue for the quarter amounted [to] $149.6 million, a 10.1% increase over the $136.0 million during the third quarter of the prior fiscal year. This resulted from a 11.3% increase in average net loans when comparing the two quarterly periods."

149.     Regarding regulatory oversight, the Summary concluded, "Finally, there is very little that is new to report on either the regulatory or legislative front at either the state o[r] federal level, other than an update on the ballot initiative in Missouri. This initiative failed to get on the ballot during the most recent election due to insufficient signatures; however, the same group has resubmitted the proposal to be on the ballot in the 2014 election."

150.     During the conference call with analysts on January 30, 2013, Defendant McLean fielded a question from a CIS Investment Partners analyst on the Company's long-term growth expectations.  Mindful of the growth challenges faced as a company matures, Defendant McLean assured, "[W]e still have ample opportunities of locations to enter; we certainly have a lot of opportunities in our existing states and Mexico and I don't believe that anything fundamentally changed in what we have been doing over the last 50 years."  He continued, "So I believe a combination of continued office expansion, a combination of asset growth as a result of growth in those of new offices as well as there are so many less than mature offices still outstanding – still in existence.  We should be able to continue some rate of asset growth – I can't tell – I'm not going to say what that is because a lot depends on the future, but certainly a reasonable rate of asset growth."

151.     Defendant McLean further added, "I believe as we get larger we can continue to see, as we have talked about on this phone, some economies of scale on an ongoing basis, although a lot of our costs are variable costs.  And I believe that there is a lot of things that we can do to continue the same type of track record that we have had for 50 years over the foreseeable future."  He then concluded, "I certainly don't believe the outlook for this Company is anything but positive."

152.     As a result of Defendants' positive statements concerning the Company's continued success and robust loan growth, WRLD stock closed at $77.55 on January 31, 2013, up from a close of $75.31 on January 30, on heavy trading volume.

153.    Further, analysts reacted positively to Defendants' statements:

(a)    Sidoti & Company LLC rated the stock a "Buy" on January 30, 2013.  The report highlighted "Solid 3Q:F12 Results" and noted "[g]ross year-over-year loan growth of 11% in 3Q:F13 versus new office growth of 6% illustrates that organic demand remains strong for WRLD's installments loans."

(b)    CL King & Associates rated World Acceptance a "Strong Buy" on January 30, 2013: "We reiterate our Strong Buy rating on World Acceptance, reflecting continued strong demand for the company's installment loan products, strong top line growth and compelling valuation."

(c)    Sterne, Agee & Leach Inc. also noted on January 30, 2013 that "World should be able to translate 10% growth in loan balances per year into EPS growth of 15%, without share repurchases, and 20% with expected return of capital measures.  Reflecting this we are increasing projected EPS and raising our price target from $70 to $80."

154.    The Company's third quarter financial results were incorporated in its third quarter 2013 Form 10-Q, filed with the SEC on February 8, 2013.  Therein, Defendants reiterated: "Interest and fee income for the quarter ended December 31, 2012 increased by $13.2 million, or 11.3%, over the same period of the prior year.  This increase resulted from a $83.1 million increase, or 11.3%, in average net loans receivable over the two corresponding periods."  Moreover, "[i]nterest and fee income for the nine months ended December 31, 2012 increased by $26.7 million, or 7.8%, over the same period of the prior year.  This increase resulted from a $74.6 million increase, or 10.7%, in average net loans receivable over the two corresponding periods."

155.    Regarding World Acceptance's various insurance products, Defendants touted: "Insurance commissions and other income increased by approximately $500,000, or 2.6%, between

the two quarterly periods.  Insurance commissions increased by approximately $852,000, or 6.6%, during the most recent quarter when compared to the prior year quarter due to the increase in loans in those states where credit insurance is sold in conjunction with the loan."  Further, "[i]nsurance commissions and other income increased by approximately $3.9 million, or 7.7%, between the two nine month periods.  Insurance commissions increased by approximately $3.8 million, or 10.7%, during the most recent nine months when compared to the same period in the prior year due to the increase in loans in those states where credit insurance is sold in conjunction with the loan."

156.     Defendants assured that "[t]he Company's accounting and reporting policies are in accordance with U. S. GAAP and conform to general practices within the finance company industry."

157.     Defendants also assured that "[a]n evaluation was carried out under the supervision and with the participation of the Company's management, including its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures as of December 31, 2012.  Based on that evaluation, the Company's management, including the CEO and CFO, has concluded that the Company's disclosure controls and procedures are effective as of December 31, 2012."

158.     Moreover, Defendants McLean and Malson signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating they had reviewed the Form 10-Q and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by" that report.

159.     Further, Defendants McLean and Malson each signed SOX certifications that the Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities

Exchange Act of 1934," and that "the information contained in the [Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

160.    As a result of Defendants' reinforcements of the Company's strong growth in the third quarter Form 10-Q, WRLD stock appreciated to $78.20 per share on February 8, 2013, up from a close of $77.70 on February 7.

161.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's third quarter 2013 earnings release and "Summary of Quarterly Results" dated January 30, 2013, the conference call with analysts held the same day, and the third quarter 2013 Form 10-Q filed on February 8, all of which touted strong growth attributable to increased loan volume, increased insurance commissions, and the lack of any concern over regulatory action, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    When promising "that there is a lot of things that we can do to continue the same type of track record that we have had for 50 years over the foreseeable future," Defendants failed to describe how World Acceptance had used illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(b)    While boasting a "10.1% increase" in revenue for the first quarter 2013, World Acceptance had used illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(c)    The Company's predatory lending practices were both consistent and pervasive throughout the Company's business as later admitted by Defendants and confirmed by a

dozen former employees with corroborating experiences in eight different states around the country (*see, e.g.*, ¶¶38-103);

(d)     Defendants encouraged this culture of lending predation, either explicitly or implicitly, by allowing district and regional management to openly disregard written underwriting policies for the sake of growing the Company's loan portfolio at any and all costs (*see, e.g.*, ¶¶54-95, 128, 131);

(e)     Though World Acceptance's "[i]nsurance commissions increased by approximately $852,000, or 6.6%, during the most recent quarter when compared to the prior year quarter due to the increase in loans in those states where credit insurance is sold in conjunction with the loan," the Company achieved this growth by tacking on worthless insurance products to customers' loans without their knowledge, which were really *de facto* interest rate hikes to skirt applicable state usury laws (*see, e.g.*, ¶¶67-81);

(f)     While assuring there was "very little that is new to report on either the regulatory or legislative front at either the state o[r] federal level," Defendants knew the foregoing predatory practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to untold legal and/or regulatory penalties (*see, e.g.*, ¶¶38-142);

(g)     Defendants' internal control over financial reporting were inadequate because World Acceptance's accounting for small-dollar loan renewals violated GAAP (*see, e.g.*, ¶¶104-114);

(h)     Though Defendants touted how "[d]emand for our loan products has remained strong," they failed to disclose that such demand was actually the product of Defendants' manipulative lending practices; moreover, World Acceptance's reported loan volume and associated

growth was actually artificially inflated as a result of its "material weakness" in accounting for small-dollar loan renewals (*see, e.g.*, ¶¶38-114);

(i)     the Company's third quarter 2013 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(j)     the SOX certifications executed by Defendants McLean and Malson included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit marketing and lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

## B.     Fourth Quarter and Full Year 2013 Results

162.     On April 25, 2013, Defendants announced World Acceptance's fourth quarter and fiscal year 2013 financial results.  The press release, which was filed with the SEC on Form 8-K, touted "record" results, including "gross loan balances growing 9.7% to $1.1 billion [for fiscal 2013] compared with fiscal 2012."  "Total revenues increased to $161.8 million in the fourth quarter of fiscal 2013, an 8.7% increase over the $148.9 million reported in the fourth quarter ended March 31, 2012.  Interest and fee income increased 9.8%, fueled by a 10.4% increase in net average loans. Insurance commissions and other income increased by 2.8% to $23.8 million in the fourth quarter of fiscal 2013 from $23.1 million in the prior year quarter."  Moreover, "[g]ross loans outstanding increased to $1.1 billion at March 31, 2013, a 9.7% increase from $972.7 million at March 31, 2012."

163.     Results for the fiscal year were similarly positive: "Total revenues for fiscal 2013 rose to $583.7 million, an 8.1% increase over the $540.2 million in fiscal 2012."

164.     Under "Selected Consolidated Statistics," the press release listed loan volume of $606,128,000 and $2,985,336,000 for the three months and year ended March 31, 2013, respectively. This was an increase from $597,401,000 and $2,819,590,000 for the three months and year ended March 31, 2012, respectively.

165.     In its "Summary of Quarterly Results," also filed on Form 8-K on April 25, the Company boasted of loan volume growth despite the negative impact on loan demand of a delay in tax filing season:

> During the quarter, the Company made 492.4 thousand individual loans for gross loan volume of $606.1 million.  This represents a 2.1% decrease in the number of loans made and a 1.5% increase in total loan volume when comparing it to the fourth quarter of the prior fiscal year.  Generally, we receive our largest repayments during January and February, when our customers are receiving their tax refunds, and begin to see growth in our loan balances during March.  This year, due to the delay, we did not see our normal growth in March.  Hopefully, we can make up for this timing difference now that the tax season is behind us.  As a result, gross loans outstanding amounted to $1.1 billion at March 31, 2013, a 9.7% increase over the $972.7 million outstanding at March 31, 2012.

> \*         \*         \*

> Additionally, the 9.7% year-over-year growth in loan balances resulted from a 3.9% increase in number of accounts and a 5.6% increase in average balances outstanding.

166.     The Summary repeated World Acceptance's quarterly revenue growth attributable to an increase in loans: "Total revenue for the quarter amounted [to] $161.8 million, an 8.7% increase over the $148.9 million during the fourth quarter of the prior fiscal year.  This resulted from a 10.4% increase in average net loans when comparing the two quarterly periods.  Revenues from the 1,062 offices open throughout [sic] both quarterly periods increased by 5.5%."

167.     On the topic of regulation, the Company provided positive outlook: "Finally, while there is very little to report on the regulatory or legislative front at the federal level, there has been positive state legislation passed, slightly increasing interest or fees on certain loans in two of the 13 states where we currently operate."

168.     During the conference call with analysts the same day, April 25, Defendants fielded numerous questions on the topics of federal and state regulation and the Company's refinancings. For example, one analyst noted recent favorable changes at the state level: "And this sounds all very delightful to have changes in the regulation, which are favorable for the industry.  I think there's been fears over time that there would be changes in regulations which would be adverse to the industry.  Can you maybe spend a moment talking about the political wind in this regard?  How did we go from a year or two ago generally being concerned that there would be significant adverse regulations, to now having state legislators or other organizations having decided to change the structures of our regulations such that we would be able to grow our businesses better and be more profitable?"

169.     Defendant McLean responded by showing confidence in the Company's relationship with the state regulators and by downplaying any concerns over federal oversight:

> We've always maintained an excellent relationship with the states – in the states where we operate.  We have a good relationship with the regulators there, the examiners there.  And these states recognize the need for these small installment loans.  And as such, have passed these alternate rates to allow companies to offer these on a profitable basis.  And I don't believe that that relationship or the attitude towards those lending products and so forth has ever changed.

> Now, certainly the payday lending industry has created a lot of concerns at the state level, and as such, there have been some negative laws passed.  For instance, in Oregon and North Carolina and Georgia and so forth, where an attempt to regulate the payday lending industry, they have basically eliminated almost all small dollar financial products.  So that is an ongoing concern.  In an attempt to regulate one industry, others are affected by hat regulation.  But with that being said, like I said, we've always maintained excellent relationships at the state level.

> And the concern over the last two years is the introduction of general oversight, which we've not had previously.  And there's been concerns about what's – you know, what is going to result from the Dodd-Frank and the creation of this Consumer Financial Protection Bureau.  I personally believe that we provide a good service, and we offer products that banks and other institutions are not offering.  And that it would be harmful to the – a large segment of the population to not have access to credit.  But you know, all of the sudden you have a Bureau with an incredible amount

of power that can deem what products are good and what products are bad, regardless of what – how it affects that individual consumer.

Well, some of those initial concerns, to a certain extent, have been – have not risen to the level of being critical because it does not appear at this point in time that the Consumer Financial Protection Bureau – the Bureau's goal is to eliminate credit to this large share – segment of the population. So I believe ultimately the availability of credit is a primary goal of this Bureau. And I believe ultimately the installment lending industry is a vehicle that offers a better product than a lot of other ones.

170.    On the subject of refinancings, a Cowen and Company analyst later asked "if you could tell us what percentage of new loans written are refinancings of prior outstanding loans, and what percentage of the loans are ultimately fully collected?"

171.    Defendant McLean answered simply: "There's no real great way to answer this, but if you base it on loan volume, 77% of our loan volume represents renewals of existing loans. And if you look at our charge-off ratios, I would say that 85% of our loans are collected because roughly 15% or 14.5% are not collected. So I think there's a lot of ways you can slice and dice that question, but the most straightforward answer is 77% and 85%."

172.    Another analyst requested "comment on how often the average customer refinances successively." In reply, Defendant McLean offered only the following:

I mean, based on the volume of business and based on the average loans outstanding, it would appear that our portfolio turns somewhere between two and three times per year. But that does not imply that it's the same customers doing this. We've got a constant mix of new people coming in, people paying us out in full and coming back in and re-accessing credit. We've got people being charged off that we have to replace with new customers. So I cannot tell you on average what a given person does. I can just tell you that the portfolio turns between two and three times per year, but that is not the same customer base.

173.    As a result of Defendants' positive statements concerning the Company's continued success and robust loan growth, WRLD stock maintained its artificial inflation.

174.    Further, analysts reacted positively to Defendants' statements:

(a)     On April 25, 2013, CL King & Associates rated World Acceptance stock a "Strong Buy" and highlighted:  "We reiterate our Strong Buy rating on World Acceptance, reflecting continued strong demand for the company's installment loan products, strong top-line growth and compelling valuation.  With the stock trading at a forward P/E of only 9.8x and earnings growth in the mid-teens or better, we view valuation as attractive."  The report continued, "At quarter's end, gross receivables were 9.7% greater than year-ago levels, in line with our expectation. Growth in loan receivables is a precursor to growth in revenue."

(b)     That same day, Sidoti & Company, LLC highlighted how "WRLD [had] reported strong loan growth, as the gross loan balance grew nearly 10% year over year," and also noted that "loan demand . . . remained robust."

175.    On July 3, 2013, after the close of trading, World Acceptance filed a Form NT 10-K/A with the SEC disclosing that the Company was unable to file a completed Form 10-K for the fiscal year ended March 31, 2013, "because of unexpected delays in completing our financial statements relating to additional review and analysis needed to support the Company's allowance for loan losses."

176.    Further, as a result of "management's ongoing assessment of these issues," the Company also announced that "it is **possible** that the Company's amended Form 10-K will report a material weakness in its internal control over financial reporting relating to its process for determining its allowance for loan losses, as well as reporting the measures it is undertaking to remediate any such material weakness."

177.    As a result of Defendants' false and misleading statements in the Company's Form NT 10-K/A, WRLD stock maintained its artificial inflation.

178.    The Company's fourth quarter and full year financial results were incorporated in its fiscal 2013 Form 10-K, initially filed with the SEC on June 14, 2013 and amended July 19, 2013. In its amended Form 10-K, the Company described its installment loan and insurance business as follows: "As of March 31, 2013, the annual percentage rates on loans offered by the Company, which include interest, fees and other charges as calculated for the purposes of the requirements of the federal Truth in Lending Act, ranged from 21% to 199% depending on the loan size, maturity and the state in which the loan is made. In addition, in certain states, the Company, as agent for an unaffiliated insurance company, sells credit insurance in connection with its loan transactions. The commissions from the premiums for those insurance products may increase the Company's overall returns on loan transactions originated in those states."

179.    World Acceptance claimed stringent underwriting practices for its installment loans:

In evaluating the creditworthiness of potential customers, the Company primarily examines the individual's discretionary income, length of current employment and/or sources of income, duration of residence and prior credit experience. Loans are made to individuals on the basis of the customer's discretionary income and other factors and are limited to amounts that the customer can reasonably be expected to repay from that income. All of the Company's new customers are required to complete standardized credit applications in person or by telephone at local Company offices. Each of the Company's local offices is equipped to perform immediate background, employment and credit checks and approve loan applications promptly, often while the customer waits. The Company's employees verify the applicant's sources of income and credit histories through telephone checks with employers, other employment references and a variety of credit services. Substantially all new customers are required to submit a listing of personal property that will serve as collateral to secure the loan, but the Company does not rely on the value of such collateral in the loan approval process and generally does not perfect its security interest in that collateral. Accordingly, if the customer were to default in the repayment of the loan, the Company may not be able to recover the outstanding loan balance by resorting to the sale of collateral.

180.    On the topic of refinancings, World Acceptance's amended Form 10-K stated the following:

It is not unusual for the Company to have made a number of loans to the same customer over the course of several years, many of which were refinanced with a new loan after the borrower had reduced the existing loan's outstanding balance by making multiple payments. In determining whether to refinance existing loans, the Company typically requires loans to be current on a recency basis, and repeat customers are generally required to complete a new credit application if they have not completed one within the prior two years.

In fiscal 2013, approximately 84.6% of the Company's loans were generated through refinancings of outstanding loans and the origination of new loans to previous customers. A refinancing represents a new loan transaction with a present customer in which a portion of the new loan proceeds is used to repay the balance of an existing loan and the remaining portion is advanced to the customer. The Company actively markets the opportunity for qualifying customers to refinance existing loans prior to maturity. In many cases the existing customer's past performance and established creditworthiness with the Company qualifies that customer for a larger loan. This, in turn, may increase the fees and other income realized for a particular customer. For fiscal 2013, 2012 and 2011, the percentages of the Company's loan originations that were refinancings of existing loans were 75.3%, 75.9% and 75.9%, respectively.

181.    Regarding the Company's refinancings of delinquent loans in particular:

The Company allows refinancing of delinquent loans on a case-by-case basis for those customers who otherwise satisfy the Company's credit standards. Each such refinancing is carefully examined before approval in an effort to avoid increasing credit risk. A delinquent loan may generally be refinanced only if the customer has made payments which, together with any credits of insurance premiums or other charges to which the customer is entitled in connection with the refinancing, reduce the balance due on the loan to an amount equal to or less than the original cash advance made in connection with the loan.

182.    Regarding the Company's practice of selling insurance products:

[I]n certain states, the Company, as agent for an unaffiliated insurance company, sells credit insurance in connection with its loan transactions. The commissions from the premiums for those insurance products may increase the Company's overall returns on loan transactions originated in those states.

