

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | | |
|---|---|---|
| EDNA SELAN EPSTEIN, Individually and on | § | |
| Behalf of All Others Similarly Situated, | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 6:14-CV-01606-MGL |
| vs. | § | |
| | § | |
| WORLD ACCEPTANCE CORPORATION, | § | |
| A. ALEXANDER MCLEAN, III, JOHN L. | § | |
| CALMES, JR., KELLY M. MALSON, and | § | |
| MARK ROLAND, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO DISMISS

## I.      INTRODUCTION

This case was filed under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated by the Securities Exchange Commission (SEC), 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the matter under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.  Pending before the Court is Defendants World Acceptance Corporation (World Acceptance or the Company), A. Alexander McLean, III, John L. Calmes, Jr., Kelly M. Malson, and Mark Roland's (Individual Defendants, or, collectively with World Acceptance, Defendants) Motion to Dismiss Plaintiff's Second Amended Complaint by way of Rule 12(b)(6) of the Federal Rules of Civil Procedure.  ECF No. 132.  Having considered the motion, the memoranda, the response, the reply, the

record, and the applicable law, it is the judgment of the Court that Defendants' Motion to Dismiss will be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

According to the allegations in Plaintiff's Second Amended Complaint, "World Acceptance is a small loan consumer finance business that specializes in sub-"subprime" lending[,]" offering short- and medium-term installment loans. ECF No. 126 at 2. In fiscal year 2014, most of the Company's outstanding loans "were issued to consumers with low FICO credit scores who had been turned down by traditional sources of credit such as commercial banks, credit unions, and credit card lenders" and who were often jobless, elderly, or disabled. ECF No. 138 at 4-5. Plaintiff claims the lending practices of World Acceptance were generally designed to trap borrowers in debt while the Company profited. For example, Plaintiff alleges the Company, acting through its senior executives, tricked customers into purchasing unneeded insurance products paid for by borrowers but solely benefitting the Company, such as credit life insurance that provided full payment of the borrower's credit obligation to World Acceptance if the borrower died before repaying the loan. *Id.* at 5. The fees and premiums associated with these insurance products also artificially inflated loan interest rates. *Id.*; ECF No. 126 at 27. Further, Plaintiff avers the Company regularly encouraged branch managers to complete "small-dollar" renewals in which loans were refinanced even when borrowers had repaid less than 10% of the original balance. ECF No. 138 at 5-6.

On July 3, 2013, the Company revealed to the public the filing of a Form NT 10-K/A, a document that disclosed World Acceptance was unable to file a completed Form 10-K for the fiscal year ending March 31, 2013, due to "unexpected delays in completing [its] financial

statements relating to additional review and analysis needed to support the Company's allowance for loan losses," and requested additional time from the SEC to file the form. *Id.* at 6. The Company also announced, "it is possible that the Company's . . . Form 10-K will report a material weakness in its internal control over financial reporting relating to its process for determining its allowance for loan losses, as well as reporting the measures it is undertaking to remediate any such weakness." *Id.* at 6-7.

World Acceptance avers, during this time, it realized its internal control over financial reporting "to assess its compliance with the accounting rules" for small-dollar loan renewals—especially where the borrower had less than 10% paid down—was inadequate. ECF No. 132-1 at 7. Looking into this material weakness, World Acceptance and KPMG LLP, the Company's auditor, determined the material weakness's effect on the accuracy of the Company's financial statements was immaterial, and as such, a "restatement" was unnecessary. *Id.* at 8. After the July 3 announcement, World Acceptance's stock price fell over 12% on the following trading day. ECF No. 138 at 7. On July 19, 2013, the Company filed [a] . . . Form 10-K, and that day its stock price increased by a little less than 4%, from $82.07 to $85.18. ECF No. 126 at 65.

On July 25, 2013, Defendant disclosed to investors it had found a material weakness in World Acceptance's treatment of small-dollar loan renewals, which comprised up to 25% of the Company's entire renewal portfolio. ECF No. 138 at 7. The Company assured investors, however, that it would correct the policies and said, "Importantly, this material weakness has no impact on the collectability of our loan portfolio." ECF No. 126 at 70. In a conference call later that day, an analyst asked Defendant McLean, CEO and Chairman of the Board of Directors, whether he thought changes in business practices would have a negative effect on the Company. ECF No. 132-1 at 8-9; ECF No. 126 at 134. Defendant McLean responded, "I do not believe [no

3

longer encouraging sub-10% renewals] will represent a material impact on our operations or results." ECF No. 132-1 at 8-9. After this announcement, the Company's stock price declined over 4% that day on unusually heavy trading volume. ECF No. 138 at 7.

On September 10, 2013, World Acceptance announced its CFO, Defendant Malson, would retire. *Id.* Shortly thereafter, on November 4, 2013, World Acceptance announced its COO, Defendant Roland, had resigned. *Id.* Later that day, the stock price declined over 12%, again on heavy trading. *Id.*

World Acceptance revealed on March 13, 2014, that it had received a Civil Investigation Demand (CID) from the Consumer Financial Protection Bureau (CFPB) to look into "potentially unlawful practices in the marketing and extension of credit." *Id.* That day, World Acceptance's stock fell almost 20%. *Id.*

On April 29, 2014, World Acceptance announced systemic changes in the Company's renewal policies as a direct result of its material accounting weakness, saying it would stop encouraging small-dollar loan renewals and admitting these system changes created the lowest quarterly loan growth in at least nine years. *Id.* at 7-8. The Company's stock price fell about 10% on unusually heavy trading volume the following day. *Id.* at 8.

Meanwhile, during the investigatory period, the Company periodically updated the market regarding the CFPB investigation. ECF No. 132-1 at 5. For example, on June 12, 2014, World Acceptance asserted:

> While the Company believes its marketing and lending practices are lawful, there can be no assurance that the CFPB's ongoing investigation or future exercise of its enforcement, regulatory, discretionary or other powers will not result in findings or alleged violations of federal consumer financial protection laws that could lead to enforcement actions, proceedings or litigation and the imposition of damages, fines, penalties, restitution, other monetary liabilities, sanctions, settlements, or changes to the Company's business practices or operations that could have a material adverse effect on the Company's business, financial

condition or results of operations or eliminate altogether the Company's ability to operate its business profitably or on terms substantially similar to those on which it currently operates.

*Id.* (emphasis omitted).  The next month**,** on a conference call with analysts, Defendant McLean said, "[W]e really don't believe we are doing anything wrong and it would be very nice if they would finish their review within the six months and go onto a different project."  ECF No. 126 at 101.