*        *        *

The Company, as an agent for an unaffiliated insurance company, markets and sells credit life, credit accident and health, credit property, and unemployment insurance in connection with its loans in selected states where the sale of such insurance is permitted by law.

*        *        *

The Company encourages customers to obtain credit insurance for all loans originated in Georgia, South Carolina, Louisiana, Indiana and Kentucky and on a limited basis in Alabama, Tennessee, Oklahoma, and Texas. Customers in those states typically obtain such credit insurance through the Company. Charges for such credit insurance are made at filed authorized rates and are stated separately in the Company's disclosure to customers, as required by the Truth in Lending Act and by various applicable state laws. In the sale of insurance policies, the Company, as an agent, writes policies only within limitations established by its agency contracts with the insurer. The Company does not sell credit insurance to non-borrowers.

183.     The amended Form 10-K also included management's discussion and analysis of World Acceptance's financial results for the fourth quarter and fiscal year 2013. Noted therein: "The Company's financial performance continues to be dependent in large part upon the growth in its outstanding loans receivable, the maintenance of loan quality and acceptable levels of operating expenses. Since March 31, 2009, gross loans receivable have increased at a 9.7% annual compounded rate from $671.2 million to $1.1 billion at March 31, 2013. The increase reflects both the higher volume of loans generated through the Company's existing offices and the contribution of loans generated from new offices opened or acquired over the period."

184.     The Company further highlighted in its amended Form 10-K:

- "Net income was $104.1 million during fiscal 2013, a 3.4% increase over the $100.7 million earned during fiscal 2012 . This increase resulted primarily from an increase in operating income (revenues less provision for loan losses and general and administrative expenses) of $9.9 million, or 5.7%, partially offset by a $3.0 million increase in income tax expense."

- "Total revenues increased to $583.7 million in fiscal 2013, a $43.6 million, or 8.1%, increase over the $540.2 million in fiscal 2012 . Revenues from the 1,062 offices open throughout both fiscal years increased by 5.5%."

- "Interest and fee income during fiscal 2013 increased by $39.0 million, or 8.4%, over fiscal 2012. This increase resulted from an increase of $75.0 million, or 10.6%, in average net loans receivable between the two fiscal years. The increase in average loans receivable was attributable to the Company's internal growth."

- "Insurance commissions and other income increased by $4.5 million, or 6.2%, over the two fiscal years. Insurance commissions increased by $4.1 million, or 8.7%, as a result of the increase in loan volume in states where credit insurance is sold."

- Insurance commissions totaled $51,345,424 for fiscal 2013, up from $47,223,398 for fiscal 2012.

185. Defendants also assured that "[t]he Company's accounting and reporting policies are in accordance with U. S. generally accepted accounting principles and conform to general practices within the finance company industry."

186. Moreover, World Acceptance's fiscal 2013 Form 10-K contained SOX certifications by Defendants McLean and Malson that were materially similar to those identified above in ¶¶158-159.

187. As a result of Defendants' reinforcements of the Company's business practices and strong growth in the amended Form 10-K, WRLD stock increased to $85.18 per share on July 19, 2013, up from a close of $82.07 on July 18, on unusually heavy trading volume.

188. Sterne, Agee & Leach, Inc. issued a report on July 22, 2013 entitled, "10K Released ahead of July 31 date… 10K OK." The report stated: "We found that the financial statements posted in the 10K today and the 8K following the earnings release in May were identical. The stock traded higher after the 10K was filed, and we would expect it to make up some of the dip that occurred after the filing delay was first announced, as some investors were concerned about the potential for restatements."

189. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's fourth quarter and full year 2013 earnings release and "Summary of Quarterly Results" dated April 25, 2013, the conference call with analysts held the same day, the Form NT 10-K/A with the SEC on July 3, 2013, and the amended fiscal 2013 Form 10-K filed on July 19, all of which touted increased loan growth, increased

insurance commissions, stringent underwriting practices, and a generally favorable regulatory environment, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     While boasting of an "8.7% increase" in total revenue for the quarter, and "an 8.1% increase" for the fiscal year, World Acceptance had used illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(b)     The Company's predatory lending practices were both consistent and pervasive throughout the Company's business as later admitted by Defendants and confirmed by over a dozen former employees with corroborating experiences in eight different states around the country (*see, e.g.*, ¶¶38-103);

(c)     Even though Defendants later admitted that the Company discovered "problems" with its allowances for loan losses in February of 2013, Defendants failed to disclose their illicit practices and, instead, filed a Form NT 10-K/A with the SEC on July 3, 2013 disclosing only that the Company needed additional time to perform its analysis and that it was only a "possibility" that it may announce a "material weakness" (*see, e.g.*, ¶¶122-131);

(d)     Defendants encouraged this culture of lending predation, either explicitly or implicitly, by allowing district and regional management to openly disregard written underwriting policies for the sake of growing the Company's loan portfolio at any and all costs (*see, e.g.*, ¶¶54-95, 128, 131);

(e)     Loans actually were ***not*** "limited to amounts that the customer can reasonably be expected to repay," but rather were made to anyone who had any income remaining after housing and automobile payments (*see, e.g.*, ¶¶56-59);

(f)    Beyond simply turning the Company's loan portfolio "between two and three times per year" by way of refinancings, Defendants harassingly pushed – and sometimes even actively defrauded – customers into renewing their loans, which churned World Acceptance's loan portfolio, boosted reported loan growth, and ensured far greater interest income as borrowers remained trapped in an endless cycle of debt (*see, e.g.*, ¶¶82-114);

(g)    While "[i]nsurance commissions and other income increased by 2.8% to $23.8 million," the Company achieved this growth by tricking its customers into purchasing worthless insurance products that were, in reality, *de facto* interest rate hikes to skirt applicable state usury laws to help boost the Company's earnings (*see, e.g.*, ¶¶67-81);

(h)    Rather than merely "encourag[ing] customers to obtain credit insurance for all loans originated in Georgia, South Carolina, Louisiana, Indiana and Kentucky and on a limited basis in Alabama, Tennessee, Oklahoma, and Texas," in reality, World Acceptance's employees often told customers such insurance products were mandatory or otherwise misled them to believe that the insurance was inextricably tied to the loan (*see, e.g.*, ¶¶67-81);

(i)    Though boasting of "positive state legislation passed" and assuring that "there is very little to report on the regulatory or legislative front at the federal level," Defendants knew their predatory lending and renewal practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to untold legal and/or regulatory penalties (*see, e.g.*, ¶¶38-142]);

(j)    Though World Acceptance touted "gross loan balances growing 9.7% to $1.1 billion" and "[i]nterest and fee income increas[ing] 9.8%, fueled by a 10.4% increase in net average loans," this reported loan volume and associated growth was artificially inflated as a result of the "material weakness" in accounting for small-dollar loan renewals (*see, e.g.*, ¶¶104-114);

(k)    Rather than admit that the Company had identified any "problems" relating to the Company's small-dollar lending practices, Defendants continued to tout increased revenue and loan growth, which were driven by the Company's predatory practices;

(l)    the Company's amended fiscal 2013 Form 10-K was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(m)    the SOX certifications executed by Defendants McLean and Malson included the misleading representation that the amended Form 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit marketing and lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### C.    First Quarter 2014 Results

190.    World Acceptance's first quarter 2014 results were released on July 25, 2013 via press release and "Summary of Quarterly Results," both filed with the SEC on Form 8-K that day. The press release once again touted "record financial results" for the Company: "Total revenues increased to $145.3 million in the first quarter of fiscal 2014, a 9.4% increase over the $132.8 million reported in the first quarter last year. Interest and fee income increased 11.0%, from $115.3 million to $128.0 million in the first quarter of fiscal 2014 due to continued growth in loan volume and expansion of offices. Insurance and other income was down 1.4% to $17.3 million in the first quarter of fiscal 2014 compared with $17.5 million in the first quarter of fiscal 2013."

191.    Further, "[g]ross loans outstanding increased 9.6% to $1.1 billion at June 30, 2013, up from $1.0 billion at June 30, 2012." Under "Selected Consolidated Statistics," the press release

showed the Company's loan volume had grown to $782,099,000 for the quarter, compared to $752,993,000 for the same quarter the previous year.

192.    World Acceptance's "Summary of Quarterly Results" again boasted of "[g]ross loans amount[ing] to $1.13 billion at June 30, 2013, a 9.6% increase over the $1.03 billion outstanding at June 30, 2012 and a 5.5% increase since the beginning of the fiscal year." "Additionally, the overall 9.6% growth in loan balances resulted from a 3.5% increase in customers and a 6.1% increase in average balances outstanding."

193.    The Summary continued, "Total revenue for the quarter amounted $145.3 million, a 9.4% increase over the $132.8 million during the first quarter of the prior fiscal year, which is in line with our loan growth on a quarter over quarter basis. Revenues from the 1,132 offices open throughout both quarterly periods increased by 7.9%."

194.    The Summary also addressed World Acceptance's current regulatory environment:

From a regulatory and legislative standpoint, the Company's greatest risk factor, there was very little activity during the first fiscal quarter. As previously disclosed, there have been several positive legislative actions taken by certain states in recent months.

*     *     *

At the federal level, Richard Cordray was recently confirmed by the Senate as the official Director of the CFPB. This should not be considered a major setback, as the Company has been operating under the assumption that he would be confirmed at some point and he has not, to date, indicated any particular issues with the installment lending industry.

195.    Lastly, the Summary provided explanation on the Company's need to have amended its fiscal 2013 Form 10-K. The Summary revealed that management and the Company's auditors had uncovered a deficiency in Defendants' process for evaluating and determining World Acceptance's allowance for loan losses. Specifically, "[t]he primary issue involved the impact of renewals (including those that did not meet the 10% cash flow threshold as required by accounting

guidelines to qualify as a new loan) on the timing of subsequent charge-offs and the impact on the allowance.  As a result, it was determined that the Company did not have a control to assess less than 10% renewals and had difficulty proving that they did not materially affect the allowance."

196.    In other words, Defendants revealed that, from an accounting perspective, World Acceptance was not properly differentiating between small-dollar loan refinancings (those below the 10% threshold) and large-dollar loan refinancings (those at or above the 10% threshold).  However, the Company assured investors that corrective policies and procedures had already begun to be implemented, and that this identified "material weakness" would have **no effect** on its overall business:

> Ultimately, a conclusion was reached that the financials, as previously reported, were materially correct and the amended 10-K and the audited financials included in it did not reflect any changes from the Company's previously reported financials; however, it was determined that the combination of the deficiencies discussed above in documentation and control regarding the allowance constituted a material weakness in the Company's internal control over financial reporting, as discussed in the amended 10-K.  As also discussed in the amended 10-K, the Company has begun and will continue to implement policies and procedures to address this identified material weakness.  Importantly, this material weakness has no impact on the collectability of our loan portfolio.  Our business model remains as it has been for the last 50 years with improvements over time.

197.    The subject of the "material weakness" concerning small-dollar loan renewals was a frequent topic of conversation during the Company's conference call with analysts held the same day, on July 25th.  As an initial matter, when asked to explain the 10% threshold at the center of the controversy, Defendant Malson provided the following explanation: "The simplest way to explain it is that when a customer renews a loan, they would need to have at least 10% equity in their loan when they renew it.  If they have less than 10% equity, then the loan's treated as a modification, and so you would treat[] it as the life of the loan has just been extended."

198.     One analyst requested whether Defendants could "kind of quantify over the last year or in this quarter or in some period in time, how much of your volume is the smaller dollar loan renewals?  I'm trying to get a sense of how meaningful that impact is."

199.     Defendant McLean responded that the small-dollar loan renewals at issue represented at least 15%, and perhaps as much as 25%, of the Company's total renewal portfolio, but that the issue was being addressed going forward:

> That's subject to interpretation.  I believe that if you look at our renewals, the percent of renewals that fall into that category of less than 10% is around 15%.  Now, there are other parties that may interpret that a little more stricter in how you define what constitutes that loan – what constitutes the new loan that's being made and that would say it would be somewhere around 25%.

> So somewhere in between that, but I believe it's closer to that 15% range and it's something that is a result of our not following that as closely and properly as we have in the past, which did, in fact, contribute to the material weakness that was identified.  Then it's something that we will be addressing in detail and make sure we have proper controls surrounding that going forward.

200.     When asked how a possible discontinuation of small-dollar renewals might affect the Company's business, Defendant McLean offered the following assurances: "I don't believe it would affect the cash flow, but certain people may have run into difficulties and if they're not allowed to renew, it creates a lot of pressure on them and I don't know, whatever I said would be speculative.  I'm not sure if it's not something that we have monitored as closely as we should have over a long period of time.  I do not believe it will represent a material impact on our operations or results."

201.     An analyst from Sidoti & Company, LLC later asked Defendants to describe the proposed "exception reports" for small dollar renewals: "[J]ust to kind of clarify what you're talking about as far as the options[,] if you will[,] for those 10% loans, in the amended 10-K that you filed, you talk about an exception[] report?  Can you just maybe lay out what the options are for you with regard to the renewals that are sub-10%; whether it's not making the loan or if you just have to

create an exception report?  I just want to be clear as to what exactly the type of options we're talking about for those specific loans."

202.    Defendant Malson provided the following explanation: "Regarding the exception report, what the intent would be is, one, from an operational standpoint, we determine exactly what we want to do regarding small-dollar renewals.  If from a GAAP accounting standpoint they don't [meet] the threshold, those loans will be flagged.  That way, I can identify what the dollar amount and the volume are and we can consider any additional accounting treatment that we may need to do for those loans."

203.    Defendant McLean also added:

Other options are to generate monthly reports that identify these loans and find out if they're less than a certain level, the dollar amounts, and from an operations and procedural standpoint, decide whether or not this is beneficial and if not, we'll discontinue it.  We can create programming edits that will make sure that it can kick out and even not allow those type of loans or either allow them under certain supervisory approvals.

I mean, there's quite a few options in the way that we can address this.  But like I say, regardless of whichever direction we head, I continue to say, I don't believe it's going to have a significant impact on the overall operations of the company.

204.    Later, Defendant Roland offered further assurances of the "negligible" impact that would be felt should the Company decide to restrict small-dollar renewals:

One thing that we may not have made clear is that South Carolina, one of our oldest states, has operated for the last 15 or 16 years under a restriction on renewals of less than 10% and although we don't disclose state-by-state results necessarily, I will tell you that South Carolina runs the lowest delinquency and the lowest bad debt and charge-off percentages in the company.

So that restriction if applied nationwide, I would assume over time would mirror South Carolina, which means the impact to me once we get our customers used to the process and our individual branch employees used to the process would be negligible.  And we've already done it in one of our largest states and oldest states for the last 15 or 16 years.

205.    A Stephens Inc. analyst wondered whether World Acceptance might "have to invest in any new . . . accounting software systems that we should think about or is this more just you've got the data, you just need to call it and analyze it in different ways?"

206.    Defendant McLean answered that the situation was under control: "We have the systems, we have the data, and we just need to determine operationally what is the best way to approach this and from the impact on accounting and so forth.  I mean, this situation is well under control."

207.    When a North Run Capital analyst asked why this issue had suddenly "crop[ped] up," Defendant McLean pointed to a Public Company Accounting Oversight Board review of World Acceptance's longtime auditor:

> As you know, we've had the same auditors for roughly, I don't know, over 20 years and maybe 40 if you go back through a long period of time and as the result of the PCAOB doing a – we were audited by – I mean, they were reviewed by the PCAOB a couple of years ago and everything went fine and then they came back in for a follow-up audit, and I think at that point in time, there was some question as to whether our documentation was satisfactory.

208.    That same analyst then requested help in understanding why the Company does small-dollar renewals in the first place.  Defendants McLean and Roland responded as follows:

**Sandy McLean** - *World Acceptance Corporation - Chairman, CEO*

> It has not been a conscious decision to do so or not to do so.  Generally, we make a renewal when a customer comes in and requests a renewal.  I mean, it could be that his need at that point in time is not that large but that amount of money is very important to him at that particular point in time, and we will go through that renewal process at our customer's request.

> Now, if it turns out that it did not meet these 10% guidelines, it has never been that much of an issue except in the State of South Carolina where they had that prohibition.  Granted that we did not properly address the accounting aspects of that, we will not have to do so.

**Mark Roland** - *World Acceptance Corporation - President, COO*

- 73 -

And if I could interject. This is Mark Roland again. It's difficult, I guess, at some income levels to understand what's going on at other levels.

But, if you would think about a $1,200 net loan and somebody has paid interest sufficiently to borrow $150 and the immediate need is two front tires on the primary vehicle so somebody can get to work, that it is greater or less than 10% is not entering that borrower's mind and therefore has not really been a factor in our decision either. It's $150 that the borrower has paid in sufficient equity to borrow that money just as if he had a MasterCard and he had $150 left on a $1,200 credit limit.

We will work – Kelly, Sandy and I – together to determine the appropriate operational procedures to mitigate that circumstance and whatever that maybe, again, as I indicated, South Carolina already has these prohibitions in place and we know we can deal with it.

209.    Finally, turning to the subject of regulation, a Lawndale Capital Management analyst inquired as to the current regulatory environment for World Acceptance: "With respect to the United States, the CFPB finally got an congressionally-approval leader and there's been this media attention – ProPublica, Marketplace, et cetera – on your sector. . . . I don't know if there are regulatory headwinds or risks that you may be facing?"

210.    Defendant McLean downplayed any concern:

[O]bviously the confirmation of Cordray as the Director of the CFPB was a big event. But as stated in the remark, I don't think it's a terrible necessarily an event for [W]orld. I mean, we've been acting under the assumption that he may get ultimately confirmed anyway, and thus far, he has not expressed any significant issues with the installment lending industry.

But there is no question that this installment lending industry is one that comes under his authority and supervision and regulations and rulemaking, and I anticipate at some important in the not too near future, whether it's this year or next, that we will probably be visited by that bureau and I would expect that they will determine at that point in time that we're offering a very valuable, fair, transparent, beneficial service to our customers.

You made mention of the ProPublica article. I don't think that was directed towards the industry. I think that was the direct charge and attack on World Acceptance Corporation. And it's unfortunate that organizations such as that say that they don't do an analysis or do some research on a company and have predetermined conclusions.

And within that article, and I go back through this because it was all addressed when this all came out the last quarter and before, but we mentioned that we went to great strides to try to answer some of their questions. And what they did is they reached out to several disgruntled former customers and two or three disgruntled former employees, several of which have been terminated for improper behavior.

And they chose to ignore our responses and draw their conclusions based on these anecdotal elements. So, there's nothing we can do about those articles. We can't fight them in the press, and to do so just delays the length of the time that it's there and we can live with that.