Shortly thereafter, on September 5, 2014, the Company made an announcement that KPMG, after serving as World Acceptance's independent auditor for twenty years, had resigned. ECF No. 138 at 8.  The Company's stock price dropped 7.5% the next trading day.  *Id.*  Then, on June 2, 2015, the Company announced Defendant McLean's retirement, and its stock price dropped over 5% by the end of that day.  *Id.*; ECF No. 126 at 6.

Finally, on August 10, 2015, the Company announced its receipt of a Notice of Opportunity to Respond and Advise (NORA) letter from the CFPB on August 7, 2015, which said the CFPB's Enforcement Office was "considering recommending that the CFPB take legal action against the Company" and "expect[ed] to allege that the Company violated the [Consumer Financial Protection Act]."  ECF No. 138 at 8-9.  World Acceptance's stock price plummeted more than 34% the following day.  *Id.* at 9; ECF No. 126 at 135.

Edna Selan Epstein originally commenced this putative securities class action on April 22, 2014, on behalf of herself and all investors who purchased or acquired World Acceptance common stock between April 25, 2013, and March 12, 2014.  ECF No. 1 at 1.  On June 23, 2014, both Epstein and Operating Engineers Construction Industry and Miscellaneous Pension Fund (Operating Engineers) moved for appointment as Lead Plaintiff.  ECF Nos. 11 & 13.  This Court appointed Operating Engineers as Lead Plaintiff on July 22, 2014.  ECF No. 47.

On August 12, 2014, Plaintiff filed an Amended Complaint, alleging the Company, as well as Individual Defendants as agents of the Company, participated in a fraudulent scheme to inflate World Acceptance's stock price artificially by misrepresenting and concealing information about World Acceptance's business practices.  ECF No. 50 at 1.  Defendants filed a Motion to Dismiss the Amended Complaint on September 16, 2014, for failure to state a claim upon which relief can be granted, ECF Nos. 58 & 59.  On May 18, 2015, this Court denied that motion, ECF No. 74.

On November 16, 2015, Plaintiff filed a Motion for Class Certification.  ECF No. 121.  Plaintiff also filed its Second Amended Complaint on December 18, 2015, on behalf of "all persons or entities who purchased or acquired shares of World Acceptance (the Class) between January 30, 2013, and August 10, 2015, inclusive (the Class Period)," which extended the Class Period from the Amended Complaint.  ECF No. 126 at 1.  Individual Defendants—McLean, Calmes, Malson, and Roland—were all senior executive officers of World Acceptance prior to and during a portion of the Class Period.  *Id.* at 8.  In addition to setting forth the same allegations from the Amended Complaint and lengthening the Class Period, Plaintiff's Second Amended Complaint includes updates since Plaintiff filed the action, including resignations by officials, the receipt of the NORA letter, and additional statements by Defendants.

On January 29, 2016, Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint.  ECF No. 132.  Plaintiff filed a response in opposition on March 10, 2016, ECF No. 138, and on April 8, 2016, Defendants filed their reply.  ECF No. 141.  The Court, having been fully briefed on the relevant issues, will now turn to the merits of Defendants' motion.

III.    STANDARD OF REVIEW

Defendants move to dismiss this putative securities fraud class action lawsuit under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the Second Amended Complaint fails to satisfy the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA) and Federal Rule of Civil Procedure 9(b).  ECF No. 132.  Therefore, according to Defendants, Plaintiff fails to state a claim for which relief may be granted.  *Id.*

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering the motion, a court accepts all of a plaintiff's well-pled allegations as true and liberally construes all reasonable inferences in the plaintiff's favor.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  The court may consider only the facts alleged in the complaint, which may include any documents referenced, and matters of which the court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To establish liability under § 10(b) of the Exchange Act and under Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 n.2 (4th Cir. 2007) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  A company is liable under § 10(b) if its officials who issued the statements possess the requisite mental state.  *See Tellabs*, 551 U.S. at 328.  Additionally, § 20(a) of the Exchange Act assigns joint and several liability to one in control of another who violates a security regulation under § 10(b).

In a securities fraud case, a plaintiff must also satisfy the heightened pleading standards of Rule 9(b) and the PSLRA. *See Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009). Rule 9(b), which governs all actions alleging fraud, requires the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In addition, the PSLRA requires a plaintiff alleging securities fraud to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (internal citations and quotations omitted). The PSLRA modifies the traditional 12(b)(6) analysis "(1) by requiring a plaintiff *to plead facts* to state a claim[,] . . . (2) by authorizing the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Hunter*, 477 F.3d at 172. The PSLRA also requires a plaintiff to plead sufficient facts "to raise a *strong inference* of scienter." *Id.* A district court must dismiss a complaint on motion of any defendant if the plaintiff fails to meet the pleading requirements of the PSLRA. 15 U.S.C. § 78u-4(b)(3)(A).

## IV.    CONTENTIONS OF THE PARTIES

Defendants contend this Court should refrain from deferring to its holdings in its prior Order on Defendants' previous motion to dismiss when judging the sufficiency Plaintiff's Second Amended Complaint. ECF No. 132-1 at 32-33. Instead, Defendants urge the Court to engage in a "statement-by-statement analysis," and consider Plaintiff's assertions "anew." *Id.*; ECF No. 141 at 2.

Defendants also posit four arguments attacking the sufficiency of Plaintiff's allegations that they violated § 10(b) of the Exchange Act. ECF No. 132-1. First, Defendants maintain that

any statements they made indicating they believed World Acceptance's company practices were compliant with legal authority—allegations added in Plaintiff's Second Amended Complaint—were neither false nor misleading. *Id*. at 13. Defendants contend these were opinion statements and Plaintiff has neglected to assert any facts "cast[ing] doubt on the sincerity of Defendants' belief[s]." *Id*. at 15. Next, Defendants aver Plaintiff insufficiently pled a strong inference of scienter with regards to Defendants' statements concerning World Acceptance's material weakness, as required by the PSLRA. *Id*. at 17. Third, Defendants stress Plaintiff's Second Amended Complaint inadequately pleads the element of loss causation required in securities fraud cases. *Id*. at 20. Fourth and finally, Defendants argue because Plaintiff's § 10(b) claims are inadequate, its derivative § 20(a) claims must also fail. *Id*. at 33.

Plaintiff counters that the Court's treatment of Defendants' Motion to Dismiss should be governed by the law of the case doctrine, which it argues precludes Defendants from reasserting arguments already addressed by this Court and mandates evaluating Defendants' new arguments consistently with the Court's prior determinations in its previous Order. ECF No. 138 at 10-12.

Plaintiff alleges Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 by concealing illicit business and lending practices and artificially inflating the market price of World Acceptance's securities through misrepresentations and omissions. ECF No. 126 at 1. Plaintiff advances in its Second Amended Complaint that it "purchased World Acceptance common stock at artificially inflated prices during the Class Period and suffered an economic loss" when a series of disclosures revealed the truth about the Company's allegedly unlawful lending practices and inflated loan growth, causing the stock price to decline. *Id*. at 7.