But what becomes especially important is that when people with responsibility and authority then draw conclusions about this company based on the conclusions of a obviously slanted report, then that gives us great deal for concern and hopefully, when it's all said and done, the CFPB will make their decisions not based on anecdotal evidence such as the inflammatory and highly-distorted picture that was painted by this article but that they will do so based on what they see when they come to visit this company.

211.    The Company's first quarter financial results were then incorporated in its first quarter 2014 Form 10-Q, filed with the SEC on August 6, 2013. Therein, Defendants reiterated: "Total revenue rose to $145.3 million during the quarter ended June 30, 2013, a 9.4% increase over the $132.8 million for the corresponding quarter of the previous year. This increase is consistent with the 8.9% increase in average net loans." "Interest and fee income for the quarter ended June 30, 2013 increased by $12.7 million, or 11.0%, over the same period of the prior year. This increase resulted from a $65.2 million increase, or 8.9%, in average net loans receivable over the two corresponding periods."

212.    Additionally, World Acceptance's first quarter 2014 Form 10-Q contained SOX certifications by Defendants McLean and Malson that were materially similar to those identified above in ¶¶158-159.

213.    As a result of Defendants' positive statements in the Company's Form 10-Q, World Acceptance stock maintained its artificial inflation.

214. For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's first quarter 2014 earnings release and "Summary of Quarterly Results" dated July 25, 2013, the conference call with analysts held the same day, and the first quarter 2014 Form 10-Q filed on August 6, all of which touted continued success and increased loan growth, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a) When touting the Company's "record financial results" for the first quarter and a "9.4% increase" in revenue, Defendants failed to describe how World Acceptance had achieved those record results using illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(b) Contrary to Defendants' assertion that the May 13, 2013 *Pro Publica* article painted an "inflammatory and highly-distorted picture" of the Company, the predatory lending practices described therein, in fact, pervaded World Acceptance's operations nationwide, as later admitted by Defendants and confirmed by a dozen former employees with corroborating experiences in eight different states around the country (*see, e.g.*, ¶¶38-103);

(c) Defendants encouraged this culture of lending predation, either explicitly or implicitly, by allowing district and regional management to openly disregard written underwriting policies for the sake of growing the Company's loan portfolio at any and all costs (*see, e.g.*, ¶¶54-95, 128, 131);

(d) Though World Acceptance reported "[i]nsurance and other income" of "$17.3 million in the first quarter of fiscal 2014," the Company achieved these revenues by tacking on worthless insurance products to customers' loans without their knowledge, which were really *de*

*facto* interest rate hikes to skirt applicable state usury laws to help boost the Company's earnings (*see, e.g.*, ¶¶67-81]);

(e)     While highlighting "several positive legislative actions taken by certain states in recent months" and otherwise showing no concern over the confirmation of Richard Cordray as Director of the CFPB, Defendants knew that World Acceptance's predatory practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to untold legal and/or regulatory penalties (*see, e.g.*, ¶¶33-142);

(f)     Though Defendants reported that "[g]ross loans outstanding [had] increased 9.6% to $1.1 billion" and that "[i]nterest and fee income [had] increased 11.0%, from $115.3 million to $128.0 million in the first quarter of fiscal 2014 due to continued growth in loan volume," these loan volume and loan growth figures were actually artificially inflated as a result of World Acceptance's ongoing predatory practices (*see, e.g.*, ¶¶38-114);

(g)     Contrary to Defendants' assurances that the "material weakness" in World Acceptance's accounting of small-dollar loan renewals was "well under control" and would ***not*** "have a significant impact on the overall operations of the company," the Company's faulty accounting had been artificially inflating reported loan growth, and continued to do so during the Class Period, and upon changing corporate policy regarding small-dollar loan renewals in response to the identified accounting weakness, World Acceptance suddenly posted in the first quarter 2015 its lowest quarterly loan growth in at least nine years (*see, e.g.*, ¶¶104-114);

(h)     Rather than admit that the Company had identified any "problems" at the beginning of the calendar year relating to the Company's small-dollar renewal practices, Defendants

continued to tout increased revenue and loan growth, which were driven by the Company's later-admitted predatory practices;

(i)     Defendants also continued to mislead investors as to the illicit practices that led to the "material weakness" in internal control over financial reporting and ultimately would lead to the withdrawal of KPMG on September 5, 2014 and the resignation of three of four Individual Defendants (*see, e.g.*, ¶¶88-114);

(j)     the Company's first quarter 2014 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(k)     the SOX certifications executed by Defendants McLean and Malson included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit marketing and lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### D.     Second Quarter 2014 Results

215.     On October 24, 2013, Defendants announced World Acceptance's second quarter 2014 financial results via press release and "Summary of Quarterly Results" filed with the SEC on Form 8-K.  According to the press release, "Total revenues increased to $150.0 million in the second quarter of fiscal 2014, a 7.6% increase over the $139.4 million reported in the second quarter last year."  It continued, "Gross loans amounted to $1.16 billion at September 30, 2013, a 6.9% increase over the $1.09 billion outstanding at September 30, 2012, and a 9.0% increase since the beginning of the fiscal year."

216.    Moreover, "[i]nterest and fee income increased 9.2%, from $121.8 million to $133.0 million in the second quarter of fiscal 2014 due to continued growth in loan volume and expansion of offices.  Insurance and other income decreased by 3.6% to $17.0 million in the second quarter of fiscal 2014 compared with $17.6 million in the second quarter of fiscal 2013."

217.    Under "Selected Consolidated Statistics," the press release listed loan volume of $773,544,000 and $1,555,643,000 for the three months and six months ended September 30, 2013, respectively.  This was an increase from $760,709,000 and $1,513,702,000 for the three months and nine months ended September 30, 2012, respectively.

218.    The Company's Summary of Quarterly Results again touted quarterly loan growth: "Gross loans amounted to $1.16 billion at September 30, 2013, a 6.9% increase over the $1.09 billion outstanding at September 30, 2012 and a 9.0% increase since the beginning of the fiscal year."  Moreover, "the overall 6.9% growth in loan balances resulted from a 2.0% increase in customers and a 4.9% increase in average balances outstanding."

219.    The second quarter 2014 Summary continued, "Total revenue for the quarter amounted [to] $150.0 million, a 7.6% increase over the $139.4 million during the second quarter of the prior fiscal year, which is in line with our loan growth on a quarter over quarter basis.  Revenue for the first six months of fiscal 2014 were $295.2 million, an 8.4% increase over the prior year period[.]  Revenues from the 1,132 offices open throughout both quarterly periods increased by 7.9%."

220.    Finally, Defendants advised that, "[f]rom a regulatory and legislative standpoint, the Company's greatest risk factor, there was very little activity during the first half of the fiscal year.  As previously disclosed, there have been several positive legislative actions taken by certain states in

recent months." Further, "[a]t the federal level, there have not been any new developments affecting the installment loan industry since the confirmation of Mr. Cordray as the Director of the CFPB."

221. During the Company's conference call that same day, October 24th, Defendants were again asked about the Company's accounting for small-dollar renewals, and whether that had any impact on increased loan losses for the quarter. Defendant McLean updated investors as follows:

> I mean you bring up a good point, so let's address it now because it will probably be answered anyway. Currently, as a result of the material weakness that was identified during last year surrounding the less than 10% loans, we have implemented procedures to monitor that much more closely. And we have actually taken into consideration the impact from an accounting standpoint of the way we should defer those fees and so forth.

> But generally speaking, we are not the ones that initiate a renewal type transaction or refinancing. Generally, that's the customer who may need that $25 or $35 or so forth, and so we have not at this point eliminated those type of loans. We are monitoring them and looking at those very closely. We are doing some things systematically to improve our monitoring over those, and so it may have a slight impact on our volume. But I do not necessarily believe that it's a direct major contributing factor towards the increased losses.

222. A Mangrove Partners analyst inquired about any regulatory concerns: "And then with regard to regulatory in the last quarter as part of your regulatory update, you had mentioned that you wouldn't be surprised if the CFPB had come to visit the Company in the not too distant future. Can you give us an update on that? Have they been? Is it still your expectation that they do so in that time frame?"

223. Defendant McLean provided the following assurance:

> I don't know what the time frame is. I believe – we just had our national trade association. There was a lot of discussion surrounding the CFPB and what it may or may not do and so forth. I do not believe that it will be in the near future. We just don't know. But I'd say it might even – the issue would be large market participant at this point for the installment loan industry. So I just said that – we probably expect at some point in time when they do start looking at the installment industry, it will grow based on its size. We'll probably be visited and audited and so forth. But the timing of that, I have no idea. I don't think it's going to be – I certainly don't believe it's going to be in fiscal 2014 and it may or may not be in fiscal 2015 or beyond.

224.    As a result of Defendants' positive statements regarding the Company's continued loan growth and otherwise successful quarter, World Acceptance stock maintained its artificial inflation.

225.    Analysts reacted positively to Defendants' statements, with Sidoti & Company, LLC rating World Acceptance stock a "Buy" on October 24, 2013. Sidoti maintained its $118 price target for WRLD stock and reported: "We raise our respective F2014 and F2015 EPS estimates to $9.21 (from $8.87) and $11.06 (from $9.97). We also increase our C2015 EPS estimate to $11.74 (from $10.70)." Moreover, in its own report on October 25, 2013, Stephens Inc. noted that "WRLD reported revenues of $150 mil., slightly above our $149 mil. forecast and representing 7.6% YoY growth. Loan volume of $774 mil. was generally in line with our forecast . . . ." Stephens also "expect[ed] loan growth in the 6%-9% range and EPS growth in the 14%-16% range going forward, with the potential for EPS to be driven higher by continued stock repurchases and potential cost scaling."

226.    The Company's second quarter 2014 financial results were incorporated in its second quarter 2014 Form 10-Q, filed with the SEC on November 1, 2013: "Total revenue rose to $150.0 million during the quarter ended September 30, 2013, a 7.6% increase over the $139.4 million for the corresponding quarter of the previous year. This increase is consistent with the 7.7% increase in average net loans. Revenue from the 1,132 offices open throughout both quarterly periods increased by approximately 5.7%."

227.    The Form 10-Q continued, "Interest and fee income for the quarter ended September 30, 2013 increased by $11.2 million, or 9.2%, over the same period of the prior year. This increase resulted from a $60.0 million increase, or 7.7%, in average net loans receivable over the two corresponding periods."

228.    Additionally,

[t]otal revenue rose to $295.2 million during the six month period ended September 30, 2013, a 8.4% increase over the $272.2 million for the corresponding period of the previous year. This increase is consistent with the 8.2% increase in average net loans. Revenue from the 1,132 offices open throughout both six month periods increased by approximately 6.8%.

Interest and fee income for the six months ended [] September 30, 2013 increased by $23.9 million, or 10.1%, over the same period of the prior year. This increase resulted from a $61.5 million increase, or 8.2%, in average net loans receivable over the two corresponding periods.

229.    Moreover, the Company's second quarter 2014 Form 10-Q contained SOX certifications by Defendants McLean and Malson that were materially similar to those identified above in ¶¶158-159.

230.    As a result of the Form 10-Q's positive statements regarding the Company's successful quarter, World Acceptance stock maintained its artificial inflation.

231.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's second quarter 2014 earnings release and "Summary of Quarterly Results" dated October 24, 2013, the conference call with analysts held the same day, and the second quarter 2014 Form 10-Q filed on November 1, all of which touted continued growth in loan volume and total revenues, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

    (a)    While Defendant McLean stated that the Company's accounting for small-dollar renewals would be minimal and only "have a slight impact on [] volume," McLean's statement was false and misleading because as later disclosed the there was a significant impact on the Company's financials due to the inability for World Acceptance to continue with all of its predatory lending practices;

(b)    While touting the Company's success that quarter, which included total revenues increasing "to $150.0 million in the second quarter of fiscal 2014, a 7.6% increase over the $139.4 million reported in the second quarter last year," Defendants failed to describe how World Acceptance had used illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(c)    The Company's predatory lending practices were both consistent and pervasive throughout the Company's business as later admitted by Defendants and confirmed by a dozen former employees with corroborating experiences in eight different states around the country (*see, e.g.*, ¶¶38-103);

(d)    Defendants encouraged this culture of lending predation, either explicitly or implicitly, by allowing district and regional management to openly disregard written underwriting policies for the sake of growing the Company's loan portfolio at any and all costs (*see, e.g.*, ¶¶54-95, 128, 131);

(e)    Contrary to Defendants' statement that "generally speaking, we are not the ones that initiate a renewal type transaction or refinancing," World Acceptance employees were specifically instructed to push for renewals at every turn to boost earnings and loan growth (*see, e.g.*, ¶¶82-103);

(f)    Though World Acceptance reported "[i]nsurance and other income" of "$17.0 million in the second quarter of fiscal 2014," the Company only achieved these revenues by tacking on worthless insurance products to customers' loans without their knowledge, which were really *de facto* interest rate hikes to skirt applicable state usury laws (*see, e.g.*, ¶¶67-81);

(g)    While highlighting "several positive legislative actions taken by certain states in recent months" and noting that "there have not been any new developments affecting the

installment loan industry since the confirmation of Mr. Cordray as the Director of the CFPB," Defendants knew that World Acceptance's predatory practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to untold legal and/or regulatory penalties (*see, e.g.*, ¶¶38-142);

(h)    Though Defendants boasted of "[g]ross loans amount[ing] to $1.16 billion at September 30, 2013, a 6.9% increase over the $1.09 billion outstanding at September 30, 2012, and a 9.0% increase since the beginning of the fiscal year," and that "[i]nterest and fee income [had] increased 9.2%, from $121.8 million to $133.0 million in the second quarter of fiscal 2014 due to continued growth in loan volume," these loan volume and loan growth figures were actually artificially inflated as a result of the Company's ongoing predatory practices (*see, e.g.*, ¶¶82-114);

(i)    Regarding the Company's "material weakness" in accounting for small-dollar loan renewals, contrary to Defendants' assurances regarding that "we have implemented procedures to monitor that much more closely," the Company's faulty accounting continued throughout the Class Period, and, and upon changing corporate policy in response to the identified accounting weakness to no longer encourage small-dollar renewals, World Acceptance suddenly posted in the first quarter 2015 its lowest quarterly loan growth in at least nine years (*see, e.g.*, ¶¶82-114);

(j)    Rather than admit that the Company had identified any "problems" at the beginning of the calendar year relating to the Company's small-dollar renewal practices, Defendants continued to tout increased revenue and loan growth, which were driven by the Company's later-admitted predatory practices;

(k)    Contrary to Defendants' prior assurances that the "material weakness" in World Acceptance's accounting of small-dollar loan renewals was "well under control," Defendants also continued to mislead investors as to the illicit practices that led to the "material weakness" in

internal control over financial reporting and ultimately would lead to the withdrawal of KPMG on September 5, 2014 and the resignation of three of the four Individual Defendants (*see, e.g.*, ¶¶88-114);

(l)     the Company's second quarter 2014 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(m)     the SOX certifications executed by Defendants McLean and Malson included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit marketing and lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### E.     Third Quarter 2014 Results

232.     On January 28, 2014, Defendants issued a press release and "Summary of Quarterly Results" announcing World Acceptance's third quarter 2014 financial results, both of which were filed with the SEC on Form 8-K that same day.  In its press release, the Company touted "improved financial results" for the third quarter, including that "[t]otal revenues increased to $160.5 million in the third quarter of fiscal 2014, a 7.3% increase over the $149.6 million reported in the third quarter last year."  Additionally,

> [g]ross loans rose to $1.26 billion at December 31, 2013, a 6.8% increase over the $1.18 billion outstanding at December 31, 2012, an 18.5% increase since the beginning of the fiscal year.

*         *         *

Interest and fee income increased 9.1% to $142.2 million in the third quarter of fiscal 2014 from $130.3 million in the third quarter of fiscal 2013 due to continued growth in loan volume and expansion of offices. Insurance and other income decreased by 5.4% to $18.3 million in the third quarter of fiscal 2014 compared with $19.3 million in the third quarter of fiscal 2013.

233.    Under "Selected Consolidated Statistics," the press release boasted strong loan growth, listing loan volume of $863,332,000 and $2,418,975,000 for the three months and nine months ended December 31, 2013, respectively.    This compared to $865,507,000 and $2,379,209,000 for the three months and nine months ended December 31, 2012, respectively.

234.    In the "Summary of Quarterly Results," the Company again boasted of "[g]ross loans amount[ing] to $1.26 billion at December 31, 2013, a 6.8% increase over the $1.18 billion outstanding at December 31, 2012 and an 18.5% increase since the beginning of the fiscal year." "Additionally, the overall 6.8% growth in loan balances resulted from a 1.0% increase in accounts and a 5.8% increase in average balance per loan outstanding."

235.    The Summary continued:

Total revenue for the quarter amounted $160.5 million, a 7.3% increase over the $149.6 million during the third quarter of the prior fiscal year, which exceeded our growth in loans on a quarter over quarter basis, primarily as a result of the law changes in Texas, Georgia, and Indiana, which took place at the end of the second quarter. Revenues for the first nine months of fiscal 2014 were $455.7 million, an 8.0% increase over the prior year period. Revenues from the 1,132 offices open throughout both nine month periods increased by 6.1%.

236.    Further, "[f]rom the standpoint of regulatory and legislative change, which, the Company believes is its greatest risk factor, there was very little activity during the third fiscal quarter."

237.    During Defendant's conference call with analysts held the same day, January 28, an analyst from Stephens Inc. specifically asked about loan volume trends: "In thinking about loan volumes, can you give us any sense for new customer trends versus recurring customer trends and

anything you can make out of those trends in terms of making it kind of discussion points about what the customer might be thinking, what opportunities they may have to get credit elsewhere?"

238.    Defendant McLean responded that Defendants remained "very conscious of our growth rates" and "all aspects" of the Company's business:

> I am not sure what kind of conclusions you can draw from this but I will be happy to share with you some statistics.
>
> If you remember for the first six months through September of the year, our new customer, brand-new customer loans, were down -- in the US were down about 7.7%. During the third fiscal quarter, those new customer loans were down about 3.3%. While they are still down this is a trend that we certainly think is an improvement.
>
> Also our growth in the US was between 5% and 6% and our growth in Mexico was about 30%. So we still see somewhat weak demand in the US but hopefully things are improving a little bit. But I don't know what kind of conclusions to draw from that.
>
> We are certainly very conscious of our growth rates and operations evaluating all aspects of our collections, underwriting and all part of our operational business.

239.    As a result of the foregoing reassurances by Defendants of World Acceptance's improved business, the Company's stock price leaped more than 14%, from a close of $87.98 on January 27 to $100.46 on January 28, on unusually heavy trading volume.