Specifically, Plaintiff argues World Acceptance employed two particular illicit practices to "create the perception of significant loan growth," allegations largely based on the accounts of confidential former employees. *Id.* at 2-3, 11-15.

The first of these, as already described above, is World Acceptance's alleged practice of regularly tricking its customers into purchasing "worthless" and unneeded credit insurance products borrowers paid for but that solely benefitted the Company. *Id.* at 2. Second, Plaintiff asseverates the Company relentlessly pushed employees to convince customers to refinance their loans before they had paid back even 10% of their debt, thereby locking them "into an endless cycle of debt." *Id.* at 2. Plaintiff asserts that these practices allowed World Acceptance to create the perception of loan growth, where Defendants were actually "improperly accounting for many of [these] renewals in violation of Generally Accepted Accounting Principles (GAAP)." *Id.* at 3. Plaintiff maintains Defendants acted with scienter in that they repeatedly misrepresented the lawfulness of these practices, despite that they were aware, or reckless in being unaware, the practices were illegal. ECF No. 138 at 17.

According to Plaintiff, Defendants' "fraudulent scheme" came to the attention of the Company's investors "through a series of partial disclosures, which caused significant investor losses." *Id.* at 1-2. These disclosures, which began in July 2013 and lasted through August 2015, announced a material weakness in the Company's renewal portfolio, changes in company practices, several "suspicious" resignations, and the receipt of a CID and a NORA letter. *Id.* at 6-9. Plaintiff further asserts these "partial disclosures" revealed "a series of misstatements and omissions" regarding the lawfulness of the Company's practices and the financial impact of implementing changes in these practices, resulting in losses for the class members and violating § 10(b). *Id.* at 3.; ECF No. 126 at 1. In addition to their liability as participants in the alleged

wrongs, Plaintiff argues Individual Defendants also violated § 20(a) of the Exchange Act through their roles as "controlling persons" of World Acceptance.  ECF No. 138 at 9.

## V.    DISCUSSION AND ANALYSIS

### A.    Law of the Case Doctrine

As a preliminary matter, before the Court discusses the primary contentions of the parties, it will consider the validity of the parties' "law of the case doctrine" arguments.  Plaintiff propounds that the law of the case doctrine requires that this Court's determinations in its prior Order denying Defendants' previous motion to dismiss bear on the instant motion.

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  Although the court remains free to deviate from its prior decisions, as the doctrine is discretionary and simply "expresses the practice of courts generally to refuse to reopen what has been decided," as a general practice, "courts should be loath[] to [revisit prior decisions] in the absence of extraordinary circumstances."  *Id.* at 817 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912) (internal quotations omitted)).  In fact, the Fourth Circuit has stated the law of the case doctrine should be disregarded only if: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice."  *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (internal citations omitted).

Defendants argue interlocutory orders are unconstrained by the law of the case doctrine and suggest the doctrine is limited to cases where an appellate decision bears on a district court's later decision. This, however, is a misinterpretation of the doctrine. Although the Fourth Circuit stated in *American Canoe Ass'n v. Murphy Farms, Inc.*, that "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted," it also emphasizes that a district court is not required to use this power—it is discretionary and should typically be used only where the court is clearly at risk of otherwise reaching the wrong result. 326 F.3d 505, 514-15 (4th Cir. 2003).

In this case, without a subsequent trial producing new evidence or any change in controlling authority, the only remaining reason for this Court to abandon its prior determinations and review this case anew under Plaintiff's version of the "law of the case doctrine" is if applying the principles from this Court's prior order would be "clearly erroneous and would work manifest injustice." *See Aramony*, 166 F.3d at 661. But, "[a] prior decision does not qualify for this third exception by being just maybe or probably wrong; it must strike [the Court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009). The Court's previous order fails to conform to this standard.

But, there appears to be a wrinkle in this law. Defendants cite to an unpublished Fourth Circuit opinions that states that the "law of the case" doctrine is inapplicable to motions to dismiss. *See. e.g. Plotkin v. Lehman*, 178 F.3d 1285 (4th Cir. 1999) (table). But, "[c]itation of [the Fourth Circuit's] unpublished dispositions issued prior to January 1, 2007, in briefs  . . . in the district courts within this Circuit is disfavored." Local App. Rule 32.1.

Having considered the arguments of both sides, the Court holds that whether the "law of the case" doctrine applies or not, the Court's determination as to each of the issues presented to it remains the same.  Hence, the Court need not reach a conclusion on whether to apply the doctrine to decide this motion.  Instead, the Court is of the firm opinion that its previous order is free from any factual or legal error.  Thus, whether the "law of the case" doctrine is applicable here is of no moment.

 With this in mind, this Court will re-scrutinize its prior holdings only where Defendants have alleged an error.  Here, Defendants specifically argue this Court's prior Order was in error with regard to its treatment of a portion of the loss causation element, discussed in more detail below.  For all other elements, this Court's discussion will restate its prior holding but mainly focus on Plaintiff's new assertions in its Second Amended Complaint and Defendants' arguments regarding those allegations.

**B.     Section 10(b) and Rule 10b-5 Claim**

Section 10(b) of the Exchange Act prohibits the use of manipulative or deceptive devices "in connection with the purchase or sale[] of any security."  15 U.S.C. § 78j.  Defendants' motion contests only three of the elements, listed above, of a claim for a § 10(b) violation: (1) the existence of a misrepresentation or omission, (2) a strong inference of scienter, and (3) a causal connection between the material misrepresentation and the economic loss experienced by the Plaintiff—otherwise known as "loss causation."  ECF No. 132-1.

*1.     False Statement or Omission of Material Fact*

The first element of a securities fraud action requires a plaintiff to point to a "factual statement or omission that is false or misleading and that is material."  *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (emphasis omitted).  In other words, "[i]f a reasonable

investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a § 10(b) claim." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (internal citations omitted).

The plaintiff's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). It is enough for the plaintiff to simply allege "*sufficient facts* to support a *reasonable belief* in the allegation that the defendant's statement was misleading." *Hunter*, 477 F.3d at 174. Reliance on confidential sources in alleging these facts is permissible so long as the plaintiff "describe[s] the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (internal quotations omitted). Furthermore, "opinion or puffery" can be actionable as long as it is false and material, such as if senior executives "did not believe what they said they believed." *Longman*, 197 F.3d at 683; *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (finding an opinion statement nonactionable where the plaintiff neglected to contest the opinion was honestly held and explicitly disclaimed an allegation of fraud or deception); *see also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) ("[T]o plead that an opinion is a false factual statement . . . the complaint must allege that the opinion expressed was different from the opinion actually held by the speaker.").