240.    Moreover, analysts reacted positively to Defendants' statements:

(a)    Sidoti & Company, LLC rated World Acceptance a "Buy" and maintained its $122 price target as "WRLD Reported Solid 3QF14 EPS." Its January 28, 2014 report highlighted "WRLD's results were generally positive, as the company reported a stabilization in credit costs and loan growth," and noted that "WRLD increased its allowance ratio to 5.90% in 3Q:F14, from 5.81% in 2Q:F14, further suggesting that this was a fundamentally sound earnings beat."

(b)    Sterne, Agee reported "[r]evenue and loan balance growth was essentially in line with expectations." The January 29, 2014 Company Report concluded: "To reflect quarterly

results and an improved credit outlook, we are raising our FY 2014 and 2015 EPS estimates from $8.50 and $11.50 to and [sic] $9.00 and $12.00, respectively."

(c)     On January 29, 2014, Stephens Inc. announced "WRLD reported F3Q14 EPS of $1.98, beating our estimate of $1.86" and highlighted that "[o]verall, WRLD reported a relatively strong bottom-line number."

241.     Days later, on February 5, 2014, the Company filed its third quarter 2014 Form 10-Q, which incorporated its third quarter financial results.  Therein, Defendants reiterated, "Total revenue rose to $160.5 million during the quarter ended December 31, 2013, a 7.3% increase over the $149.6 million for the corresponding quarter of the previous year.  This increase was primarily driven by the 6.6% increase in average net loans.  Revenue from the 1,132 offices open throughout both quarterly periods increased by approximately 4.8%."

242.     The Form 10-Q also touted: "Interest and fee income for the quarter ended December 31, 2013 increased by $11.9 million, or 9.1%, over the same period of the prior year.  This increase primarily resulted from a $52.9 million increase, or 6.5%, in average net loans receivable over the two corresponding periods, as well as fee revenue increases in Texas, Georgia, and Indiana due to regulation changes which allowed increased fees on certain loans."

243.     Additionally, regarding fiscal year to date,

[t]otal revenue rose to $455.7 million during the nine month period ended December 31, 2013, an 8.0% increase over the $421.9 million for the corresponding period of the previous year.  This increase was primarily driven by the 7.6% increase in average net loans.  Revenue from the 1,132 offices open throughout both nine month periods increased by approximately 6.1%.

Interest and fee income for the nine months ended December 31, 2013 increased by $35.8 million, or 9.7%, over the same period of the prior year.  This increase resulted from a $59.1 million increase, or 7.6%, in average net loans receivable over the two corresponding periods as wells as fee revenue increases in Texas, Georgia, and Indiana due to regulation changes which allowed increased fees on certain loans.

244.    Moreover, the Company's third quarter 2014 Form 10-Q contained SOX certifications by Defendants McLean and Calmes that were materially similar to those identified above in ¶¶158-159.

245.    As a result of Defendants' statements in the Form 10-Q, filed after the close of trading on February 5, 2014, World Acceptance's share price jumped the next day to close at $95.63 on February 6, up from a close of $92.55 on February 5.

246.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's third quarter 2014 earnings release and "Summary of Quarterly Results" dated January 28, 2014, the conference call with analysts held the same day, and the third quarter 2014 Form 10-Q filed on February 5, all of which touted a strengthening in World Acceptance's business and continued loan growth, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    When touting the Company's "improved financial results" for the third quarter, including "[t]otal revenues [having] increased to $160.5 million in the third quarter of fiscal 2014, a 7.3% increase over the $149.6 million reported in the third quarter last year," Defendants failed to describe how World Acceptance had achieved those "improved" results using illicit, manipulative lending practices to grow its business by preying upon a customer base with few other places to turn for financial assistance (*see, e.g.*, ¶¶38-114);

(b)    World Acceptance's predatory lending practices were both consistent and pervasive throughout the Company's business, as later admitted by Defendants and confirmed by a dozen former employees with corroborating experiences in eight different states around the country (*see, e.g.*, ¶¶38-103);

- 89 -

(c)    Defendants encouraged this culture of lending predation, either explicitly or implicitly, by allowing district and regional management to openly disregard written underwriting policies for the sake of growing the Company's loan portfolio at any and all costs (*see, e.g.*, ¶¶54-95, 128, 131);

(d)    Though World Acceptance reported "[i]nsurance and other income" of "$18.3 million in the third quarter of fiscal 2014," the Company achieved these revenues by tacking on worthless insurance products to customers' loans without their knowledge, which were really *de facto* interest rate hikes to skirt applicable state usury laws (*see, e.g.*, ¶¶67-81);

(e)    While noting "very little activity during the third fiscal quarter" "[f]rom the standpoint of regulatory and legislative change," Defendants knew that World Acceptance's predatory practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to untold legal and/or regulatory penalties (*see, e.g.*, ¶¶38-142);

(f)    Though Defendants reported that "[g]ross loans [had risen] to $1.26 billion at December 31, 2013, a 6.8% increase over the $1.18 billion outstanding at December 31, 2012, an 18.5% increase since the beginning of the fiscal year" and that "[i]nterest and fee income [had] increased 9.1% to $142.2 million in the third quarter of fiscal 2014 from $130.3 million in the third quarter of fiscal 2013 due to continued growth in loan volume," these loan volume and loan growth figures were actually artificially inflated as a result of World Acceptance's "material weakness" in accounting for small-dollar loan renewals (*see, e.g.*, ¶¶82-114);

(g)    Contrary to Defendants' prior assurances that the "material weakness" in World Acceptance's accounting of small-dollar loan renewals was "well under control" and would **not** "have a significant impact on the overall operations of the company," the Company's faulty

accounting continued to artificially inflate its reported loan volume and loan growth, and upon changing corporate policy regarding small-dollar loan renewals in response to the identified accounting weakness, which would cause World Acceptance to suddenly post in the first quarter 2015 its lowest quarterly loan growth in *at least nine years* (*see, e.g.*, ¶¶82-114);

(h)     Rather than admit that the Company had identified any "problems" at the beginning of the calendar year relating to the Company's small-dollar renewal practices, Defendants continued to tout increased revenue and loan growth, which were driven by the Company's later-admitted predatory practices;

(i)     Defendants also continued to mislead investors as to the illicit practices that led to the "material weakness" in the Company's internal control over financial reporting and ultimately would lead to the withdrawal of KPMG on September 5, 2014 and the resignation of three of the four Individual Defendants (*see, e.g.*, ¶¶88-114);

(j)     the Company's third quarter 2014 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(k)     the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit marketing and lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

## VI.    DEFENDANTS MINIMIZE THE FINANCIAL IMPACT OF THEIR FRAUDULENT PRACTICES

### A.    Fourth Quarter and Full Year 2014 Results

247.    On April 29, 2014, Defendants issued a press release and "Summary of Quarterly Results" announcing World Acceptance's fourth quarter and full year 2014 financial results, both of which were filed with the SEC on Form 8-K that same day.  According to the press release, "Total revenues increased slightly to $161.9 million in the fourth quarter of fiscal 2014 over the $161.8 million reported in the fourth quarter last year."  It continued, gross loans outstanding "rose to $1.11 billion at March 31, 2014, a 4.2% increase over the $1.07 billion outstanding at March 31, 2013."

248.    Moreover, "[i]nterest and fee income increased 0.6% to $139.0 million in the fourth quarter of fiscal 2014 from $138.1 million in the fourth quarter of fiscal 2013 due to continued growth in outstanding loans receivable and expansion of offices."  Further, "[i]nsurance and other income decreased by 3.4% to $23.0 million in the fourth quarter of fiscal 2014 compared with $23.8 million in the fourth quarter of fiscal 2013."  The Company also reported that "[a]ccounts contractually delinquent 61+ days increased from 4.4% at March 31, 2013 to 5.3% at March 31, 2014."

249.    Under "Selected Consolidated Statistics," the press release listed loan volume of $535,104 for the three months ended March 31, 2014.  This was a decline from $606,128 for the three months ended March 31, 2013.

250.    In the "Summary of Quarterly Results," the Company stated, "gross loans outstanding amounted to $1.11 billion at March 31, 2014, a 4.2% increase over the $1.07 billion outstanding at March 31, 2013. We continue to see a shift in the mix of our loan portfolio. The percentage of loans outstanding that represents the larger loans has increased from 33.1% to 38.0% over the last twelve months."

251.    The Summary of Quarterly Results stated that the Company's made "some system changes during the quarter that ensured customers were not encouraged to refinance existing loans where the proceeds from the transaction were less than 10% of the loan being refinanced.  This resulted in a decrease in our loan volume and had an impact on our balances outstanding and our overall yields."

252.    The fourth quarter and full year 2015 Summary of Quarterly Results continued, "Total revenue for the quarter amounted to $161.9 million, a 0.1% increase over the $161.8 million during the fourth quarter of the prior fiscal year. This increase was substantially less than our expected revenue increase given the 5.4% increase in average net loans outstanding over the two quarterly periods and the increased fees in Texas and Georgia due to the law changes in these two states. The expected revenue increase was offset by the reduction in loan volume during the quarter and the change in the portfolio mix. Revenues from the 1,131 offices open throughout both quarterly periods decreased by 2.5%."

253.    World Acceptance issued a "Summary of Quarterly Results" on Form 8-K, filed April 29, 2014, that revealed "the Company [had] made some system changes during the quarter that ensured customers were not encouraged to refinance existing loans where the proceeds from the transaction were less than 10% of the loan being refinanced.  This resulted in a *decrease in our loan volume and had an impact on our balances outstanding and our overall yields*. As a result, gross loans outstanding amounted to $1.11 billion at March 31, 2014, a 4.2% increase over the $1.07 billion outstanding at March 31, 2013," which was the lowest quarterly growth in *at least nine years*.

254.    During the Company's conference call with analysts that same day, Defendants elaborated further on the nature of, and reasons for, those "system changes."  Defendant McLean

explained that World Acceptance's auditors had uncovered a "material weakness" in that Defendants "were not properly accounting for those [refinancings involving] loans with proceeds of less than 10%. Although we've proved that it did not have a material impact on our financial statements, *we have since put procedures into place to monitor these loans and to make sure that they are properly accounted for."*

255.    As Defendant McLean explained on the April 29th conference call:

On our receipt statements and other type of paper that is given to the customer, the amount of money that's available to that customer in the event that they would like to refinance a loan to show them what they would get back under that transaction, this has been there for quite some time, and it shows up on the screen so that our finance personnel can tell them if they would like to renew it at any point in time, that this was the amount of money they'd get back if they had the same transaction. *We decided to suppress that information until such time as that amount that they could get back exceeded that 10% threshold.*

256.    Defendants McLean, continued:

*Now, we anticipated that this would have an impact on volume, and as it turned out, it had a fairly substantial impact on the volume in the fourth quarter.* We also anticipate, going forward, that this is not necessarily a disruption to the relationship we have with the customers, but it will, at least in the fourth quarter, some of those renewals will probably get pushed back a month or so. *And we do not believe that the impact on an ongoing basis will be as dramatic as it was during the fourth quarter. However, it is extremely hard to quantify the impact of these type of changes.*

257.    In such a way, Defendants admitted that they had previously encouraged renewals below this threshold by providing the very information they now purportedly suppress. Moreover, Defendant McLean went on to reveal: "Now, we anticipated that this would have an impact on volume, and as it turned out, it had a fairly substantial impact on the volume in the fourth quarter." As investors learned from the Company's "Summary of Quarterly Results," that "substantial impact" was decidedly negative. The Company's implemented changes to discourage small-dollar renewals had "*resulted in a decrease in our loan volume* and had an impact on our balances outstanding and overall yields."

258.    The analyst from FBR Capital Markets & Co. further asked about the effects of these changes: "Do you know, Sandy, roughly what percent of originations are small dollar renewals [less-than-10%] after you all have implemented these changes as compared to before?"

259.    Defendant McLean responded, "It's dropped dramatically.  It's somewhere around -- it depends on if you look at number or dollars.  And we measure it a month at a time on a rolling basis, and ***it's dropped down to the 7% or 8% range from the 20% range that we announced last year***. So it's dropped down dramatically."

260.    As a result of Defendants' continued false and misleading statements in the Company's fourth quarter and full year 2014 press release and conference call, WRLD stock maintained its artificial inflation.

261.    The Company's fourth quarter and full year financial results were incorporated in its fiscal 2014 Form 10-K, filed with the SEC on June 12, 2014, after the market closed.  The 2014 Form 10-K reflected information discussed in the press release, Summary of Quarterly Results, and during the conference call on April 29, 2014.  It also contained substantially similar statements as those in the Company's fiscal 2013 Form 10-K as detailed above.

262.    More specifically, in the 2014 Form 10-K, the Company once again falsely claimed to have stringent underwriting practice for its installment loans, stating:

> . . . the Company primarily examines the individual's discretionary income, length of current employment and/or sources of income, duration of residence and prior credit experience.
>
> *        *        *
>
> The Company's employees verify the applicant's sources of income and credit histories through telephone checks with employers, other employment references and a variety of credit services.

263.    With respect to refinancings, World Acceptance's Form 10-K stated the following:

It is not unusual for the Company to have made a number of loans to the same customer over the course of several years, many of which were refinanced with a new loan after the borrower had reduced the existing loan's outstanding balance by making multiple payments. In determining whether to refinance existing loans, the Company typically requires loans to be current on a recency basis . . .

\*        \*        \*

A refinancing represents a new loan transaction with a present customer in which a portion of the new loan proceeds is used to repay the balance of an existing loan and the remaining portion is advanced to the customer. The Company actively markets the opportunity for qualifying customers to refinance existing loans prior to maturity. In many cases the existing customer's past performance and established creditworthiness with the Company qualifies that customer for a larger loan.

264.    The Form 10-K, also provided detail on the Company's refinancing of delinquent

loans in particular:

The Company allows refinancing of delinquent loans on a case-by-case basis for those customers who otherwise satisfy the Company's credit standards. Each such refinancing is carefully examined before approval in an effort to avoid increasing credit risk. ***A delinquent loan may generally be refinanced only if the customer has made payments*** which, together with any credits of insurance premiums or other charges to which the customer is entitled in connection with the refinancing, reduce the balance due on the loan to an amount equal to or less than the original cash advance made in connection with the loan.

\*        \*        \*

The Company believes that refinancing delinquent loans for certain customers who have made periodic payments allows the Company to increase its average loans outstanding and its interest, fees and other income without experiencing a significant increase in loan losses.

265.    Regarding the Company's practice of selling insurance products, the Form 10-K

stated, in part:

In certain states, the Company sells credit insurance to customers in connection with its loans as an agent for an unaffiliated insurance company. These insurance policies provide for the payment of the outstanding balance of the Company's loan upon the occurrence of an insured event. The Company earns a commission on the sale of such credit insurance, which, for most products, is directly impacted by the claims experience of the insurance company on policies sold on its behalf by the Company.

\*        \*        \*

The Company, as an agent for an unaffiliated insurance company, markets and sells credit life, credit accident and health, credit property, and unemployment insurance in connection with its loans in selected states where the sale of such insurance is permitted by law.

*        *        *

The Company encourages customers to obtain credit insurance for all loans originated in Georgia, South Carolina, Louisiana, Indiana, Kentucky, and Mississippi and on a limited basis in Alabama, Tennessee, Oklahoma, and Texas. Customers in those states typically obtain such credit insurance through the Company. Charges for such credit insurance are made at filed authorized rates and are stated separately in the Company's disclosure to customers, as required by the Truth in Lending Act and by various applicable state laws.

266.    Regarding regulatory matters impacting the Company, the Form 10-K provided detail on the previously disclosed CID, stating:

**While the Company believes its marketing and lending practices are lawful**, there can be no assurance that CFPB's ongoing investigation or future exercise of its enforcement, regulatory, discretionary or other powers will not result in findings or alleged violations of federal consumer financial protection laws that could lead to enforcement actions, proceedings or litigation and the imposition of damages, fines, penalties, restitution, other monetary liabilities, sanctions, settlements or changes to the Company's business practices or operations that could have a material adverse effect on the Company's business, financial condition or results of operations or eliminate altogether the Company's ability to operate its business profitably or on terms substantially similar to those on which it currently operates.

267.    The Form 10-K also included management's discussion and analysis of World Acceptance's financial results for the fourth quarter and fiscal year ended 2014, in which the Company reiterated its gross loan receivables while failing to disclose that they were the result of continued improper lending practices. The Company also reiterated its net income and interest and fee income as stated in its earlier Form 8-K, while failing to disclose that they were the result of continued improper lending practices.

268.    Defendants also assured investors that "[t]he Company's accounting and reporting policies . . . conform to general practices within the finance company industry."

269.    Moreover, World Acceptance's 2014 Form 10-K contained SOX certifications by Defendants McLean and Calmes that were materially similar to those identified above in ¶¶158-159.

270.    As a result of Defendants' continued false and misleading statements in the 2014 Form 10-K, WRLD stock maintained its artificial inflation.

271.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's fourth quarter and full year 2014 earnings release and "Summary of Quarterly Results" dated April 29, 2014, the conference call with analysts held the same day, and in the Company's fiscal 2014 Form 10-K filed on June 12, 2014, which discussed the Company's previously disclosed "material weakness," the resulting decrease in loan volume due to "system changes," the Company's loan growth and stringent underwriting practices, and the lawfulness of the Company's marketing and lending practices, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)    Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)    While Defendants later claimed to have ceased its practice of ***directly soliciting*** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans,

which continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)    Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)    Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)    Contrary to Defendants' prior assurances that the "material weakness" in World Acceptance's accounting of small-dollar loan renewals was "well under control," Defendants also continued to mislead investors as to the illicit practices that led to the "material weakness" in internal control over financial reporting and ultimately would lead to the withdrawal of KPMG on September 5, 2014 and the resignation of three of the four Individual Defendants (*see, e.g.*, ¶¶88-114);

(g)    the Company's fiscal 2014 Form 10-K was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(h)    the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that

World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### B.    First Quarter 2015 Results

272.    On July 22, 2014, before the market opened, Defendants announced World Acceptance's first quarter 2015 financial results via press release and "Summary of Quarterly Results filed with the SEC on Form 8-K.  According to the press release, "Total revenues increased to $150.3 million in the first quarter of fiscal 2015, a 3.5% increase over the $145.3 million reported in the first quarter of last year."  It continued, "Gross loans outstanding increased 3.5% to $1.2 billion at June 30, 2014, up from $1.1 billion at June 30, 2013."

273.    Further, the "[i]nterest and fee income increased 5.0%, from $128.0 million to $134.4 million in the first quarter of fiscal 2015 due to continued growth in loans outstanding."  Further, "[i]nsurance and other income decreased by 8.0% to $15.9 million in the first quarter of fiscal 2015 compared with $17.3 million in the first quarter of fiscal 2014."  The Company further experienced,

> . . . an increase in its accounts that are 61 days or more past due. Accounts that were 61 days or more past due increased to 3.6% on a recency basis and to 5.6% on a contractual basis at the end of the current quarter, compared to 2.8% and 4.2%, respectively, at June 30, 2013.