Finally, because § 10(b) claims are fraud claims, the plaintiff must satisfy the pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure, which requires all elements of fraud be stated with particularity. A plaintiff satisfies this requirement when it

pleads with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009), *rev'd on other grounds, Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 (2011).

This Court addressed Plaintiff's initial assertions of Defendants' false and misleading statements and omissions in its previous order, holding them sufficiently pled. In the absence of any specific argument from Defendants that this Court's erred in making its prior determinations on this issue, the Court turns its attention to Plaintiff's new allegations, which fall into two general categories: (1) misleading statements by Defendants regarding the lawfulness of the Company's lending practices and (2) omissions by Defendants concealing the material weakness and its impact on the Company.

In the Second Amended Complaint, numerous confidential former employees explain how supervisors encouraged them to enforce illicit business practices that gave loans to customers well below the floor for legal subprime credit scores, deceive customers into purchasing unnecessary insurance products, and renew loans before customers had paid off even 10% of the loan balance. ECF No. 126 at 16-38. One former employee recalled being told by his manager to "look for reasons to give the loan," and another remembered his superior saying everyone who applied for a loan from the Company "should be approved for 'something' because 'everyone qualifies' for a starter loan." *Id.* at 22-23. Further, employees described an "implied understanding" between District Supervisors and Branch Managers that they "should do whatever was needed to reach their monthly quotas," which generally involved ignoring written company policies and procedures. *Id.* at 23-24. The employees also described aggressive practices for insurance policies, including "automatically includ[ing] insurance

15

premiums on all loans and . . . tell[ing] borrowers the insurance products were mandatory, even though that was not the case."  *Id.* at 25.

Plaintiff contends Defendants repeatedly stated they believed their business and lending practices were lawful when in actuality they were aware, or severely reckless in being unaware, of the unlawfulness, employing "a corporate culture of looking the other way."  ECF No. 138 at 17; ECF No. 126 at 25; *see, e.g.*, ECF No. 126 at 56, 67, 77, 84, 90 ("Defendants knew that World Acceptance's predatory practices widely used around the Company flew in the face of federal and state consumer financial protection laws and regulations.").

Between March 2014 and August 2015, the Company issued numerous statements in its reports on forms to the SEC, such as, and as already quoted, "While the Company believes its marketing and lending practices are lawful, there can be no assurance that CFPB's ongoing investigation . . . will not result in findings or alleged violations of federal consumer financial protection laws."  *See* ECF No. 126 at 97; *see also, e.g.*, ECF No. 126 at 102, 108, 112, 119, 123, 129.  Conference calls with Individual Defendants produced similar statements, such as during the aforementioned earnings call in which Defendant McLean said, "we really don't believe we are doing anything wrong."  ECF No. 132-1 at 14.  Despite these assurances, Defendants were in violation of state opt-in and usury laws, as well as federal and state consumer financial protection laws and regulations—policies which Plaintiff argues ultimately led to CFPB scrutiny and the receipt of the NORA letter.  ECF No. 126 at 99.

Applying the relevant law, this Court determines knowledge of World Acceptance's practices would have been material to a reasonable investor, especially after CFPB announced an investigation into the Company.  Although Defendants propound *Omnicare* requires a showing that a defendant's opinion statement is inconsistent with the opinion he actually held at the time,

this Court holds, taking all of Plaintiff's factual allegations as true, Plaintiff has pled sufficient facts to support a reasonable inference Defendants were aware, or severely reckless in being unaware, that the Company's widespread, multi-district practices violated the law.  *See* 135 S. Ct. at 1328-30.

Further, *Omnicare* is distinguishable from this case, as the plaintiff in *Omnicare* explicitly disclaimed any allegations of deception, instead solely alleging the defendants' stated beliefs turned out to be untrue.  *Id.* at 1324.  Here, on the other hand, Plaintiff alleges Defendants either knew, or recklessly ignored, their company practices were unlawful and pleads sufficient facts to show this.  For example, Plaintiff alleges facts illustrating the Company's aggressive approach to lending and its policy of forcing sales of insurance products violated state opt-in and usury laws.  *See* ECF No. 138 at 17; *see, e.g.*, ECF No. 126 at 23-24.  The existence of these practices creates a compelling inference of truth that Defendants knew of the Company's illicit behavior, as Defendants state they kept a close eye on the day-to-day happenings of the business.  *See, e.g.*, ECF No. 126 at 87.

Defendants also argue *Omnicare* provides the omission of a rebutting fact "fails to render a statement of opinion . . . misleading."  ECF No. 141 at 4 (internal citations omitted).  This is a misinterpretation of the text of *Omnicare*.  Although *Omnicare* acknowledges omissions can be insufficient in some cases to render a statement misleading, it goes on to explain "if the issuer [of the statement] made the statement . . . with knowledge that the [f]ederal [g]overnment was taking the opposite view," for example, then a reasonable investor could deem this statement "misleading" if the statement fails to "align[] with the information in the issuer's possession at the time."  *Omnicare*, 135 S. Ct. at 1329.

Here, the CFPB investigation and NORA letter are indicative the federal government may have a differing opinion on World Acceptance's legal compliance—despite the fact that the commencement of an investigation itself is inconclusive.   That Defendants would feel comfortable continuously expressing their beliefs that the Company's business practices were legally compliant in the face of these investigatory challenges would give their statements more weight to a reasonable investor.   Thus, a reasonable investor could rely on Defendants' willingness to issue these statements as a sign they had information in their possession unbeknown to the government that made them comfortable stating the Company's practices were legal.  If the statements were later found to be out of line with what the speaker actually knew or believed, they would be "misleading."   But even disregarding the government's investigation, Plaintiff has pled sufficient facts to draw a reasonable inference that Defendants either knew, or recklessly ignored, the Company's practices were inconsistent with the law.

Next, Plaintiff asserts Defendants concealed the material weakness and the impact of changes in their business practices on the Company's overall financial condition.  ECF No. 138 at 13.   According to Plaintiff, Defendants both failed to disclose the Company's illicit practices—instead filing a Form NT 10-K/A to request additional time—and represented there was only a "possibility" it may announce a "material weakness" when Defendants allegedly already knew one existed.  ECF No. 126 at 66, 68.  Plaintiff avers Defendants regularly "tout[ed] increased revenue and loan growth, which were driven by the Company's later-admitted predatory practices," and "continued to mislead investors as to the illicit practices that led to the 'material weakness' in internal control over financial reporting."  *E.g.*, *id.* at 68, 78, 84-85, 91, 99, 103.  More specifically, Plaintiff cites many instances in which Defendants assured investors the material weakness—and system changes related to it—would be inconsequential, such as

when the Company stated, "this material weakness has no impact." *Id.* at 70. But Plaintiff asseverates Defendants knew, or recklessly ignored, that this weakness would have an impact, as any changes related to the material weakness "fundamentally altered the Company's business model." *E.g.*, *id.* at 82, 84-85, 98, 102, 109, 113, 119, 123.