274.    Under "Selected Consolidated Statistics," the press release listed loan volume of $731,565 for the three months ended June 30, 2014.  This was a decline from $782,099 for the three months ended June 30, 2013.

275.    The Company's Summary of Quarterly Results reported quarterly loan growth: "Gross loans amounted to $1.16 billion at June 30, 2014, a 3.5% increase over the $1.13 billion outstanding at June 30, 2013 and a 4.7% increase since the beginning of the fiscal year."  Moreover, "the overall 3.5% growth in loan balances resulted from a 3.5% increase in average balances outstanding as the number of accounts outstanding remained flat."

276.    The first quarter 2015 Summary continued, "Total revenue for the quarter amounted $150.3 million, a 3.5% increase over the $145.3 million during the first quarter of the prior fiscal year, which is in line with our loan growth on a quarter over quarter basis. Revenues from the 1,197 offices open throughout both quarterly periods increased by 2.7%."

277.    During the Company's conference call with analysts held that same day, July 22, 2014, Defendants were again asked by a Sidoti & Company LLC analyst for an update on the CID. Defendant McLean responded that "we haven't . . . heard anything from the CFPB at this point." McLean continued:

> I don't even know when we are going to hear from them initially and I don't necessarily believe that once we do hear from them, that will be the resolution. That would certainly be nice, but we would anticipate possibly additional questions, clarifications or something else.  I have been led to believe that this process can take quite some time.  But by the same token, **we really don't believe that we are doing anything wrong** and it would be very nice if they would finish their review within the six months and go onto a different project.

278.    In response to the announced 14% decrease in renewals, another analyst asked "[h]ow much of that is related to the small dollar renewal changes that you all made and then is it your sense that that is timing or some of that is timing? Or is it simply with the changes you have made is it more of a structural change?"

279.    In reply, Defendant McLean offered the following:

> I believe almost it is 100% due to that. I think that we will continue to see reduced renewal volume. **We started these initiatives back when this problem was identified a year ago, but then we made some formal system changes at the beginning of the calendar year.**  So until we actually lap those formalized changes, you will probably see a drop in year-over-year renewal volume.  But by the same token, we will still make those loans in those cases where the customer wants to.  **We are just no longer soliciting directly, if you remember.**

280.    As a result of Defendants' continued false and misleading statements in the first quarter 2015 press release and conference call, WRLD stock maintained its artificial inflation.

281.     The Company's first quarter 2015 financial results were incorporated in its first quarter 2015 Form 10-Q, filed with the SEC on August 6, 2014.  Therein, Defendants reiterated the Company's total revenue while failing to disclose that they were the result of continued improper lending practices.  The Form 10-Q also reiterated its interest and fee income stated in its earlier Form 8-K, while failing to disclose that they were the result of continued improper lending practices.

282.     The 2015 Form 10-Q included the same false and misleading statement and omissions contained in the Company's fiscal 2014 Form 10-K filed on June 12, 2014, which updated investors on the status of the CID and stated that "***the Company believes its marketing and lending practices are lawful*** . . ."

283.     Moreover, the Company's first quarter 2015 Form 10-Q contained SOX certifications by Defendants McLean and Calmes similar to those identified above in ¶¶158-159.

284.     As a result of Defendants' false and misleading statements in the first quarter 2015 Form 10-Q, WRLD stock maintained its artificial inflation.

285.     For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's first quarter 2015 earnings release and "Summary of Quarterly Results" dated June 22, 2014, the conference call with analysts held the same day, and the first quarter 2015 Form 10-Q, which discussed the Company's business and loan growth, and the lawfulness of the Company's marketing and lending practices, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and

led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)    Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)    While Defendants claimed to have ceased its practice of ***directly soliciting*** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans, which continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)    Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)    Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)    Contrary to Defendants' prior assurances that the "material weakness" in World Acceptance's accounting of small-dollar loan renewals was "well under control," Defendants also continued to mislead investors as to the illicit practices that led to the "material weakness" in internal control over financial reporting and ultimately would lead to the withdrawal of KPMG on

September 5, 2014 and the resignation of three of the four Individual Defendants (*see, e.g.*, ¶¶88-114);

(g)    the Company's first quarter 2015 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(h)    the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

286.    On October 1, 2014, Stephens Inc. initiated coverage and issued an in-depth report on World Acceptance citing "regulatory uncertainty surrounding Company's announcement of a CID from the CFPB and the departure of its auditor" as a source of "potential overhang" that "makes a true valuation tough to obtain." The report further attributed slowing loan growth to the Company's struggle to locate new customers and a "change in the refinancing of loans with low equity."

## C.    Second Quarter 2015 Results

287.    On October 22, 2014, before the market opened, Defendants announced World Acceptance's second quarter 2015 financial results via press release and "Summary of Quarterly Results" filed with the SEC on Form 8-K. According to the press release, "Total revenues increased to $152.6 million in the second quarter of fiscal 2015, a 1.7% increase over the $150.0 million reported in the second quarter last year." It continued, "[g]ross loans amounted to $1.19 billion at September 30, 2014, a 2.6% increase over the $1.16 billion outstanding at September 30, 2013, and a 9.0% increase since the beginning of the fiscal year. Loan growth benefited from a change in our branch level incentives that was implemented July 1, 2014."

288.    Moreover, "[i]nterest and fee income increased 2.6%, from $133.0 million to $136.5 million in the second quarter of fiscal 2015 due to continued growth in our loans outstanding." Further, "[i]nsurance and other income decreased by 5.2% to $16.1 million in the second quarter of fiscal 2015 compared with $17.0 million in the second quarter of fiscal 2014." The press release further continued:

> Accounts contractually delinquent 61+ days increased from 5.3% at September 30, 2013 to 7.0% at September 30, 2014. The allowance to net loans increased from 8.0% at September 30, 2013 to 9.4% at September 30, 2014. Our net charge-off rate, delinquencies, and allowance to loans ratio were all significantly impacted by the change in branch level incentives mentioned above. The change did not have a significant impact on our provision as the increase in allowance related to delinquent accounts was largely offset by the decrease in net charge-offs. The provision for the quarter decreased $2.0 million dollars quarter over quarter due to a $1.5 million qualitative increase to the provision recorded in the second quarter of fiscal 2014 as well as slower loan growth from June 30, 2014 to September 30, 2014 compared with the same period in the prior year.

289.    Under "Selected Consolidated Statistics," the press release listed loan volume of $696,264 and $1,427,830 for the three and six months ended September 30, 2014, respectively. This was a decrease from $773,544 and $1,555,643 for the three and six months ended September 30, 2013, respectively.

290.    The Company's Summary of Quarterly Results reported quarterly loan growth: "Gross loans amounted to $1.19 billion at September 30, 2014, a 2.6% increase over the $1.16 billion outstanding at September 30, 2013. We estimate that gross loans would have increased by 1.4% to $1.18 billion if we had not made the change to the branch incentives. The number of loans to first time and former borrowers was approximately 290,000 during the first six months, which is flat compared to the same period of the prior fiscal year. The mix in our loan portfolio continued to shift over the past 12 months and at September 30, 2014 consisted of 60.0% small loans, 39.0% larger loans and 1.0% sales finance. This compared with 63.8%, 35.0% and 1.2% at September 30,

2013. Additionally, the overall 2.6% growth in loan balances resulted from a 1.1% increase in customers and a 1.5% increase in average balances outstanding."

291.    The second quarter 2015 Summary continued, "Total revenue for the quarter amounted $152.6 million, a 1.7% increase over the $150.0 million during the second quarter of the prior fiscal year, which is in line with our loan growth on a quarter over quarter basis. Revenues for the first six months of fiscal 2015 were $302.9 million, a 2.7% increase over the prior year period. Revenues from the 1,193 offices open throughout both quarterly periods increased by 1.1%."  The Summary also discussed the Company's implemented change to its branch level incentives and the impact on net charge-offs and delinquencies, stating:

> The Company implemented a change to its branch level incentive plan that we believe will reduce out net charge-offs on a long-term basis. Our branch managers receive a monthly bonus based on their performance against profitability and delinquency targets. Historically, the delinquency component of the bonus was determined based on all delinquencies, including 90+ day delinquencies. We believe that in certain circumstances, loans that were 90 days or more past due were being charged off in order for the branch manager to meet their delinquency target when there was still potential for collection. Effective July 1, 2014, managers are compensated only based on their 60 days and less delinquencies. We believe that this will remove any incentive to charge off loans prematurely and allow the collection efforts to continue at the local office, which is generally the most effective.

> As expected, the change in the incentive decreased net charge-offs and increased 90 day delinquencies during the quarter. Allowing the loans to age longer also had an impact on gross loan growth.

292.    During the Company's conference call that same day, October 22, 2014, Defendants were once again questioned on deceleration in loan renewables.  For example, one analyst asked, "Do you have any sense that the changes you all are implementing mean that you're closer to a t[h]rough? Did you have any sort of outlook on when things could actually begin to rebuild, or whether we continue to see a drifting in growth from here?"

293.    Defendant McLean responded:

Well, certainly I believe the impact of the changes we had surrounding the less-than-10% renewables will be lessened over the next couple of months because of the implementation date of that back in February. But I believe our renewals activity, although Janet is -- we've done some things to encourage renewals, but our renewal volume is actually down on a year-to-year basis. I don't know if people are renewing as frequently, or there's a general trend in people not borrowing.

It's because of the size and the volume of people we are dealing with and so forth, it's very difficult to identify all of the areas that impact our growth in loan volumes and so forth. But I know that the things that we're doing are very positive for the Company. As but when, like I say, hopefully some of Janet's initiatives will begin to have an impact as they get implemented, and we're getting closer to implementing those. But whether or not this is the trough, as you speak, so to speak, a lot depends on the growth seasons that's coming up. It's a very important time of the year for us, so we certainly are doing anything we can.

294.    Also during the call, a CAS Investment Partners analyst further questioned Defendants on the decline in refinancings, stating "has there been any historical seasonality in the level of less-than-10% refinances which would be impacted by this change? Or is it fair to say that the relative weakness in refinancing is difficult to get to the bottom of?"

295.    Defendants McLean, responded:

I would say the latter. It's very difficult to isolate and specifically identify the impact resulting from the less-than-10%, as opposed to weakness in demand by our customers. ***The biggest change that we made to our systems took place in February of last year.*** And while, as you know, we will continue to make those loans of less than 10% if the customer wants us to***, we're just not marketing them like we previous did.*** So we will probably see a weakness in these renewal volume up until we make that lap of the February timeframe.

But we also, like you, would have expected that impact to be less this quarter compared to the last quarter. But there may be some seasonality. We do have seasonality within our portfolio. And at this point in time, we have not been able to drive down deep enough to isolate the various causes of what's going on.

296.    As a result of Defendants' continued false and misleading statements in the second quarter 2015 press release and conference call, WRLD stock maintained its artificial inflation.

297.    Then on November 10, 2014, the Company filed its second quarter 2015 Form 10-Q, which incorporated its third quarter financial results.  Therein, Defendants reiterated the Company's total revenue for the quarter, while failing to disclose that it was the result of continued improper lending practices.  The Form 10-Q also reiterated the Company's interest and fee income for the quarter, while failing to disclose that it was the result of continued improper lending practices.

298.    Additionally, the Form 10-Q reiterated the Company's total revenue and interest and fee income for the six month period ended September 30, 2014, while failing to disclose that it was the result of continued improper lending practices.

299.    The Form 10-Q also included the same false and misleading statement and omissions contained in the Company's fiscal 2014 Form 10-K filed on June 12, 2014 and August 6, 2014 Form 10-Q, which updated investors on the status of the CID and stated that "***the Company believes its marketing and lending practices are lawful*** . . . ."

300.    Moreover, the Company's second quarter 2015 Form 10-Q contained SOX certifications signed by Defendants McLean and Calmes that were materially similar to those identified above in ¶¶158-159.

301.    As a result of Defendants' false and misleading statements in the second quarter 2015 Form 10-Q, WRLD stock maintained its artificial inflation.

302.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's second quarter 2015 earnings release and "Summary of Quarterly Results" dated October 22, 2014, the conference call with analysts held the same day, and the second quarter 2015 Form 10-Q, which discussed the Company's business and loan growth, and the lawfulness of the Company's marketing and lending practices,

were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)     Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)     While Defendants claimed to have ceased its practice of ***directly soliciting*** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans, which continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)     Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)     Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)    the Company's second quarter 2015 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)    the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

## D.    Third Quarter 2015 Results

303.    On January 29, 2015, before the market opened, Defendants issued a press release and "Summary of Quarterly Results" announcing World Acceptance's third quarter 2015 financial results, both of which were filed with the SEC on form 8-K that same day.  In its press release, the Company reported "Total revenues decreased to $153.7 million in the third quarter of fiscal 2015, a 4.3% decrease from the $160.5 million reported in the third quarter last year." Additionally, the Company provided additional detail on its gross loans, interest and fee income, and delinquencies:

> Gross loans slightly decreased to $1.263 billion at December 31, 2014, a 0.1% decrease from the $1.264 billion outstanding at December 31, 2013. The third quarter's growth rate in loans reflected lower loan demand from our U.S. operations and continued the trend seen during the first half of the year.

> Interest and fee income decreased 3.4% to $137.4 million in the third quarter of fiscal 2015 from $142.2 million in the third quarter of fiscal 2014 due to a shift in the mix of our loan portfolio to larger, lower yielding loans as well as lower U.S. loan volume and a higher number of accounts 60+ days past due, which are no longer accruing revenue. Insurance and other income decreased by 11.2% to $16.2 million in the third quarter of fiscal 2015 compared with $18.3 million in the third quarter of fiscal 2014.

*       *       *

Accounts contractually delinquent 61+ days increased from 5.0% at December 31, 2013 to 6.7% at December 31, 2014. The increase in accounts contractually delinquent is primarily due to the change in branch level incentives discussed in the second quarter. The accounts contractually delinquent 61+ days decreased from 7.0% at September 30, 2014. The provision for loan losses decreased 6.9% to $38.3 million in the third quarter of fiscal 2015 compared with the third quarter of fiscal 2014. The provision decreased due to slower loan growth and a smaller increase in the amount of delinquent accounts when comparing the quarter ended December 31, 2014 to the quarter ended December 31, 2013.

304.    Under "Selected Consolidated Statistics," the press reported loan growth, listing loan volume of $778,453 and $2,206,283 for the three and nine months ended December 31, 2014, respectively.  This compared to $863,332 and $2,418,975 for the three months and nine months ended December 31, 2013, respectively.

305.    In the "Summary of Quarterly Results," the Company reported,

Gross loans amounted to $1.263 billion at December 31, 2014, a 0.1% decrease over the $1.264 billion outstanding at December 31, 2013 and a 13.5% increase since the beginning of the fiscal year. The third quarter's growth rate in loans continued the trend seen during the first half of the year, which reflects the lower demand seen in our US operations. The number of loans to first time borrowers in the US was approximately 233,000 during the first nine months, a 5.7% decrease from the approximately 247,000 during the same period of the prior fiscal year. The mix in our loan portfolio has also continued to shift over the past 12 months and at December 31, 2014 consisted of 61.2% small loans, 37.9% larger loans and 0.9% sales finance. This compared to 63.6%, 35.3% and 1.2% at December 31, 2013. As discussed in our 10-Q for the period ended September 30, 2014, the Company has decided to wind down our sales finance business. As a result of that decision, our sales finance receivables decreased $3.0 million from $14.8 million at December 31, 2013 to $11.8 million at December 31, 2014. Additionally, the overall 0.1% decrease in loan balances resulted from a 0.8% decrease in accounts and a 0.7% increase in average balance per loan outstanding.

306.    The summary also reiterated the Company's total revenue for the quarter, stating:

Total revenue for the quarter amounted to $153.6 million, a 4.3% decrease over the $160.5 million during the third quarter of the prior fiscal year. Revenues for the first nine months of fiscal 2015 were $456.5 million, a 0.2% increase over the prior year period. Revenues for the quarter and period were negatively impacted by a shift in the mix of our loan portfolio to larger, lower yielding loans as well as lower volumes and a higher number of accounts 60+ days past due, which are no longer accruing revenue.

307.    During the Company's conference call with analysts held the same day, January 29, 2015, an analyst from Stephens, Inc., questioned Defendants on the "lack of demand" the Company was experiencing in the United States.  Defendant McLean responded, in part:

> Well, before doing that, in conjunction with that, obviously the two main issues that we're facing right now is the slowdown in the demand in the US. And, you know, just to highlight, our loan volume for the first nine months was down about 8.8% from the same period last year. In the US we had about $2.3 billion in fiscal 2014 versus 2.1. I know borrowers, based on numbers are down about 5.7%, our former borrowers are down about 2%. And our refinancings are down about 14%. The refinancings we can explain and understand and is consistent with the reductions that we've had over the last two or three quarters, ***ever since we made that change regarding the solicitation of those lower dollar renewals.*** The things that we have been attempting to address is the attraction of, or getting additional traffic in the office, both in the form of new borrowers and getting or former borrowers back into the office.

308.    As a result of Defendants' continued false and misleading statements in the third quarter 2015 press release and conference call, WRLD stock maintained its artificial inflation.

309.    Days later, on February 6, 2015, the Company filed its third quarter 2015 Form 10-Q, which incorporated its third quarter financial results.  Therein, Defendants reiterated the Company's total revenue for the quarter, while failing to disclose that it was the result of continued improper lending practices.  The Form 10-Q also reiterated the Company's interest and fee income for the quarter, while failing to disclose that it was the result of continued improper lending practices.

310.    Additionally, regarding fiscal year to date, the Company reiterated its total revenue and interest and fee income for the nine months ended December 31, 2014, while failing to disclose that it was the result of continued improper lending practices.

311.    The Form 10-Q also included the same false and misleading statement and omissions contained in the Company's fiscal 2014 Form 10-K filed on June 12, 2014, and the Forms 10-Q filed on August 6, 2014 and November 10, 2014, which updated investors on the status of the CID, and stated that "***the Company believes its marketing and lending practices are lawful*** . . ."

312.     Moreover, the Company's third quarter 2015 Form 10-Q contained SOX certifications by Defendants McLean and Calmes that were materially similar to those identified above in ¶¶158-159.

313.     As a result of Defendants' continued false and misleading statements in the third quarter 2015 Form 10-Q, WRLD stock maintained its artificial inflation.