Defendants avow many of these statements are "forward-looking" and thus are nonactionable under the Exchange Act's "safe harbor" provision, which covers: (1) statements identified as a forward-looking statement and accompanied by "meaningful cautionary language" that warns actual results may differ, (2) an immaterial forward-looking statement, or (3) instances in which the plaintiff fails to prove the forward-looking statement was made with "actual knowledge . . . that the statement was false or misleading." *See* 15 U.S.C. § 78u-5(c)(1)(A)-(B). This Court already addressed this argument in its prior Order, however, and as such, it declines to revisit the argument today. *See Epstein v. World Acceptance Corp.*, No. 6:14-CV-01606-MGL, 2015 WL 2365701, at *6 (D.S.C. May 18, 2015) (holding that the statements cannot be "clearly classified as forward-looking or as mere immaterial puffery at this stage of the litigation," so the Court declines to extend absolute immunity here).

Consequently, this Court holds Plaintiff has pled sufficient facts to allege many misrepresentations and omissions by Defendants. Plaintiff points to numerous, material misleading statements and omissions, stating the reasons the statements were misleading and the facts upon which this allegation is formed. *See* 15 U.S.C. § 78u-4(b)(1). Further, Plaintiff pled the details with sufficient particularity to support a "reasonable belief" the statements were misleading because Defendants did not believe what they said they believed. *See Hunter*, 477 F.3d at 174; *see also Longman*, 197 F.3d at 683. Finally, Plaintiff also successfully alleged what

Defendants "obtained thereby," by showing that investors' reliance on these statements helped artificially inflate the Company's stock price.  *See in re Mut. Funds Inv. Litig.*, 566 F.3d at 120.

The Court also holds Plaintiff's reliance on confidential sources is permissible, as it described the sources with sufficient particularity to lend them credibility.  *See Hunter*, 477 F.3d at 174.  Although Defendants deny Plaintiff's allegations and assert their own arguments to refute Plaintiff's position, the Court need not address these arguments when reviewing the pleadings on a motion to dismiss—all that is necessary at this stage is whether Plaintiff has alleged sufficient facts that, if true, would form a basis for relief.  *See id.* at 173.  The Court holds Plaintiff has done so here.

### 2.    *Strong Inference of Scienter*

Defendants' Motion to Dismiss also challenges whether Plaintiff raised a strong inference of scienter with respect to the statements relating to the Company's material weakness.  In a securities fraud action, a plaintiff is required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A state of mind satisfying scienter should show an "intent to deceive, manipulate, or defraud."  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (internal citation omitted).  Alternatively, allegations of reckless conduct are enough to satisfy the scienter requirement to the level necessary to survive a motion to dismiss.  *Hunter*, 477 F.3d at 174.  The defendant must have had the necessary state of mind at the time the misstatements were made.  *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 388 (4th Cir. 2005).  Although a "strong inference of scienter" must be "powerful or cogent," it is unnecessary that the inference be "irrefutable . . . or even the most plausible of competing inferences."  *See Tellabs*, 551 U.S. at 323-24 (internal quotations omitted).

The allegations of scienter should be evaluated "holistically" and afforded "the inferential weight warranted by context and common sense." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009). Relevant factors considered by the Fourth Circuit include "when there are sufficient red flags to alert senior officers to the unreliability of statements about internal controls and financial information." *Id.* at 188. In addition, the Fourth Circuit has held that certain GAAP violations may help support an inference of scienter for pleading purposes." *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d at 389. Any attempt by the moving party to assert its own version of events should be disregarded, as facts alleged in a plaintiff's complaint are all accepted as true at this stage in the case. *See Zak*, 780 F.3d at 601.

Plaintiff alleges Individual Defendants acted with scienter by issuing public statements and documents in the name of the Company inflating loan growth and painting a false picture of the Company's health when, in fact, they knew, or recklessly ignored, that the Company's business practices violated federal securities laws and that changing the Company's loan renewal practices would hugely impact the Company. ECF No. 126 at 41. Plaintiff also asserts Defendants were aware, or reckless in being unaware, that the Company's practices were in violation of GAAP. ECF No. 138 at 17. Plaintiff provides numerous examples of instances it argues give rise to an inference of scienter. Several of these arguments were also present in the Amended Complaint, and have thus already been deemed acceptable by this Court, including:

(1) "Defendants' issuance of installment loans and renewals thereof were the core business of World Acceptance during the Class Period, and were tracked closely by Defendants on a daily basis (¶¶116, 126, 132-133, 238);

(2) "Defendants admitted to addressing the Company's material weakness, including implementing appropriate procedures to monitor small dollar loan renewals 'much more closely' and ensuring that all of the necessary accounting systems were in place (¶¶115-117, 122-131, 238);

(3) "the significant magnitude and duration of Defendants' fraud (supported by the corroborated accounts of a dozen former Company insiders nationwide) (¶133); and

(4) "Defendants' illicit practices received media and government scrutiny, which Defendants addressed, evidencing their awareness of practices called into question and their investigation of the same (¶¶134-142)."

ECF No. 138 at 18-19.

Further, Plaintiff pleads new facts in its Second Amended Complaint, which it argues also give rise to a strong inference of scienter.  *Id.*  First, Plaintiff propounds the receipt of the CID and the NORA letter is "compelling evidence of scienter."  *Id.* at 19.  Plaintiff explains the Company had to investigate its own practices to respond to the broad discovery requests of the CID, so the fact that the information provided by World Acceptance resulted in a NORA letter indicates "Defendants knew or had access to information regarding the Company's predatory and deceptive lending practices."  *Id.*  Additionally, Plaintiff posits the departures of three of the four Individual Defendants—the Company's most senior executive officers—contributes to an inference of scienter, as they "evince a consciousness of guilt," particularly when considered "against the backdrop" of a number of red flags, including identification of a material weakness, revelations and major changes in the Company's business practices, KPMG's resignation.  *Id.* at 20.

Defendants asseverate that because the Company determined none of its financial data needed to be restated after the material weakness was found, Plaintiff's assertions that loan growth and volume figures were "inflated" must be false.  ECF No. 132-1 at 18 n.5.  Defendants also advance that KPMG, the Company's auditor, "consistently provided unqualified audit opinions approving World Acceptance's financial statements as well as unqualified opinions the Company's internal control over financial reporting was effective."  *Id.* at 18.  Evaluating whether a plaintiff has sufficiently pled a strong inference of scienter, however, is a totality of the circumstances determination.  So, World Acceptance's financial statements being deemed

permissible and KPMG's audit opinions are insufficient on their own to counter the existence of scienter absolutely. *See Deloitte,* 551 F.3d at 313.