314.     For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's third quarter 2015 earnings release and "Summary of Quarterly Results" dated January 29, 2015, the conference call with analysts held the same day, and the third quarter 2015 Form 10-Q, which discussed the Company's business and loan growth and the lawfulness of the Company's marketing and lending practices, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)     Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)     Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)     While Defendants claimed to have ceased its practice of ***directly soliciting*** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans, which

continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)    Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)    Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)    the Company's third quarter 2015 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)    the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### E.    Fourth Quarter and Full Year 2015 Results

315.    On April 30, 2015, before the market opened, Defendants announced World Acceptance's fourth quarter and full year 2015 financial results via a press release and "Summary of Quarterly Results" filed with the SEC on Form 8-K on the same day. According to the press release, "Total revenues increased to $173.0 million in the fourth quarter of fiscal 2015 compared with

$161.9 million reported in the fourth quarter last year. The results for the fourth quarter of fiscal 2015 included a $10.0 million after-tax gain on the sale of previously charged-off accounts." It continued, "[g]ross loans remained at $1.11 billion at March 31, 2015 consistent with March 31, 2014."

316.    Moreover, the "[i]nterest and fee income decreased 2.6% to $135.3 million in the fourth quarter of fiscal 2015 from $139.0 million in the fourth quarter of fiscal 2014 due to a shift in the mix of our loan portfolio to larger, lower yielding loans as well as lower U.S. loan volume and a higher number of accounts 60+ days past due, which are no longer accruing revenue." The press release continued:

> Accounts contractually delinquent 61+ days increased from 5.3% at March 31, 2014 to 7.0% at March 31, 2015. The increase in accounts contractually delinquent is primarily due to the change in branch level incentives discussed in the second quarter.

317.    Under "Selected Consolidated Statistics," the press release listed loan volume of $517,960 and $2,724,243 for the three months and year ended March 31, 2015, respectively. This was a decline from $535,104 and $2,954,079 for the three months and year ended March 31, 2014, respectively.

318.    The Company's Summary of Quarterly Results reported quarterly loan growth and delinquencies, stating:

> Gross loans amounted to $1.1 billion at March 31, 2015, approximately the same as the end of the prior fiscal year. The lack of growth during fiscal 2015 is primarily due to the decline in loan demand that we have been experiencing during the past several quarters.

*        *        *

> Loans to former borrowers, as well as refinancing to present borrowers, also declined during fiscal 2015 by 2.4% and 13.0%, respectively. As expected, the level of refinancing of present customers began to level off as we crossed the anniversary of the system changes that were made regarding low-dollar renewals. The mix in our loan portfolio has also continued to shift slightly over the past year and at March 31,

2015 consisted of 59.5% small loans, 39.7% larger loans and 0.8% sales finance. This compared to 60.8%, 38.1% and 1.1%, respectively at March 31, 2014. The overall 0.1% decrease in loan balances resulted from a 1.7% decrease in accounts offset by a 1.6% increase in average balance per loan outstanding.

*    *    *

Delinquencies and charge-offs will always be a primary concern of the Company. Accounts that were 61 days or more past due increased to 4.4% on a recency basis and to 7.0% on a contractual basis at the end of the current quarter, compared to 3.0% and 5.3%, respectively, at March 31, 2014. The increase in accounts that are 61 days or more past due is primarily a result of the change in our branch level incentive plan that was implemented in the second quarter. Since the change in the second quarter, the delinquency levels have leveled off. Net charge-offs as a percentage of average net loans on an annualized basis decreased from 13.9% to 13.0% when comparing the two quarterly periods, which is in line with historical levels for the fourth quarter.

319.    The fourth quarter 2015 Summary continued,

Total revenue for the quarter amounted to $173.0 million, a 6.9% increase over the $161.9 million during the fourth quarter of the prior fiscal year. Interest and fees declined by 2.6%, to $135.3 million, due to the shift in mix in the loan portfolio to larger, lower yielding loans, lower loan volume, and an increase in the amount of 60+ day past due accounts, which are no longer accruing revenue. Insurance income decreased by 5.5%, to $11.1 million due to the decline in loan volume and other income increased by $15.4 million, due to the $16.0 million net proceeds recorded from the sale of previously charged-off accounts. Revenues from the 1,179 offices open throughout both twelve month periods increased by 0.8%.

320.    During the Company's conference call that same day, April 30, 2015, Defendants were once again questioned on the Company's loan growth. Defendant McLean, responded:

Well, there's two pieces. ***As we anticipated, when we actually stopped soliciting for those low-dollar renewals, we anticipated it would take us a year before we saw that level off.*** And it just so happens that in March of this year, we did experience a leveling off on that renewal volume. So that's a big plus going forward. So we don't expect to have the negative aspect of that.

321.    As a result of Defendants' continued false and misleading statements in the Company's fourth quarter and full year 2015 press release and conference call, WRLD stock maintained its artificial inflation.

322.     The Company's fourth quarter and full year financial results were incorporated in its fiscal 2015 Form 10-K, filed with the SEC on June 2, 2015.  The 2015 Form 10-K reflected information discussed in the press release, Summary of Quarterly Results, and during the conference call on April 30, 2015.  It also contained substantially similar statements as those in the Company's fiscal 2013 and 2014 Forms 10-K as detailed above.

323.     More specifically, in the 2015 Form 10-K, the Company once again falsely claimed to have stringent underwriting practice for its installment loans, stating:

> . . . the Company primarily examines the individual's discretionary income, length of current employment and/or sources of income, duration of residence and prior credit experience.
>
> *          *          *
>
> The Company's employees verify the applicant's sources of income and credit histories through telephone checks with employers, other employment references and verification with various credit bureaus.

324.     With respect to refinancings, World Acceptance's Form 10-K stated the following:

> It is not unusual for the Company to have made a number of loans to the same customer over the course of several years, many of which were refinanced with a new loan after the borrower had reduced the existing loan's outstanding balance by making multiple payments.  In determining whether to refinance existing loans, the Company typically requires loans to be current on a recency basis . . .
>
> *          *          *
>
> A refinancing represents a new loan transaction with a present customer in which a portion of the new loan proceeds is used to repay the balance of an existing loan and the remaining portion is advanced to the customer. The Company markets the opportunity for qualifying customers to refinance existing loans prior to maturity.  In many cases the existing customer's past performance and established creditworthiness with the Company qualifies that customer for a larger loan.

325.     The Form 10-K also provided detail on the Company's refinancings of delinquent loan in particular:

The Company allows refinancing of delinquent loans on a case-by-case basis for those customers who otherwise satisfy the Company's credit standards. Each such refinancing is carefully examined before approval in an effort to avoid increasing credit risk. ***A delinquent loan may generally be refinanced only if the customer has made payments*** which, together with any credits of insurance premiums or other charges to which the customer is entitled in connection with the refinancing, reduce the balance due on the loan to an amount equal to or less than the original cash advance made in connection with the loan.

*     *     *

The Company believes that refinancing delinquent loans for certain customers who have made periodic payments allows the Company to increase its average loans outstanding and its interest, fees and other income without experiencing a significant increase in loan losses.

326.     Regarding the Company's practice of selling insurance products, the Form 10-K:

In certain states, the Company sells credit insurance to customers in connection with its loans as an agent for an unaffiliated insurance company. These insurance policies provide for the payment of the outstanding balance of the Company's loan upon the occurrence of an insured event. The Company earns a commission on the sale of such credit insurance, which, for most products, is directly impacted by the claims experience of the insurance company on policies sold on its behalf by the Company.

*     *     *

The Company, as an agent for an unaffiliated insurance company, markets and sells credit life, credit accident and health, credit property, and unemployment insurance in connection with its loans in selected states where the sale of such insurance is permitted by law.

327.     The Form 10-K also included management's discussion and analysis of World Acceptance's financial results for the fourth quarter and fiscal year ended 2015. The increase over this period reflects both the higher volume of loans generated through the Company's existing branches and the contribution of loans generated from new branches opened or acquired over the period." The Company further reiterated in its Form 10-K the financial results stated in the fourth quarter and full year 2014 Form 8-K, while failing to disclose that it was the result of continued improper lending practices.

328.    The Form 10-K also included the same false and misleading statement and omissions contained in the Company's fiscal 2014 and 2015 Forms 10-K filed on June 12, 2014 and the Company's Forms 10-Q filed on August 6, 2014, November 10, 2014, and February 6, 2015, which also updated investors on the status of the CID, stating that "*the Company believes its marketing and lending practices are lawful* . . ."

329.    Moreover, World Acceptance's 2015 Form 10-K contained SOX certifications by Defendants McLean and Calmes that were materially similar to those identified above in ¶¶158-159.

330.    As a result of Defendants' continued false and misleading statements in the 2015 Form 10-K press release, WRLD stock maintained its artificial inflation.

331.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's fourth quarter and fiscal 2015 earnings release and "Summary of Quarterly Results" dated April 30, 2015, the conference call with analysts held the same day, and the Form 10-K filed with the SEC on June 2, 2015, which discussed the Company's previously disclosed "material weakness," the Company's business, and the resulting decrease in loan volume due to "system changes," and the lawfulness of the Company's marketing and lending practices, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)     Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)     While Defendants claimed to have ceased its practice of **directly soliciting** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans, which continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)     Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)     Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)     the Company's fiscal 2015 Form 10-K was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)     the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the 2015 Form 10-K did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that

World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

### F.    First Quarter 2016 Results

332.    On July 23, 2015, before the market opened, Defendants announced World Acceptance's first quarter 2016 financial results via press release and "Summary of Quarterly Results" filed with the SEC on Form 8-K.  According to the press release, "Total revenues decreased to $137.2 million in the first quarter of fiscal 2016, a 6.0% decrease over the revised $145.9 million reported for first quarter last year."  It continued, "[g]ross loans decreased to $1.15 billion as of June 30, 2015, a 1.2% decrease from the $1.16 billion of loans outstanding as of June 30, 2014. Gross loans in the US decreased 0.4% . . . ."

333.    Moreover, "[i]nterest and fee income decreased 5.5%, from a revised $130.0 million to $122.8 million in the first quarter of fiscal 2016 due to a decrease in average earning loans as well as lower volumes."  Further, "[i]nsurance and other income decreased by 9.5% to $14.4 million in the first quarter of fiscal 2016 compared with $15.9 million in the first quarter of fiscal 2015. The decrease was related to a $770,000 decrease in insurance revenue and a $740,000 decrease in other income compared with the first quarter of fiscal 2015."  The press release continued:

> The provision for loan losses decreased 15.1% to $26.2 million in the first quarter of fiscal 2016 from $30.9 million in the first quarter of 2015. The provision decreased due to a reduction in net charge-offs, slower loan growth, and a smaller increase in past due accounts that are fully reserved when comparing the first quarter of 2016 to the first quarter of 2015.

334.    Under "Selected Consolidated Statistics," the press release listed loan volume of $698,241 for the three month ended June 30, 2015.  This was a decline from $731,565 for the three months ended June 30, 2014.

335.    The Company's Summary of Quarterly Results reported quarterly loan growth:

"Gross loans amounted to $1.15 billion at June 30, 2015, a 1.2% decrease over the $1.16 billion outstanding at June 30, 2014 and a 3.7% increase since the beginning of the fiscal year. The shift in the mix of our loan portfolio leveled off over the past 12 months and at June 30, 2015 consisted of 60.3% small loans, 39.0% larger loans and 0.6% sales finance. This is compared to 60.4%, 38.7% and 1.0% at June 30, 2014. Additionally, the overall 1.2% decrease in loan balances resulted from a 2.7% decrease in the number of accounts outstanding and a 1.5% increase in average balances outstanding."

336.    The first quarter 2015 Summary continued,

"Total revenue for the quarter amounted to $137.2 million, a 6.0% decrease over the $145.9 million during the first quarter of the prior fiscal year. Revenues continue to be negatively impacted by lower volumes and a higher number of accounts 60+ days past due, which are no longer accruing revenue. We experienced a 3.0% decrease in our average net loans receivable less loans that are 60+ days or more contractually past due when comparing two corresponding periods for our US and traditional Mexican loans.

\*        \*        \*

Accounts that were 61 days or more past due increased to 4.4% on a recency basis and to 6.5% on a contractual basis at the end of the current quarter, compared to 3.6% and 5.6%, respectively, at June 30, 2014. The increase in accounts that are 61 days or more past due was primarily a result of the change in our branch level incentive plan that was implemented in the second quarter of fiscal 2015. Since the change in the second quarter, the delinquency rates in this category have leveled off. When excluding our payroll deduct loans in Mexico, which tend to run higher delinquencies but have lower loss rates than our traditional loans, the accounts that were 61 days or more past due at June 30, 2015 were 4.2% on a recency basis and 5.8% on a contractual basis.

337.    As a result of Defendants' continued false and misleading statements in the first quarter 2016 press release and conference call, WRLD stock maintained its artificial inflation.

338.    The Company's first quarter 2016 financial results were incorporated in its first quarter 2016 Form 10-Q, filed with the SEC on July 30, 2015. The Form 10-Q reiterated the total revenue, while failing to disclose that it was the result of continued improper lending practices. The Form 10-Q also reiterated the interest and fee income for the quarter, while failing to disclose that it was the result of continued improper lending practices.

339.    The Form 10-Q reiterated the same false and misleading statement and omissions contained in the Company's fiscal 2014 and 2015 Forms 10-K filed on June 12, 2014 and June 2, 2015, and the Company's Forms 10-Q filed on August 6, 2014, November 10, 2014, and February 6, 2015, which updated investors on the status of the CID and stated that "*the Company believes its marketing and lending practices are lawful* . . ."

340.    Moreover, the Company's first quarter 2016 Form 10-Q contained SOX certifications by Defendants McLean and Calmes similar to those identified above in ¶¶158-159.

341.    As a result of Defendants' false and misleading statements in the first quarter 2016 Form 10-Q press release, WRLD stock maintained its artificial inflation.

342.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's first quarter and fiscal 2016 earnings release and "Summary of Quarterly Results" dated April 30, 2015, the conference call with analysts held the same day, and the first quarter 2016 Form 10-Q, which discussed the Company's previously disclosed "material weakness" and the resulting decrease in loan volume due to "system changes," and the lawfulness of the Company's marketing and lending practices, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because, for example:

(a)    Defendants misleadingly downplayed true financial impact of its cessation of certain illicit practices (*i.e.*, direct solicitation of small-dollar loan renewals), which they coyly referred to as "system changes," that had fundamentally altered the Company's business model and led to a continued historical decline in loan growth, an increase in delinquencies, a resulting decline in interest and fee income, and a shift in the "mix" of the Company's loan portfolio;

(b)     Defendants failed to disclose that although the Company had changed certain of its practices in response to the disclosure of "material weakness," in July 2013 it was still engaged in other predatory and illicit lending practices to grow its business and its revenues;

(c)     While Defendants claimed to have ceased its practice of ***directly soliciting*** small-dollar loan renewals, they continued to allow frequent renewal of small dollar loans, which continued to artificially inflate the Company's loan volume and growth and minimize delinquencies, although not as significantly as before;

(d)     Defendants' reported "insurance and other income" was driven by deceptively tacking on worthless insurance products to customers' loans without their knowledge or through high pressure tactics, and in substance amounted to *de facto* interest rate hikes, which skirted applicable state usury laws and benefited World Acceptance and not borrowers (*see, e.g.*, ¶¶67-81);

(e)     Defendants' predatory lending practices were both consistent and pervasive throughout the Company's business and were in direct violation of federal and state consumer financial protection laws and regulations, thus subjecting World Acceptance to CFPB scrutiny, and would later subject the Company to a NORA letter, as well as untold legal and/or regulatory penalties;

(f)     the Company's first quarter 2016 Form 10-Q was materially false and misleading because it failed to disclose (in violation of Item 303 of regulation S-K) these materially adverse conditions to the market; and

(g)     the SOX certifications executed by Defendants McLean and Calmes included the misleading representation that the Form 10-Q did not contain untrue statements or material omissions, when in reality, Defendants knew but failed to disclose, or recklessly disregarded, that

World Acceptance's reported success was predicated on illicit lending practices as well as artificially inflated loan volume and growth due to the Company's faulty accounting for small-dollar renewals.

## VII.   THE TRUTH EMERGES THROUGH A SERIES OF PARTIAL DISCLOSURES

343.    On July 3, 2013, after the close of trading, World Acceptance filed a Form NT 10-K/A with the SEC revealing that World Acceptance was unable to file a completed Form 10-K for the fiscal year ended March 31, 2013.   Due to "unexpected delays in completing our financial statements," and the need for an "additional review and analysis" to support the Company's allowance for loan losses.  The Company further revealed that as a result of "management's ongoing assessment of these issues,"  that it is "*possible*" that the Company's will report a "material weakness in its internal control over financial reporting relating to its process for determining its allowance for loan losses, as well as reporting the measures it is undertaking to remediate any such material weakness."

344.    In response to this negative news, the Company's stock price fell ***more than 12%***, on unusually high trading volume, falling from a close of $88.71 on July 3, 2013, to a close of $78.20 on July 5, 2013, with continued drops in the days following the announcement and resulting in substantial losses to investors.  Analysts were understandably concerned over World Acceptance's notification of late filing.   CL King published a report on July 8, 2013, lowering its rating of the Company to "Neutral" from "Strong Buy," stating that "these delays relate to a crucial component of the company's core business . . . . Thus far the company has been unable to support its allowance for loan losses, which clearly is fundamental to its core business of lending to consumers."  More specifically the report raised concern that the Company "may also report a material weakness in its internal control over financial reporting related to its process for determining its allowances for loan losses. This obviously could have serious ramifications for the company's financial results."

345.    On July 25, 2013, Defendants revealed that management and the Company's auditors had in fact uncovered a deficiency in Defendants' process for evaluating and determining World Acceptance's allowance for loan losses which required an amendment to its fiscal 2013 Form 10-K.

346.    Specifically, the Company revealed that World Acceptance was not properly differentiating between small-dollar loan refinancings, those loans below the 10% threshold and large-dollar loan refinancing which fall above the 10% threshold.  However, the Company assured investors that corrected policies and procedures were being put in place and that the identified "material weakness" would have *no* effect on its overall business.

347.    Defendants' July 25th revelations regarding the nature of World Acceptance's "material weakness" in accounting for small-dollar loan renewals immediately caused the Company's stock price to dip 4.3%, falling from a close of $83.74 on July 24, 2013 to a close of $80.10 on July 25, 2014, on heavy trading volume.  However, this stock drop would have been even greater had Defendants: (a) revealed the truth about the impact on loan growth of small-dollar loan renewals; (b) not falsely reassured investors that the "material weakness" in accounting would *not* have a "material impact on our operations"; and (c) not simultaneously disclosed generally positive news regarding World Acceptance's "record financial results" for the first quarter of fiscal 2014.