Similarly, Defendants maintain the resignation of the Company's auditor fails to create a showing of scienter, and might even negate it, as the Company's Form 8-K announcing KPMG's resignation indicated "no disagreements" between the parties. ECF No. 132-1 at 20. This argument is lacking for the same reason as Defendants' previous one: under a holistic analysis, any factor by itself is inadequate to reveal or refute the presence of scienter.

In addition, Defendants contend "a company does not commit securities fraud when . . . it is alerted to a theretofore unknown issue with its accounting controls and promptly takes steps to fix it." *Id.* at 19. Defendants go on to further downplay the problem discovered by saying the material weakness was "limited to compliance with a single GAAP rule concerning sub-10% refinancings." *Id.* Sub-10% refinancings, however, made up a significant percentage of World Acceptance's loan renewal portfolio—up to 25%—so in the context of this particular company, compliance with this "single GAAP rule" has a significant—and later seen to be material— impact on the Company's financials. *See* ECF No. 138 at 5. Under Fourth Circuit law, some GAAP violations may support an inference of scienter at the pleading stage. *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d at 389. Hence, the Court holds that Defendants' efforts to minimize the impact of the violations are unpersuasive

Finally, Defendants contend Plaintiff has neglected to show "Defendants knew about or recklessly disregarded the material weakness before it was discovered and disclosed in 2013" and thus conclude this Court's previous order failed to analyze scienter with respect to the alleged material weakness. *Id.* at 21. Defendants are mistaken. This Court rejected this argument explicitly when it wrote: "Plaintiff has alleged facts that give rise to a strong inference

of the existence of recklessness by claiming that Defendants had information about the true nature of its business conditions and performance." *Epstein*, 2015 WL 2365701, at *7. This prior holding is especially true where the Second Amended Complaint largely sets forth the same allegations as the Amended Complaint, in addition to asserting new statements Plaintiff avouches reveal Defendants' knowledge. *See* ECF No. 138 at 21.

Although this Court declines, under the law of the case doctrine, to reconsider its treatment of allegations already discussed in its prior Order without a showing of clear error, these allegations still carry weight in a holistic analysis determining the existence of scienter. Factors Plaintiff alleges indicating the presence of scienter include: Defendants' close monitoring of the Company's day-to-day business and corporate practices; accounts from Plaintiff's confidential sources regarding the business culture; government scrutiny and investigation; the receipt of the NORA letter as a result of information provided by the Company during CID discovery; the resignation of the Company's three most senior executive officers; and the "backdrop" of the identification of the material weakness, major changes in business practices, and KPMG's resignation.

Keeping all of the factors in mind and taking Plaintiff's factual allegations as true, this Court holds Plaintiff has alleged facts giving rise to a strong inference of the existence of recklessness, which is at least as likely as any opposing inference. *See Tellabs*, 551 U.S. at 323-24. Further, Plaintiff's allegations reveal Defendants acted with scienter at the time they made the challenged statements. *See in re PEC Sols., Inc. Sec. Litig.*, 418 F.3d at 388. Thus, Plaintiff satisfies the PSLRA with respect to this element.

3.    *Loss Causation*

Plaintiff avows in its Second Amended Complaint that eight partial corrective disclosures revealed the truth about World Acceptance's illicit lending practices and artificially inflated loan growth.  ECF No. 126 at 136-58.  Defendants argue the alleged disclosures are insufficient to establish their alleged fraud was the cause of Plaintiff's losses.  ECF No. 132-1 at 20-32.

In a private securities fraud action, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  A loss is actionable when a plaintiff has sufficiently pled a corrective disclosure, or in other words, where "the [stock] price fell after the truth came to light about a misrepresentation, and . . . the plaintiff suffered damages as a result."  *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 478 (4th Cir. 2006).  In addition, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures [prompted] the stock price deflation."  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) (internal citations omitted).

The parties are in disagreement on what standard Plaintiff must meet to plead adequately loss causation.  According to Plaintiff, "[l]oss causation is not one of the elements with respect to which the PSLRA imposes a more stringent pleading requirement."  *Hunter*, 477 F.3d at 185.  According to Defendants, however, the Court is to "review allegations of loss causation for sufficient specificity, a standard largely consonant with Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be pled with particularity."  *Katyle*, 637 F.3d at 471. (citation omitted) (internal quotation marks omitted) (footnote omitted).

Inexplicably, although each party cites to Fourth Circuit law for their competing positions, neither party briefed the Court on how or if it is possible for the Court to reconcile the

holdings in the two cases. The Court is unconvinced that it is. Nevertheless, it is quite settled in the Fourth Circuit as to conflicts between panel opinions, application of the basic rule that one panel cannot overrule another requires this Court follow the earlier of the conflicting opinions. *See Booth v. Maryland*, 327 F.3d 377, 383 (4th Cir. 2003).

A panel of the Fourth Circuit decided *Hunter* in 2007 and another panel decided *Katyle* in 2011. Therefore *Hunter* controls the standard that the Court has employed in determining if Plaintiff's causation claim can survive Defendants' motion to dismiss. The Court notes, however, that even if it were to apply the *Katyle* standard, it would find that Plaintiff has met that pleading requirement as well.

Plaintiff's complaint contains three previously alleged disclosures and five new partial disclosures, all of which are described above. The partial disclosures Plaintiff re-asserts, which this Court deemed sufficiently alleged loss causation in its prior Order, are as follows:

(1) The July 25, 2013, revelation that a material weakness had been found in the Company's small dollar renewals, which comprised up to 25% of the Company's renewals;
(2) The March 13, 2014, receipt of a CID from the CFPB to look into "potentially unlawful practices" at World Acceptance, followed by a stock price decrease of 20%;
(3) The April 29, 2014, announcement of systemic changes in the Company's renewal policies, resulting in a 10% fall in stock price.

ECF No. 126 at 136-58; *see Epstein*, 2015 WL 2365701, at *8. The five newly alleged partial disclosures are:

(1) The July 3, 2013, admission that World Acceptance could not file a Form 10-K due to the possibility of the existence of a material weakness, after which the Company's stock price fell 12%;
(2) The November 4, 2013, announcement that Defendant Roland, World Acceptance's COO, had resigned, leading to a 12% decline in stock price;
(3) The September 5, 2014, resignation of KPMG as the Company's auditor, followed by a 7.5% stock price decrease on the next trading day;
(4) The June 2, 2015, announcement of Defendant McLean's retirement as CEO, after which the stock price dropped over 5%;

(5) The August 10, 2015, announcement of the receipt of a NORA letter from the CFPB, leading to a fall of more than 34%.