348.    Analysts were understandably settled by Defendants' assurances regarding the identified weakness.  Stephens Inc. issued a report on July 25, 2013 maintaining its "Equal-Weight" rating and $88 price target, further noting that the accounting issue would have minimal impact and was thus considered merely a "modest risk to our forecast."  Sidoti & Company, LLC showed even less concern.  Rating WRLD stock a "Buy" in its July 25, 2013 report, Sidoti recognized that the "material weakness" was "a paramount concern for investors" but, "based on the unchanged financials in the amended 10-K, we do not think this is an issue."   The report continued,

"Management does not think that there are any credit implications from this rule, as a similar rule has been in place for over 15 years in South Carolina.  Per management, South Carolina has some of the strongest credit metrics of any state in which the company operates."

349.    Less than two months later, on September 10, 2013, the Company unexpectedly announced that its Chief Financial Officer and Senior Vice President, Defendant Malson, would "retire" from her positions upon appointment of her successor.  On November 4, 2013, just three months after the Company disclosed the existence of a "material weakness," World Acceptance filed a Form 8-K with the SEC unexpectedly announcing the resignation of COO and President Roland effective November 1, 2013.  The market connected the unexpected resignations to the Company's lending practices and the earlier announcement of a "material weakness."   In response to this negative news, the price of World Acceptance stock dropped $12.40 per share or roughly 12%, to close at $88.9 per share on November 4, 2013, on unusually high trading volume.

350.    Then, on March 13, 2014, investors were stunned by Defendants' revelation regarding the truth about World Acceptance's illicit lending practices when the Company filed a Form 8-K to announce its receipt of a CID from the Bureau, which the CID revealed the Bureau's investigative efforts to determine: (a) "whether finance companies or other unnamed persons [within the Company] have been or are engaging in unlawful acts or practices in connection with the marketing, offering, or extension of credit in violation of Sections 1031 and 1036 of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531, 5536, the Truth in Lending Act, 15 U.S.C. §§ 1601, et seq., Regulation Z, 12 C.F.R. pt. 1026, or any other Federal consumer financial law;" and (b) "whether Bureau action to obtain legal or equitable relief would be in the public interest."   World Acceptance further disclosed that it was in the process of providing the information requested in the

Bureau's "broad requests for production of documents, answers to interrogatories and written reports related to loans made by the Company and numerous other aspects of the Company's business."

351.    Analysts recognized the importance of the Bureau's investigation into World Acceptance's marketing and lending practices – the very heart of the Company's money-making operations.  In particular, Sterne, Agee & Leach Inc. immediately noted on March 13, 2014, "Two areas of likely focus are 1) rollovers and renewals, and 2) the sale of credit-related insurance products, in our view."  Its report continued, "With approximately 30% of the [C]ompany's loans underwritten with some form of credit insurance, it would be difficult for WRLD to continue to make these loans without this product."  Sterne, Agee also noted that approximately 13.5% of World Acceptance's fiscal 2013 revenue "was from insurance commissions and other products."

352.    Sidoti & Company, LLC published its own report on March 13, 2014 regarding this "Negative Regulatory Action," noting concern that the Bureau "would take a close look at the marketing of credit insurance products."  Sidoti & Company LLC characterized the Bureau's CID as "the most specific threat to date" on the regulatory front.

353.    On March 14, 2014, Sterne, Agee issued a follow-up report on the disclosure of the investigation.   Upon further reflection, Sterne, Agee was not merely concerned about the investigation resulting in "the loss of any ancillary product" but rather "some change in business practices that lowers revenue, increases cost, or both."  Accordingly, it lowered its price target for WRLD common stock by $30 per share "to reflect the uncertainty surrounding this issue[]."

354.    Defendants' March 13, 2014 revelations, and the resulting analyst commentary, immediately caused the Company's stock price to plummet by *20%*, falling from a close of $97.32 on March 12, 2014 to a close of $78.25 on March 13, 2014.  The volume of WRLD shares traded on March 13, 2014 was *over 22 times greater* than on March 12, 2014.  World Acceptance's investors

lost millions as a result of this massive sell-off.  Once again, to help ease concerns over the Bureau's investigation, the Company simultaneously assured investors that they had nothing to fear.  The March 13, 2014 Form 8-K revelation closed with the following statement: "The Company believes its marketing and lending practices are lawful."  This assurance helped buoy WRLD's share price from an otherwise steeper fall.

355.    Then, on April 29, 2014, just weeks after disclosing the Bureau's federal investigation but promising its operations were "lawful," Defendants revealed in the Company's Form 8-K, that World Acceptance's "material weakness" in accounting for small-money renewals had caused the Company to change its policies to no longer encourage such refinancings, which, in turn, negatively affected the Company's loan volume for the quarter.

356.    World Acceptance issued a "Summary of Quarterly Results" on Form 8-K, filed April 29, 2014, that revealed "the Company [had] made some system changes during the quarter that ensured customers were not encouraged to refinance existing loans where the proceeds from the transaction were less than 10% of the loan being refinanced.  This resulted in a ***decrease in our loan volume and had an impact on our balances outstanding and our overall yields***.  As a result, gross loans outstanding amounted to $1.11 billion at March 31, 2014, a 4.2% increase over the $1.07 billion outstanding at March 31, 2013," which was the lowest quarterly growth in ***at least nine years***.  Importantly, this was the first date in which the Company admitted that its "system changes" resulted in ramifications of Defendants' undisclosed fraud that continued to reverberate through to the end of the Class Period, as the Company's historically low gross loan and loan volume numbers continued to worsen during subsequent quarters.

357.    During the Company's conference call with analysts that same day, Defendants elaborated further on the nature of, and reasons for, those "system changes."  Defendant McLean

explained that World Acceptance's auditors had uncovered a "material weakness" in that Defendants "were not properly accounting for those [refinancings involving] loans with proceeds of less than 10%. Although we've proved that it did not have a material impact on our financial statements, *we have since put procedures into place to monitor these loans and to make sure that they are properly accounted for*." In such a way, Defendants admitted they had not previously had procedures in place to monitor or properly account for the Company's renewal loans.

358.    As explained in more detail above, *see* Section IV.C.6, when borrowers choose to refinance their existing loans, GAAP mandates that World Acceptance account for those refinancings differently depending on the proceeds available to the borrower. The line of demarcation is 10%. In short, if the borrower has funds available totaling at least 10% of his or her original loan (meaning that the borrower has paid down at least 10% of the original loan's principal), that refinancing is properly considered a "renewal," which allows the original debt to be extinguished and a new loan to be issued to the borrower.

359.    On the other hand, if the borrower has anything less than 10% available (meaning the borrower has yet to repay at least 10% of the original loan's principal), then his or her refinancing is properly considered a "modification" to the original loan. When "modified," that loan is *not* distinguished but instead extended, and thus *no new loan* is issued to the borrower.

360.    The Company has far less incentive to "modify" an existing loan than it does to "renew" that loan. World Acceptance pushes for "renewals" because they allow for the issuance of a brand new loan, along with the attendant fees and charges associated with that new loan. Plus, each new loan counts toward the Company's reported loan volume and loan growth for the quarter. Loan "modifications" offer no such advantage.

361.    In such a way, Defendants admitted that they had previously encouraged renewals below this threshold by providing the very information they now suppress.  Moreover, Defendant McLean went on to reveal: "Now, we anticipated that this would have an impact on volume, and as it turned out, it had a fairly substantial impact on the volume in the fourth quarter."  As investors learned from the Company's "Summary of Quarterly Results," that "substantial impact" was decidedly negative.  The Company's implemented changes to discourage small-dollar renewals had "***resulted in a decrease in our loan volume*** and had an impact on our balances outstanding and overall yields."

362.    Accordingly, upon recognizing their errors in accounting, Defendants changed their policies to ***discourage*** refinancings of loans below the 10% equity threshold.  As Defendant McLean explained on the April 29th conference call:

> On our receipt statements and other type of paper that is given to the customer, the amount of money that's available to that customer in the event that they would like to refinance a loan to show them what they would get back under that transaction, this has been there for quite some time, and it shows up on the screen so that our finance personnel can tell them if they would like to renew it at any point in time, that this was the amount of money they'd get back if they had the same transaction. ***We decided to suppress that information until such time as that amount that they could get back exceeded that 10% threshold.***
>
> ***Now, we anticipated that this would have an impact on volume, and as it turned out, it had a fairly substantial impact on the volume in the fourth quarter.*** We also anticipate, going forward, that this is not necessarily a disruption to the relationship we have with the customers, but it will, at least in the fourth quarter, some of those renewals will probably get pushed back a month or so. And we do not believe that the impact on an ongoing basis will be as dramatic as it was during the fourth quarter. However, it is extremely hard to quantify the impact of these type of changes.

363.    The analyst from FBR Capital Markets & Co. further asked about the effects of these changes: "Do you know, Sandy, roughly what percent of originations are small dollar renewals [less-than-10%] after you all have implemented these changes as compared to before?"

364.    Defendant McLean responded, "It's dropped dramatically. It's somewhere around -- it depends on if you look at number or dollars. And we measure it a month at a time on a rolling basis, and *it's dropped down to the 7% or 8% range from the 20% range that we announced last year*. So it's dropped down dramatically." Thus, as a result of branch offices no longer encouraging less-than-10% refinancings, the number of those particular refinancings had been more than cut in half. Defendants, however, failed to reveal to the market at this point in time that employees had been "soliciting directly" customers as later admitted by Defendant McLean during the Company's July 22, 2014 conference call. Ultimately, when the Company stopped this direct solicitation of loan renewals, the Company's loan growth numbers dropped and delinquencies increased, as detailed in the Company's press releases, Forms 10-Q and Forms 10-K, and continued to decrease for the remainder of the Class Period.

365.    Analysts understandably were concerned over World Acceptance's "system changes" and their resulting decreases in loan growth. Sidoti & Company, LLC published a report on April 29, 2014 noting that "[s]lower loan growth and a decline in portfolio yield are concerning." More specifically, the report called attention to World Acceptance's lowest reported loan growth in nine years following the Company's fourth quarter "system changes":

> WRLD's 4Q:F14 loan growth was just 4.2% year-over-year, *which is the lowest quarterly growth we have on record through F2005.* While we think there are some negative cyclical factors hampering loan growth, the 8-k sheds some light on this topic. . . . [M]anagement noted that they made some system changes in 4Q:F14 that made sure customers were not encouraged to refinance loans where the proceeds were less than 10% of the loans being financed. When loan refinancing fall[s] below this threshold it is considered a loan modification and the amortization of the loan does not start over once again (*a negative for WRLD*).

366.    Moreover, on May 1, 2014, Sterne, Agee & Leach Inc. issued its own report highlighting the practical effects of the Company discouraging small-dollar renewals: "WRLD implemented the planned change in renewal policy limiting renewals on transactions, where the net

proceeds to the borrower must exceed 10%, in February. The effect of this was already apparent: turnover rates were declined from 3x to 2.5x on a year-over-year basis, ***and we expect this rule to reduce the amount of fee income the company can collect***."

367.    Defendants' April 29th revelations, and the resulting analyst commentary, immediately caused the Company's stock price to fall by ***nearly 10%***, on abnormally heavy trading volume, from a close of $80.50 on April 28, 2014 to a close of $72.60 on April 30, 2014 and causing investors to lose millions. However, to help ease concerns over the Company's internal policies and practices, Defendants concurrently assured investors that they had "since put procedures into place to monitor loans and to make sure that they are properly accounted for" and explained that the identified material weakness would not have a material impact on the Company's financial statements. This assurance helped sustain WRLD's share price from an otherwise sharper decline.

368.    On September 5, 2014, the Company filed a Form 8-K with the SEC, unexpectedly revealing that its auditor KPMG, "would not respond to the Company's recent request for proposal to serve as the Company's independent registered public accounting firm and that KPMG ***resigned*** as the Company's current independent registered public accounting firm."

369.    An analyst report issued by Jefferies on September 8, 2014 cited KPMG's resignation which was on "the heels of [the] March 2013 accounting issue" as unexpected. The report indicated that it expected the announcement to cause "shares of WRLD stock to be under pressure." Also on September 8, 2014, Sterne Agee & Leach, Inc., published a report in response to KPMG's resignation. The report tied WRLD's stock volatility to the KPMG announcement.

370.    As a result of this news, the price of World Acceptance stock dropped ***7.5%***, on abnormally heavy trading volume, from a close of $76.95 per share on September 5, 2014 to a close of $71.18 per share on September 8, 2015 (the next trading day), causing investors to lose millions.

The drop would have been more dramatic, however, Defendants falsely assured investors that there were "no reportable events" that led to KPMG's resignation, allowing the artificial inflation in WRLD's stock to remain.

371.    On June 2, 2015, World Acceptance filed at Form 8-K with the SEC unexpectedly announcing the retirement of CEO and Chairman of the Board of Directors McLean, effective September 30, 2015.  The Form 8-K also announced that Janet Lewis Matricciani, the Company's Chief Operating Officer since January 2014 would succeed McLean.  Executive resignations such as McLean's are often viewed by investors as a signal that there are undisclosed problems at the Company.  This announcement came mere weeks before the CFPB served its NORA letter notifying the Company that it intended to file charges for its violative lending practices and was the third Individual Defendant resignation in 21 months.  The market linked this and the earlier unexpected executive resignations to the previously reported "material weakness," but still kept investors in the dark about Defendants' illicit lending practices and their financial impact.

372.    On the same day as the June 2, 2015 Form 8-K revelation, Macquarie Research published a report citing the CEO change as a "distraction while World Acceptance faces 1) securing additional financing sources to replace banks that are exiting the credit facility syndicate, and 2) navigating regulatory headwinds as the CFPB imposes larger participant installment lending rules." The report also noted that the new CEO "has less than 2yrs experience at World Acceptance, and did not have lending experience prior to working at WRLD."

373.    As a result of the CEO's resignation and resulting analyst coverage, World Acceptance's stock fell *over 5%*, from a close of $80.51 on June 1, 2015 to a close of $75.89 on June 2, 2015.  The drop would have been more dramatic, however, Defendants falsely assured investors

that McLean's departure was the result of a retirement and not the Company's fraudulent conduct and impending action from the CFPB.

374.    Then, on August 10, 2015, the truth about World Acceptance's illicit lending practices was more fully revealed when the Company filed a Form 8-K with the SEC announcing that on August 7, 2015, the Company received a NORA Letter from the CFPB notifying World Acceptance that the "CFPB's Enforcement Office is considering recommending that the CFPB take legal action against the Company." According to the letter, the "CFPB's Enforcement Office expects to allege that the Company violated the Consumer Financial Protection Act of 2010, 12 U.S.C. §5536." Legal action brought by the CFPB will be directly related to the Company's response to the CFPB's broad requests for production of documents, answers provided to interrogatories and written requests related to loans made by the Company and numerous other aspects of the Company's business, as well as subsequent requests and demands for information by the Bureau. Available relief to the CFPB under 12 U.S.A. §5565 includes, without limitation, restitution, disgorgement or compensation of unjust enrichment, the payment of damages or other monetary relief, and civil money penalties as high as one million for knowing violation, among others. In response to this announcement that stood in stark contrast to earlier protestation of illicit practices, the Company's stock price plummeted *more than 34%*, on unusually high trading volume, from a close of $51.80 on August 10, 2015, to a close of $34.00 on August 11, 2015 and resulting in substantial additional losses to investors.

375.    Following the disclosure of the NORA letter and impending CFPB legal action, on August 10, 2015, Macquarie Research published a report reiterating its "Underperform" rating and "lowering [its] target price to WRLD's F1Q16 tangible book of $38." The report further stated, "[a]t the very least, a significant fine; at worst, the business model could be untenable by a CFPB action."

376.    On August 11, 2015, Sterne Agee CRT published a report reducing its price target from $55 to $37 to "reflect the acceleration of the CID between WRLD and the CFPB." The Sterne Agee CRT report also identified that it believes the CFPB is looking at the Company's "sales practices" surrounding, its "sale of credit insurance products in conjunction with its loans" and "the whole process of loan renewals." Also on August 11, 2015, Janney published an analyst report downgrading its rating of the Company to "Neutral" from "Buy," stating that the NORA letter from the CFPB "indicates that the agency is 'considering' legal action against the company. This is the next in a series of escalating steps that began with the Civil Investigative Demand issued to WRLD from the CFPB in March 2014. The range of outcomes from this investigation are vast."

377.    Defendants' August 10, 2015 revelation and resulting analyst commentary, immediately caused the Company's stock price to plummet ***more than 34%, a six year low***, on trading volume ***over 13 times greater*** than the previous trading day, from a close of $51.80 on August 10, 2015, to a close of $34.00 on August 11, 2015, causing millions of dollars in additional losses to investors. However, once again, to help ease concerns over the Bureau's impending action, the Company simultaneously assured investors that they had nothing to fear. The August 10th Form 8-K revelation closed with the following statement: "The Company continues to believe that its marketing and lending practices are lawful." This assurance helped buoy WRLD's share price from an otherwise sharper fall.

## VIII.  LOSS CAUSATION

378.    As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated World Acceptance's stock price by misrepresenting and concealing the Company's illicit, predatory lending practices and artificially inflated loan growth, including the facts that: (a) World Acceptance preyed on its customers with unnecessary, worthless loan products that offered little more than contributions to the Company's bottom line; (b) employees aggressively pushed

borrowers into an endless cycle of debt by encouraging loan renewals at every turn, which cost borrowers dearly in the long run but helped churn World Acceptance's loan portfolio and reported growth in the short term; (c) the Company was improperly accounting for small-dollar loan renewals in violation of GAAP; and (d) World Acceptance's GAAP violations regarding small-dollar renewals served to artificially inflate the Company's reported loan volume and loan growth, key metrics to the evaluation of the Company's ongoing success.

379.    Defendants' false and misleading statements and omissions, individually and collectively, concealed the true business prospects of the Company, resulting in World Acceptance's stock being artificially inflated until, as indicated herein, the relevant truth about its lending practices and inflated loan growth was revealed.  While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate World Acceptance's stock price and the image of its future business prospects to give the market the false notion that World Acceptance was above board in its lending and accounting practices.  These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.  Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, World Acceptance's stock trading at artificially inflated levels, reaching as high as $107.33 during the Class Period.