*Id.*

The Court will focus its analysis on the newer disclosures, including the announcement of the possibility of a material weakness, the three resignations, and the announcement of the receipt of the NORA letter.  In addition, Defendants specifically request this Court reconsider its prior holding in connection to the March 13, 2014, announcement, so this Court will delve more deeply into its discussion of that disclosure, despite the fact the Court has already addressed it.

Defendants urge "losses caused by market speculation—rather than an actual revelation of fraud—are not recoverable under the securities laws."  ECF No. 132-1 at 21; *see Katyle*, 637 F.3d at 477 ("Speculation and conjecture . . . in the context of market prognostication [do] not suffice to establish a fact.").  Defendants then move to discredit the July 2013 disclosures, arguing because the July 3, 2013, announcement stated only that it was "possible" a material weakness would be reported, any ensuing stock price drop stemmed from speculation rather than the revelation of any fraudulent conduct.  ECF No. 132-1 at 22.

The bright-line rule Defendants attempt to create is a misinterpretation of *Katyle*, in which the Fourth Circuit noted the plaintiff's "alleged disclosures told the market nothing factually about the deal's prospects that it had not already heard, repeatedly."  637 F.3d at 477.  Thus, *Katyle* stands in stark contrast to the case before this Court in which the July 3 announcement presented new information to the market.  Further, the announcement discussed more than simply the possibility of a problem, instead explaining the Company was experiencing "unexpected delays" at the time and was undergoing an "ongoing assessment" of accounting problems and working "to remediate" these issues.  ECF No. 138 at 32-33.

Defendants also recycle arguments from their previous motion to dismiss, stressing that after July 19, 2013, when the Company filed its Form 10-K revealing it had suffered a material weakness, the stock price increased.  ECF No. 132-1 at 23.  They propound that the July 25, 2013, quarterly earnings call when they addressed the material weakness thus cannot be a corrective disclosure because the material weakness had already been disclosed six days earlier. *Id.*; *see Hunter*, 477 F.3d at 187-88 ("To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts.").  Plaintiff, however, is correct in asserting this Court rejected this argument in its prior Order when it held Plaintiff sufficiently pled loss causation with this partial disclosure.  *See Epstein*, 2015 WL 2365701, at *8.  In addition, Plaintiff aptly notes the earnings call "did not simply repeat or confirm information in the Form 10-K" but rather "revealed specifics surrounding the nature and impact of the material weakness" and disclosed the significance of the portion of the Company's loan renewal portfolio this weakness would affect.  ECF No. 138 at 27.

Next, Defendants reassert the April 29, 2014, announcement of systemic business changes fails as an allegation of a corrective disclosure because, although the announcement revealed this policy change resulted in a decrease in the previous quarter's loan volume and growth, it also "did not show any . . . prior figure to be false or misleading."  ECF No. 132-1 at 25.  The Court, however, addressed this argument in is previous Order and, giving Plaintiff's factual allegations the benefit of the doubt, the Court again deems persuasive Plaintiff's argument this announcement "directly linked [this] disclosure[] to Defendants' fraud because [it] revealed that Defendants' predatory lending practices had boosted the Company's finances, which then suffered when those practices were curtailed."  ECF No. 138 at 31 (emphasis

omitted).  Plaintiff also avows the announcement "directly contradicted Defendants' misleading assurances the Company's material weakness in internal control had no material impact."  *Id.*

In addition, Defendants profess Plaintiff failed to show the series of resignations—including COO Defendant Roland on November 4, 2013, KPMG on September 5, 2014, and CEO Defendant McLean on June 2, 2015—constitute corrective disclosures.  ECF No. 132-1 at 25-26, 30-32.  First, Defendants argue KPMG's resignation "revealed nothing about any alleged fraud" where the Company had "no disagreements" with KPMG and there were "no issues with the Company's financial statements," so the announcement merely reassured investors the resignation was unproblematic.  *Id.* at 25.  Second, Defendants argue the executives' resignations were too far removed from the alleged fraud, if at all connected, to be considered a corrective disclosure, and they cite several cases from other circuits indicating similar sentiments.  *Id.* at 31; *see, e.g.*, *In re Omnicom Grp. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (explaining "[t]he generalized investor reaction of concern . . . is far too tenuously connected . . . to the [fraudulent] transaction to support liability" on a review on appeal of a motion for summary judgment); *see also United States v. Hatfield*, No. 06-CR-0550 (JS) (AKT), 2014 WL 7271616, at *11 (E.D.N.Y. Dec. 18, 2014) (holding, on review of memoranda submitted by the parties regarding the restitution to be assigned during sentencing, "[t]he announcement of [the] resignation should not be considered a corrective disclosure, because at the time of the resignation, investors had no reason to suspect that it was indicative of any fraud by Defendants.").

To this Court, however, it appears those courts' decisions were based on individualized facts, in which the resignations were too isolated or attenuated from the alleged fraud to indicate new information to investors.  Further, as already noted, neither of the cases cited by Defendants

considers the loss causation element on a motion to dismiss, so their procedural postures critically differ from the case before this Court.

Under different circumstances, courts have held resignation announcements can be corrective disclosures where they are viewed collectively with other disclosures.  *See, e.g.*, *Pub. Emps. Ret. Sys. of Miss., P.R. Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 318 (5th Cir. 2014) (finding announcements of executive resignations adequately plead loss causation). Unlike the cases cited by Defendants, *Amedisys* evaluates loss causation at the motion to dismiss stage.  *See id.* at 319.  When viewing the resignation announcements in combination with the other alleged partial corrective disclosures—which is what Plaintiff argues should be done here—this Court holds these partial disclosures are sufficiently pled to withstand a motion to dismiss, particularly because it is inappropriate at this stage to weigh competing factual interpretations.  *See Zak*, 780 F.3d at 601 (stating a plaintiff's facts are accepted as true in a motion to dismiss).

Finally, Defendants insist the two announcements of CFPB action on March 31, 2014, and the August 10, 2015, NORA letter, fail to constitute corrective disclosures, as the announcement of a government investigation conclusively reveals nothing.  ECF No. 132-1 at 26-30.  This Court rejected in its prior Order Defendants' arguments regarding the March 31 receipt of the CID, which Defendants rehash in this Motion to Dismiss, holding the announcement of the CID a sufficiently pled partial corrective disclosure.  But, Defendants argue that this holding was made in error.  Consequently, the Court will readdress the same arguments again here.  ECF No. 132-1 at 30; *see Epstein*, 2015 WL 2365701, at *8.