380.    The true picture about World Acceptance's illicit lending practices and artificially inflated loan growth was revealed: (a) on July 3, 2013, when Defendants filed a Form NT 10-K/A disclosing that it was unable to file a completed Form 10-K for fiscal 2013 citing the needs for "additional analysis" to support the Company's allowances for loan losses and the possibility of reporting a material weakness; (b) on July 25, 2013, when Defendants discussed a "material

weakness" that had been identified concerning World Acceptance's accounting for small-dollar loan refinancings failing to meet the 10% threshold separating loan "renewals" from loan "modifications;" (c) on November 4, 2013, when Defendant Roland resigned as COO and President not long after the Company disclosed the existence of a "material weakness;" (d) on March 13, 2014, when the Company filed a Form 8-K announcing it was the target of an investigation by the Bureau concerning potentially "unlawful acts or practices in connection with the marketing, offering, or extension of credit;" (e) on April 29, 2014, when World Acceptance disclosed significantly weakened loan growth stemming from the policy changes it had enacted to remediate the Company's "material weakness" in its accounting for small-dollar loan renewals; (f) on September 5, 2014, when the Company filed a Form 8-K disclosing that KPMG resigned as its independent auditor; (g) on June 2, 2015 when the Company filed a Form 8-K announcing the retirement of Defendant McLean; and (h) on August 10, 2015, when the Company filed a Form 8-K announcing receipt of a NORA letter from the CFPB and notification that the CFPB Enforcement Officer was considering recommending that the CFPB take legal action against the Company. When World Acceptance provided the market with these revelations on July 3, 2013, July 25, 2013, November 4, 2013, March 13, 2014, April 29, 2014, September 5, 2014, June 2, 2015, and August 10, 2015, it was an indication to the market that Defendants' prior Class Period statements were false and misleading.

### A.     July 3, 2013 Disclosure

381.     The truth about the Company's artificially inflated loan growth and improper accounting practices began to emerge on July 3, 2013, when World Acceptance filed a Form NT 10-K/A disclosing that it was unable to file a completed Form 10-K for fiscal 2013, citing the need for an "additional analysis" of the Company's allowances for loan losses and the possibility of reporting a material weakness involving loan losses. The market learned for the first time that World Acceptance's accounting practices were potentially at issue and that the Company was performing

"additional analysis" that may result in the future disclosure of a "material weakness" in internal control over financial reporting.

382.    As a result of the information revealed to the market on July 3, 2013, World Acceptance's stock immediately dipped over 12%, from a close of $88.71 on July 3, 2013, to a close of $78.20 on July 5, 2013, on unusually heavy trading volume.  The market's negative reaction to World Acceptance's began on July 5, 2013 and continued in the days following, is demonstrated in the following stock chart:



383.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's inability to file a timely Form 10-K with the SEC and the disclosure of the possibility of a "material weakness"  with respect to the Company's loan losses.

384.    After extracting general market and industry conditions, the stock price decline on July 5, 2013 had statistical significance to the disclosure alleged.  The timing and magnitude of

World Acceptance's stock price decline from July 3, 2013 through July 9, 2013 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index[5] as the revelation of the truth became known to the market. As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on July 3, 2013, causing World Acceptance's stock price to fall below its peer index in the days following the announcement.



### B.     July 25, 2013 Disclosure

385.     The truth about the Company's violative lending practices and artificially inflated loan growth continued to emerge on July 25, 2013, when World Acceptance held a conference call

---

[5]     In its 2014 Proxy Statement, filed with the SEC on June 30, 2014, the Company compares itself to Credit Acceptance Corp., EZCORP Inc., First Cash Financial Services Inc., Infinity Property and Casualty Corp., National Interstate Corp., QC Holdings Inc., RLI Corp., and Safety Insurance Group Inc.

with analysts to discuss a recently identified "material weakness" in the Company's accounting treatment of small-dollar loan refinancings, which comprised between 15% and 25% of the Company's entire loan renewal portfolio. The market learned that World Acceptance's accounting practices had been in violation of GAAP for failing to differentiate between small-dollar loan refinancings and large-dollar loan refinancings, the latter of which qualifies as a "renewal" while the former is merely a "modification" to the existing loan. Although the "material weakness" had been disclosed in the Company's amended Form 10-K filed on July 19, 2013, this day, July 25th, marked the first time analysts could discuss the weakness with Defendants and ask relevant questions to fully appreciate its long-term ramifications to World Acceptance's business.

386. As a result of the information revealed to the market on July 25, 2013, World Acceptance's stock immediately dipped over 4%, from a close of $83.74 on July 24, 2013 to a close of $80.10 on July 25, 2013, on unusually heavy trading volume. The drop would have been more dramatic, however, had Defendants not falsely assured investors that this "material weakness" would not have any "material impact on our operations or results." The market's negative reaction to World Acceptance's July 25, 2013 revelations is demonstrated in the following stock chart:



387.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's "material weakness" in accounting for small-dollar loan renewals, which had been concealed or misrepresented by Defendants' scheme and misstatements. This decline would have been even more significant, however, had Defendants not falsely assured the market that the weakness would not have any "material impact on our operations or results."

388.    After extracting general market and industry conditions, the stock price decline on July 25, 2013 had statistical significance to the disclosure alleged. The timing and magnitude of World Acceptance's stock price decline from July 24, 2013 through July 25, 2013 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of

the truth became known to the market.  As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on July 25, 2013, causing World Acceptance's stock price to fall below its peer index.



### C.     November 4, 2013 Disclosure

389.     Thereafter, on November 4, 2013, the Company filed a Form 8-K with the SEC announcing the retirement of Defendant, COO and President Roland effective November 1, 2013.

390.     As a result of the information revealed to the market on November 4, 2013, World Acceptance's stock fell over 12%, from a close of $101.29 on November 1, 2013 to a close of $88.89 on November 4, 2013.  The drop would have been more dramatic, however, Defendants falsely assured investors that Roland's departure was the result of "personal reasons" and not the Company's illicit lending practices or improper accounting practices recently revealed.  The

market's negative reaction to World Acceptance's November 4, 2013 revelation is demonstrated in the following stock chart:



391.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's disclosure that Defendant Roland was leaving the Company, the only bad news impacting World Acceptance on this date.  This executive resignation on the heels of the CFO resignation was viewed by investors as a signal that there were undisclosed problems at the Company.  Defendant Roland's resignation occurred not long after the Company announced the discovery of a "material weakness" in accounting for small-dollar loan renewals and was the second high-level resignation in a six-week period.

392.    After extracting general market and industry conditions, the stock price decline on November 4, 2013 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from November 1, 2013 through November 4, 2013, the

next trading day, negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market. As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on November 4, 2013, causing World Acceptance's stock price to fall further.



### D.     March 13, 2014 Disclosure

393.     The truth about World Acceptance's violative lending practices continued to emerge on March 13, 2014, when the Company filed a Form 8-K disclosing it was the focus of an investigation by the Bureau "to determine whether finance companies or other unnamed persons have been or are engaging in unlawful acts or practices in connection with the marketing, offering, or extension of credit in violation of Sections 1031 and 1036 of the Consumer Financial Protection

Act, 12 U.S.C. §§5531, 5536, the Truth in Lending Act, 15 U.S.C. §§1601, *et seq.*, Regulation Z, 12 C.F.R. pt. 1026, or any other Federal consumer financial law" and "also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest."

394.    As a result of the information revealed to the market on March 13, 2014, World Acceptance's stock immediately plummeted ***nearly 20%***, from a close of $97.32 on March 12, 2014 to a close of $78.25 on March 13, 2014, on abnormally high trading volume, as the market reacted to revelations in the Company's Form 8-K.  The drop would have been more dramatic had Defendants not falsely assured investors that World Acceptance's practices were above board and in compliance with all relevant laws and regulations.  The market's negative reaction to World Acceptance's March 13, 2014 revelation is demonstrated in the following stock chart:



395.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's illicit marketing and lending practices, which had been concealed or misrepresented by Defendants'

scheme and misstatements.  This decline would have been even more significant, however, had Defendants not falsely assured the market that the Company was in full compliance with the law.

396.   After extracting general market and industry conditions, the stock price decline on March 13, 2014 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from March 12 through March 13, 2014 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market.  As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on March 13, 2014, causing World Acceptance's stock price to fall below its peer index.



### E.    April 29, 2014 Disclosure

397.    Weeks later, on April 29, 2014, World Acceptance published its fourth quarter 2014 financial results, revealing significantly weakened loan growth due to a new Company policy ***not*** to encourage small-dollar loan renewals, which had previously comprised between 15% and 25% of World Acceptance's entire loan renewal portfolio.  This sudden change in refinancing practices exposed the extent to which World Acceptance had been improperly relying on small-dollar loan renewals to artificially inflate its reported loan volume and loan growth.

398.    As a result of the information revealed on April 29, 2014, World Acceptance's stock immediately fell ***nearly 10%***, from a close of $80.50 on April 28, 2014 to a close of $72.60 on April 30, 2014, on unusually heavy trading volume.   The market's negative reaction to World Acceptance's April 29, 2014 revelations is demonstrated in the following stock chart:



399.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the impact of small-

dollar loan renewals on the Company's artificially inflated reported loan volume and loan growth, which had been concealed or misrepresented by Defendants' scheme and misstatements.

400.    After extracting general market and industry conditions, the stock price declines between April 28, 2014 and April 30, 2014 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from April 28 through April 30, 2014 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market.  As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on April 29, 2014, causing World Acceptance's stock price to fall below its peer index.



### F.     September 5, 2014 Disclosure

401.     On September 5, 2014, the truth about the importance and seriousness of the Company's improper accounting practices and illicit business practices were further revealed, following the resignation of independent auditor KPMG.  Although the "material weakness" had been previously disclosed it was not until this date that the Company's independent auditor KPMG formally resigned.

402.     As a result of the information revealed to the market on September 5, 2014, World Acceptance's stock immediately dropped over 7.5%, from a close of $76.95 on September 5, 2014 to a close of $71.18 on September 8, 2015, on unusually heavy trading volume.  The market's negative reaction to World Acceptance's September 5, 2014 revelation is demonstrated in the following stock chart:



403.     The rapid decline in World Acceptance's stock price on this day was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's revelation that its independent auditor had resigned.

404.     After extracting general market and industry conditions, the stock price decline on September 8, 2014 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from September 5, 2014 through September 8, 2014, the next trading day, negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market.  As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on September 5, 2014, causing World Acceptance's stock price to fall below its peer index on September 8, 2014.



### G.    June 2, 2015 Disclosure

405.    The truth about World Acceptance's violative lending practices were further revealed on June 2, 2015, when the Company filed a Form 8-K with the SEC announcing the retirement of Defendant, CEO and Chairman of the Board, McLean effective September 30, 2015.  Defendant McLean's resignation occurred during a time when the Company was "navigating regulatory headwinds."  Further, McLean was the third Defendant to unexpectedly leave World Acceptance during the Class Period.

406.    As a result of the information revealed to the market on June 2, 2015, World Acceptance's stock fell over 5%, from a close of $80.51 on June 1, 2015 to a close of $75.89 on June 2, 2015.  The drop would have been more dramatic, however, Defendants falsely assured investors that McLean's departure was the result of a retirement and not the Company's fraudulent conduct and impending charges from the CFPB.  The market's negative reaction to World Acceptance's June 2, 2015 revelation is demonstrated in the following stock chart:



407.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's disclosure that Defendant McLean was leaving the Company, the only bad news impacting World Acceptance on this date.  This high level resignations was viewed by investors as a signal that there were undisclosed problems at the Company.  This announcement came weeks before the CFPB served its NORA Letter notifying the Company that it intended to file charges for its violative lending practices.

408.    After extracting general market and industry conditions, the stock price decline on June 2, 2015 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from June 1, 2015 through June 2, 2015, the next trading day, negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market.  As is evident below, this artificial inflation swiftly dissipated upon Defendants' revelations on June 2, 2015, causing World Acceptance's stock price to fall further below its peer index.



**H.     August 10, 2015 Disclosure**

409.    The truth about World Acceptance's violative lending practices further emerged on August 10, 2015, when the Company filed a Form 8-K with the SEC disclosing the receipt of a NORA letter from the CFPB stating that the CFPB's Enforcement Office expects to allege that the Company violated the Consumer Financial Protection Act of 2010, 12 U.S.C. §5536.  Any legal action against the Company by the CFPB will be the direct result of responses submitted by the Company to broad requests for the production of documents, answers to interrogatories and written reports related to loan made by World Acceptance and numerous other aspects of the Company's business.

410.    As a result of the information revealed to the market on August 10, 2015, World Acceptance's stock immediately plummeted more than 34%, from a close of $51.80 on August 10, 2015, to a close of $34.00 on August 11, 2015, on abnormally high trading volume, as the market reacted to the revelation in the Company's Form 8-K.  The market's negative reaction to World Acceptance's August 10, 2015 revelation is demonstrated in the following stock chart:



411.    The rapid decline in World Acceptance's stock price was the direct result of the nature and extent of the revelations made to investors and the market regarding the Company's illicit marketing and lending practices, which had been concealed or misrepresented by Defendants' scheme and misstatements.

412.    After extracting general market and industry conditions, the stock price decline on August 11, 2015 had statistical significance to the disclosure alleged.  The timing and magnitude of World Acceptance's stock price decline from August 10, 2015 to August 11, 2015 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrated the clear divergence of World Acceptance's stock price from the aggregate stock price of its peer index as the revelation of the truth became known to the market. As is evident below, this artificial inflation swiftly dissipated

upon Defendants' revelation on August 10, 2015, causing World Acceptance's stock price to fall further below its peer index.



413.    Additionally, the following chart demonstrates the clear divergence of WRLD's stock price from the aggregate stock price of its peer index as the July 3, 2013, July 25, 2013, November 4, 2013, March 13, 2014, April 29, 2014, September 5, 2014, June 2, 2015, and August 10, 2015 revelations of truth became known to the market:



World Acceptance Corp (WRLD) vs. Peer Group (PEER

414.    In sum, the rapid declines in World Acceptance's stock price following the Company's July 3, 2013, July 25, 2013, November 4, 2013, March 13, 2014, April 29, 2014, September 5, 2014, June 2, 2015, and August 10, 2015 disclosures were the direct result of the nature and extent of the revelations made to investors and the market regarding World Acceptance's illicit marketing and lending practices and improper reliance on small-dollar loan renewals to artificially boost loan growth, all of which had been concealed or misrepresented by Defendants' scheme and misstatements.  Thus, the revelations of truth following the close of the Class Period, as well as the resulting clear market reaction, support a reasonable inference that the market understood that World Acceptance's prior statements were false and misleading.  In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price

quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

415.    Accordingly, the economic loss, *i.e.*, damages, suffered by Plaintiff was a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated World Acceptance's stock price and the subsequent significant decline in the value of World Acceptance's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## IX.    PRESUMPTION OF RELIANCE

416.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which there was a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, the Defendants failed to disclose material information regarding World Acceptance's illicit lending and renewal practices.

417.    Plaintiff also is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations, because the market for World Acceptance's publicly traded securities was open, well-developed, and efficient at all times.  As a result of these materially false and misleading statements, World Acceptance's publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired World Acceptance's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to World Acceptance, and have been damaged thereby.

418.    At all relevant times, the market for World Acceptance's securities was an efficient market for the following reasons, among others:

(a)     World Acceptance's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, World Acceptance regularly made public filings with the SEC, including its Forms 10-K, Forms 10-Q, and related press releases;

(c)     World Acceptance regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d)     World Acceptance was followed by several securities analysts employed by major brokerage firms, such as Sterne, Agee & Leach, Inc., Sidoti & Company, LLC, and Stephens Inc., among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

419.     As a result of the foregoing, the market for World Acceptance's securities promptly digested current information regarding World Acceptance from all publicly available sources and reflected such information in the prices of World Acceptance's securities.

420.     Under these circumstances, all purchasers of World Acceptance's securities during the Class Period suffered similar injury through their purchase of World Acceptance's securities at artificially inflated prices and a presumption of reliance applies.

421.     At the times they purchased or otherwise acquired World Acceptance's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

422.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and the other members of the Class purchased the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## X.    NO SAFE HARBOR

423.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Indeed, the risk warnings that may have been provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

424.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking

statements because, at the time each of those forward-looking statements was made, as detailed above in the Substantive Allegations section, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of World Acceptance who knew that those statements were false or misleading when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

425.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of World Acceptance between January 30, 2013 and August 10, 2015, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

426.    Because World Acceptance has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable.  According to World Acceptance's SEC filings, as of shortly before the close of the Class Period, World Acceptance had over 9 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

427.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

428.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

429.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

430.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)    whether the market prices of World Acceptance's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages as a result of the decline in value of World Acceptance's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS**

431.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

432.    During the Class Period, World Acceptance and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff, and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of World Acceptance's publicly traded securities; and (iii) cause Plaintiff and the other members of the Class to purchase World Acceptance's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, World Acceptance and the Individual Defendants, and each of them, took the actions set forth herein.

433.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of World Acceptance, as alleged below.

434. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition, and operational performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

435. World Acceptance and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about World Acceptance's illicit lending and renewal practices, as specified herein.

436. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of World Acceptance's value, performance and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about World Acceptance's lending

practices and loan growth and omitting to state material facts necessary in order to make the statements made about those practices and growth not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of World Acceptance's securities during the Class Period.

437. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (i) the Individual Defendants were high-level executives at the Company during the Class Period; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in, the creation, development, and reporting of the Company's sales, marketing, projections, and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's sales trends and promotional activities at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

438. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing information regarding the Company's illicit lending and renewal practices from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Individual Defendants'

misstatements and omissions throughout the Class Period regarding the strength of World Acceptance's regulatory compliance and loan growth, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

439.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of World Acceptance's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of World Acceptance's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with deliberate recklessness by, Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired World Acceptance's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

440.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of World Acceptance's fraudulent practices, the true nature and prospects of its business, or World Acceptance's true intrinsic value, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their World Acceptance publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

441.    By virtue of the foregoing, World Acceptance and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

442.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from World Acceptance's stock.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

443.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

444.    The Individual Defendants acted as controlling persons of World Acceptance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

445.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

446.    As set forth above, World Acceptance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from World Acceptance's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  December 18, 2015                    MOTLEY RICE LLC

                                                            *s/ David P. Abel*
                                            DAVID P. ABEL
                                            (D.S.C. Bar No. 11395)

                                            MARLON E. KIMPSON
                                            28 Bridgeside Blvd.
                                            Mount Pleasant, SC  29464
                                            Telephone:  843/216-9000
                                            843/216-9450 (fax)
                                            dabel@motleyrice.com
                                            mkimpson@motleyrice.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            JACK REISE (*pro hac vice*)
                                            STEPHEN R. ASTLEY (*pro hac vice*)
                                            ELIZABETH A. SHONSON (*pro hac vice*)
                                            BAILIE L. HEIKKINEN *(pro hac vice)*
                                            JANINE D. ARNO *(pro hac vice)*
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)
                                            jreise@rgrdlaw.com
                                            sastley@rgrdlaw.com
                                            eshonson@rgrdlaw.com
                                            bheikkinen@rgrdlaw.com
                                            jarno@rgrdlaw.com

                                            *Counsel for Operating Engineers Construction
                                            Industry and Miscellaneous Pension Fund*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 18, 2015, I authorized the electronically filed of the

foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic

Filing to all counsel of record.

*s/David P. Abel*

DAVID P. ABEL

(D.S.C. Bar No. 11395)