Defendants advance that this partial disclosure—in addition to the August 10, 2015, announcement of the receipt of a NORA letter—fails to correct a specific prior statement and

any resulting stock price drop must have been founded on mere market speculation. ECF No. 132-1 at 26. Again, Defendants attempt to create a bright-line rule from the holding of *Katyle*, 637 F.3d at 477, arguing first, successive disclosures revealing an "ever-mounting risk" of a negative event fail to constitute a partial corrective measure and second, the announcement of a government investigation can never be a corrective disclosure. ECF No. 132-1 at 28. To support their assertions, Defendants cite a variety of cases from other circuits concluding the disclosures regarding the government investigation alleged are impermissible. They also quote a large passage from *Meyer v. Greene*, 710 F.3d 1189, 1200-02 (11th Cir. 2013) for the same proposition. *Id.*

This Court is unpersuaded by Defendants' arguments, as Defendants' interpretation of *Meyer* is fundamentally misguided. Although Defendants attempt to have this Court outright ban the use of announcements of government investigations as corrective disclosures, the language on which they most heavily rely, both from *Meyer* and from other cases, implicitly suggests these investigations can be adequate to constitute a partial disclosure when alleged in combination with other corrective disclosures. *See Meyer*, 710 F.3d at 1201 (explaining "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure" and "the investigations, in and of themselves, [do not] reveal to the market that a Company's previous statements were false or fraudulent."); *see also Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("[W]e hold that the announcement of an investigation, without more, is insufficient to establish loss causation."). Here, there are more partial corrective disclosures, in addition to the two regarding the government investigation.

Plaintiff's allegations are appropriate, emphasizing the two government investigation disclosures reveal a showing of prior misstatements and fraudulent activity that led to loss when

viewed in combination with its other six alleged partial corrective disclosures.  ECF No. 138 at 29.  Plaintiff's alleged disclosures are to be viewed holistically, rather than considering each as an allegation of a full disclosure in and of itself.  *Id.*; *see Meyer*, 710 F.3d at 1201.

Defendants' citations to numerous district court cases are unpersuasive and fail to create a bright-line rule against the use of government investigations as partial corrective disclosures. *See, e.g.*, *Caplin v. TranS1, Inc.*, 973 F. Supp. 2d 596, 608-10 (E.D.N.C. 2013) ("[T]he announcement of a subpoena by itself was insufficient").

In addition, Defendants purport the cases they cite are "more faithful to both Supreme Court and Fourth Circuit precedent" than other cases holding these investigations can be deemed partial corrective disclosures.  ECF No. 132-1 at 29.  The Court is unpersuaded, just as the Fifth and Ninth Circuits were.  *See, e.g.*, *Amedisys*, 769 F.3d at 325 (holding "[t]he district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud."); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (holding government investigations were adequate partial corrective disclosures, as "any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false.").  In light of Defendants' deeply flawed argument, this Court is unconvinced government investigations are impermissible as partial corrective disclosures and thus holds incorrect Defendants' conclusion that the Court's prior conclusion on this matter was made in error.

Defendants go on to declare any stock price drop resulting from the announcements of the government investigation "may well have arisen from a host of non-fraud factors, including the market's perception that the CFPB's investigation would continue to be costly and distracting

for the Company." ECF No. 132-1 at 27. But that there is another possible factual explanation fails to render Plaintiff's allegations meritless. At this stage of litigation, as already observed, Plaintiff's factual allegations are accepted as true. *Zak*, 780 F.3d at 601. Further, a "fact-for-fact disclosure of the relevant truth" is an unnecessary prerequisite to establishing loss causation." *See Katyle*, 637 F.3d at 472.

Finally, Defendants discuss the resignation of Defendant Malson on September 10, 2013, as if it were a partial disclosure. Nowhere in Plaintiff's "Loss Causation" section of the Second Amended Complaint, however, does Plaintiff allege Defendant Malson's resignation was a partial corrective disclosure, so this Court declines to treat it as such here.

This Court holds Plaintiff satisfactorily pleads how the partial disclosures revealed the Company's illicit practices to the market over time, as well as pleads a causal connection between the partial corrective disclosures, Defendants' alleged fraudulent conduct, and the resulting loss via stock price drop. Further, this Court's decision as to the two announcements regarding government investigation are not dispositive of the Court's holding that Plaintiff has sufficiently pled loss causation. The other partial corrective disclosures, viewed together, sufficiently plead a causal link between Defendants' misrepresentations and the decline in stock price. Stated differently, even if this Court were to agree with Defendants' argument that the announcements of government investigations are improper considerations, it would fail to affect the outcome of the Court's holding on this issue. Thus, Plaintiff has alleged loss causation sufficiently to withstand Defendants' motion to dismiss.

Because Plaintiff has adequately pled each of the elements Defendants contested— misrepresentations and omissions, a strong inference of scienter, and loss causation—this Court holds Plaintiff has sufficiently pled a claim under § 10(b). And, as already noted, even if the law

of the case doctrine was inapplicable, the outcome would be unchanged, as Defendants have failed to marshal any arguments in their motion to change the Court's view of the law or facts in the action from when it considered their arguments in the first motion to dismiss. Thus, Plaintiff's § 10(b) claim will survive Defendants' motion to dismiss.

### C.    Section 20 Derivative Claims

Finally, Plaintiff alleges Individual Defendants are liable under § 20(a) of the Exchange Act, as their statuses as senior executive officers render them "controlling persons" within the meaning of the Act.   Section 20(a) imposes secondary liability, jointly and severally, on any person who "controls" the primary violator of the Exchange Act.  15 U.S.C. § 78t. Section 20(a) liability is derivative of a finding of liability under § 10(b).  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014).

Due to the complexity of assessing control person liability, this question is "'not ordinarily subject to resolution on a motion to dismiss,' and dismissal should be granted only when 'a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.'"   *Id.* (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998)).

In its previous Order, this Court held that because Plaintiff sufficiently stated a claim for primary liability under § 10(b), the § 20(a) claims should also survive dismissal.   Plaintiff's Second Amended Complaint sets forth the same arguments as its Amended Complaint, in addition to providing further instances of statements issued by Individual Defendants in connection with the § 10(b) claim.  *See, e.g.*, ECF No. 126 at 41, 43-44, 46-47, 99, 106, 111-12, 117, 121, 136.

In their Motion to Dismiss, Defendants fail to contest whether Individual Defendants were controlling persons during their time at the Company, contending only that because the § 10(b) claim fails, the § 20(a) claim must also fail.  Because this Court holds Plaintiff adequately pled a primary violation under § 10(b) of the Exchange Act, however, it declines to dismiss Plaintiff's § 20(a) claims.  Plaintiff sufficiently pled facts in which a conclusion Individual Defendants were controlling persons can be reasonably inferred.

**VI.     CONCLUSION**

Wherefore, based on the foregoing discussion and analysis, it is the judgment of this Court Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint is **DENIED**.

**IT IS SO ORDERED**.

Signed this 24th day of August, 2016, in Columbia, South Carolina.

s/Mary Geiger Lewis_____
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE